## FINDINGS OF FACT AND DECISION

Case Number: ▬▬▬

Student's Name: ▬▬▬▬▬▬

Date of Birth: ▬▬▬▬▬

District: 2

Hearing Requested By: Parent

Dates of Hearing: February 16, 2007
April 27, 2007
May 2, 2007
June 7, 2007

Hearing Officer: Martin Schiff, Esq.

Hearing Officer's Findings of Fact and Decision                                1

Case No. ▓▓▓▓▓

---

## NAMES AND TITLES OF PERSONS WHO APPEARED FEBRUARY 16, 2007

| ▓▓▓▓▓ | Parent and Co-Counsel | |
| | Parent and Co-Counsel | |
| Felicia Polikoff | Chairperson Designee, CSE Region 9 | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED APRIL 27, 2007

| ▓▓▓▓▓ | Parent and Co-Counsel | |
| | Parent and Co-Counsel | |
| Carol Fiorile | Educational Consultant | Parent |
| Chigusaweekley Haldeman | ABA Therapist, McCarton School | Parent |
| Ivy Feldman | Director, McCarton School | |
| Felicia Polikoff | Chairperson Designee, CSE Region 9 | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED MAY 2, 2007

| ▓▓▓▓▓ | Parent and Co-Counsel | |
| | Parent and Co-Counsel | |
| Paul Fraioli | Paralegal | Parent |
| Felicia Polikoff | Chairperson Designee, CSE Region 9 | Department of Education |
| Dewey Aleem (Via Telephone) | School Psychologist | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 7, 2007

| ▓▓▓▓▓ | Parent and Co-Counsel | |
| | Parent and Co-Counsel | |
| Paul Fraioli | Paralegal | Parent |
| Felicia Polikoff | Chairperson Designee, CSE Region 9 | Department of Education |
| Anne-Marie Babcock (Via Telephone) | Director of Admission | Department of Education |
| Tina Covington (Via Telephone) | School Director | Department of Education |
| Dewey Aleem (Via Telephone) | School Psychologist | Department of Education |

Hearing Officer's Findings of Fact and Decision                    2

Case No. ████

---

On December 8, 2006 I was appointed to hear the matter █████ pursuant to the Individuals with Disabilities Act (IDEA), 20 U.S.C. 1415 (f)(1) and <u>Florence County School District Four v. Carter by Carter</u>, 114 S.Ct. 361 (1993). The matter came on for a hearing on February 16 , 2007 which was continued on April 27, 2007, May 2, 2007, and June 7, 2007. The hearing was completed on June 7, 2007. At this time the proceedings were closed, and no further testimony was taken. There were post-hearing closing statements submitted. Appended to the record is a list of persons in attendance and evidence submitted.

It is noted that this is a parental request for an impartial hearing based on the allegations  that: (1) the school district failed to offer their child, █████, a 10-year-old boy diagnosed with an autism, a free and appropriate education (FAPE) in the least restrictive environment (LRE) for the twelve month 2006-2007 school year including the summer of 2007; and (2) the school district's failure necessitated the parents taking the initiative: (a) to enroll their child and pay for his tuition at the McCarton School; (b) to arrange to receive supplemental extended day ABA support for their child in a McCarton-affiliated home instruction program. The parents seek reimbursement of $129,000 from the Department of Education (DOE) for all of their costs in the combined school-based and home-based programs set forth above.

It is the position of the Department of Education (DOE) that its IEP of June 23, 2006 was procedurally and substantively valid and correct and offered █████ the child in question a FAPE as required by law and as set forth in the <u>Burlington/Carter</u> court mandate. The placements offered the parents for consideration, the DOE contends further, were not considered in good faith because the parents had already made up their minds to enroll their child at the McCarton School. Therefore, the parents have failed to make their case and meet their burden of proof under prong one of <u>Burlington/Carter</u>. In addition, the DOE argued, the parental selection of the McCarton School has not provided the child with a FAPE as required by prong two of <u>Burlington/Carter</u>. Finally, the DOE claimed that the parents had not cooperated with the DOE in its efforts to secure an appropriate placement for this child, thereby failing to satisfy the criteria of prong three of

Hearing Officer's Findings of Fact and Decision                                    3

Case No. ████

---

Burlington/Carter as is required to secure reimbursement for private school tuition payments.

THE DEPARTMENT OF EDUCATION'S CASE

1st Hearing Date: February 16, 2007

Ms. Felicia Polikoff, a school psychologist, represented the school district. She argued in her opening statement that the DOE does not concede that it did not offer this child a FAPE. The case was deferred to the central based support team (CBST) "because we felt a non-public school program would be appropriate to meet the needs of this child ...." [Tr. at 32] The DOE disagreed, however, with the parents' choice of the McCarton School since "it's not an approved school." [Tr. at 33] "However, we did offer several schools that we believe would have been appropriate, and it is our contention here that the parents did not fully cooperate with the placement process and that they did not fully investigate the schools that we offered. They did not go on the interviews. They did not tour the schools even though the schools did make outreaches to make appointments. They declined those appointments and stated that they already had an appropriate placement that they were happy with." [Tr. at 33]

2nd Hearing Date: April 27, 2007

The school district presented no direct case for the DOE on this date but confined its case to cross-examination of the parents' witnesses.

3rd Hearing Date: May 2, 2007

The school district called as its first witness Dr. Dewey Aleem, a school psychologist who attended the IEP meeting of June 23, 2006. He noted that he did not directly tell the parents that ████ needed a 1:1 teacher to pupil ratio but that he was not allowed to put that on the IEP. He noted also that a crisis management professional was added as a related service because "there was some concern about ████ behavior." [Tr. at 391] The reason that no staffing ratio was put into the IEP was because it was felt that the non-public school which the child was expected to attend would make a decision on the ratio. [Tr. at 394]

On cross-examination the parents questioned him as to why he checked off 3

Hearing Officer's Findings of Fact and Decision                                    4

Case No. ████████

different boxes on the IEP regarding ██████ behavior needs. His response, in essence, was "your input was very relevant in terms of checking off the appropriate box." [Tr. at 409] He was adamant that he never acknowledged that the child needed a 1:1 teaching ratio and did not recall that any school district personnel at the IEP meeting made any such acknowledgment.

Further, on cross-examination, the parents questioned the bonafides of Bern University from whom Dr. Aleem acquired his Ph.D. degree. He testified that he attended the St. Kitt's campus of Bern University "for about two to three months residency." [Tr. at 418] He acknowledged that Bern University was never accredited by the American Psychological Association (APA). The school later changed its name to Bernelli which is also not accredited. [Tr. at 419-420] He agreed that Bern/Bernelli University was primarily an on-line school. [Tr. at 424]

4th Hearing Date: June 7, 2007

Anne-Marie Babcock, the Hawthorne School's Director of Admissions, was the DOE's first witness on this date.

She testified that on July 24, 2006 the Hawthorne School had an opening for a child, and so she "left a message on Dad's work number." [Tr. at 529] "Now sometime in August, it wan't me, maybe it was my assistant, but the family had called because there's a note on this form that I have that we closed the file because the parent told us that they have another placement." [Tr. at 530] Then "a letter was sent [by Hawthorne] to the Board of Education that we closed the file because the parent had another placement." [Tr. at 531] She had no note to confirm or deny that "staff members speaking with any of the parents to say that they believe together that this was a joint decision that the program wouldn't be appropriate." [Tr. at 53] On cross examination, the "person who wrote parent found another placement, was that Katy, your assistant?" asked ██████ the child's father. The response from Ms. Babcock was "Right." [Tr. at 534] Her full name is Katherine O'Dell. [Tr. at 539] Ms. Babcock admitted that she had no knowledge of the full conversation that ██████ had with Ms. O'Dell regarding a possible placement for the child at Hawthorne. Ms. Babcock was not herself available to speak to the parent because she

Hearing Officer's Findings of Fact and Decision                                    5

Case No. 

---

went on maternity leave at the beginning of August 2006. [Tr. at 538, 540]

On re-direct examination, Ms. Babcock testified that it is possible for a student to receive a 1:1 program throughout the day. [Tr. at 544] She also stated that Katherine O'Dell did not "have the authority to make a decision that the placement would not be appropriate." [Tr. at 546] Ms. Babcock said that she was "the one who's responsible for setting up the tours and talking with having the parents come in." [Tr. at 546]

On re-cross examination, Ms. Babcock agreed that when she was "getting ready to go out on maternity leave it is correct that you would tell parents when you left messages that they could call back either you or your assistant, Katy." [Tr. at 547]

Dr. Dewey Aleem returned as a witness in the school district's direct case. He cited Exhibit 22, a letter issued by the White House promoting foreign study, as inspirational for him to "continue my study abroad specifically at Bern University." [Tr. at 562] He also submitted Exhibits 17, 18, 19, 20 and 21 in support of the accreditation of Bern University at the time that he received his Ph.D. degree.

On cross-examination, the parents determined that Bern/Bernelli University was never accredited by the American Psychological Association (APA) and is not recognized by the N.Y. State Office of Professional Responsibility, the Middle States Association of Colleges and Schools and others. [Tr. at 582-589] The cross-examination also established that the U.S. Department of Education withdrew certification from Bern/Bernelli University because "they did not believe that a school or student could in fact earn credit hours at the rate that Bern University purported to grant credits." [Tr. at 512] It was determined further that the 21 credits earned by Dr. Aleem, according to the Bern transcript, in the summer of 1998 could not have been earned based on the normal academic standards of class attendance per credit hour. It was also shown on cross-examination that Exhibit 22, cited by Dr. Aleem as inspirational for him to study abroad, was dated April 24, 2000 whereas he had already completed all of his courses at St. Kitts in the summer of 1998. [Tr. at 593-611]

The school district's next witness was Tina Covington, the director of the Hawthorne School. She testified that the school was able to provide 1:1 ABA instruction

Hearing Officer's Findings of Fact and Decision                                6

Case No. ▨▨▨▨▨

---

for students with severe impairments. [Tr. at 615, 618] On cross-examination ▨▨▨▨ determined that "when a student has a 1:1 aide, that student has that 1:1 aide during small group instruction" or 'during large group instruction." [tr. at 624]

THE PARENTS' CASE:

1st Hearing Date: February 16, 2007

▨▨▨▨, the child's father and co-counsel, and ▨▨▨▨▨▨ the child's mother and co-counsel, summarized the parents' case in their opening statement. The parents were seeking reimbursement for the school year beginning September 2006 for the costs which they incurred in connection with the placement of their child at the McCarton School and the McCarton-affiliated home-based program for their child. [Tr. at 17] ▨▨▨▨. described his child as autistic with Landau Kleffner Syndrome, "a kind of epilepsy where the child doesn't have clinical seizure like a grand mal seizure but during the nighttime has epileptic type abnormal brain waves that cause disruption to the part of the brain that control language and impulse control." [Tr. at 24] He argued that the Department of Education (DOE) does not dispute the classification nor that his child needs one on one instruction. [TR. at 25] The best that the DOE could provide is a 6:1 educational setting which is not adequate for this child. The DOE is disputing payment for his after-school program which is the home-based portion of the McCarton School curriculum. [Tr. at 26] The child receives 3 hours per day of home instruction, 7 days a week. "It's a prescribed part of the integrated McCarton School curriculum." [Tr. at 26] He contended that the DOE offered two private schools for enrollment of their child for the 2006-2007 school year, but the schools "did not and do not have appropriate placements given where Henry is." [Tr. at 26] The child's home program is a critical part of his education since without it he will perseverate and regress "and likely lose whatever he's gained during the school day." [Tr. at 30] The total reimbursement request for the combined day and home-based program at McCarton is approximately $124,000. [Tr. at 31]

▨▨▨▨▨▨ the child's mother, was the parents' first witness. She described her child as a 9-year-old boy turning 10 in May 2007. Her child has autism spectrum disorder and Landau Kleffner Syndrome. [Tr. at 37] She described how these conditions severely

Hearing Officer's Findings of Fact and Decision                                    7

Case No. █████████

---

delayed his development since early childhood. [Tr. at 37-40] The Gillen Brewer School in which he had been enrolled reported to the parents in November 2001 that their school was not for ████████ since "████ could not learn in group settings, and he needed to be taught one on one." [Tr. at 40]

███████████ testified further that ███████ started at the McCarton School in September 2002 "with a program during the school day and then as part of the curriculum a home program." [Tr. at 53] His instructional ratio at the school "is always one on one." [Tr. at 54-55] He receives occupational therapy at the school through a "sensory gym." [Tr. at 55] The school does not provide physical therapy but works on building his physical strength through a climbing wall, a treadmill and various ABA techniques. [Tr. at 55-56] He also receives speech therapy there.

The most recent IEP meeting was June 23, 2006. █████classroom teacher from the McCarton School attended the IEP meeting, ████████continued, and emphasized "the need for███████to have a strict one on one learning environment." [Tr. at 61] Lois Sigler, a DOE employee who attended the meeting, told the group████████contended, that "we're not allowed to recommend one to one." [Tr. at 61] Ms. Sigler said, allegedly, that she would not put down a 1:1 ratio on the IEP. The IEP team members, ██████████ continued, did not contest the child's need for a 1:1 ratio but maintained simply that they could not make such an IEP recommendation. The recommendation was to defer the matter to CBST. [Tr. at 62] [Exh. B-9] In prior IEP's the recommended staffing ratio, after the notation of "defer to CBST," had been 6:1:1. However, at the June 23, 2006 IEP meeting, no staffing ratio at all was put down next to the words "defer to CBST." [Tr. at 63] She noted also that the IEP had the following sentence: "Special class in a special school would not provide enough support for Henry." [Tr. at 64] The IEP's related service recommendations of occupational therapy, and speech and language therapy were for a group size ratio of 1:1. A crisis management paraprofessional was also assigned to Henry. [Tr. at 65]

██████████ testified further that one-half of the McCarton School tuition, or $42,000, was due on September 5, 2006. [Tr. at 74] A payment of $42,000 was in fact

made on August 4, 2006 to reserve a place for the child at the McCarton School. This is an unrefundable amount. [Tr. at 74] ▬▬▬ emphasized that :I'm not stuck on one on one in the sense that I would love it if ▬▬▬ were able to function in a less restrictive environment. It's just unfortunately that's where he is now, and I [am] so very hopeful for him ... that someday that will be different but that's not where he is remotely." [Tr. at 89]

Under cross-examination by Ms. Polikoff, ▬▬▬ noted that Dr. Aleem, the school psychologist who attended the June 23, 2006 IEP meeting, showed marked inconsistencies in how he evaluated ▬▬▬. The inconsistencies, she noted, are obvious in a review of what he wrote on the IEP. [Exh. P-9][Exh. 4] Dr. Aleem checked three different boxes regarding whether the child's behavior interferes with instruction and can be addressed by the classroom teacher. The three boxes were each inconsistent with the other two. The first two boxes were crossed out when Dr. Aleem was criticized by ▬▬▬ ▬▬▬ for checking them off and then Dr. Aleem checked off the box which says "behavior requires highly intensive supervision." The last check-off box amounted to a complete about-face from the first box which he had checked off which says "behavior does not seriously interfere with instruction and can be addressed by the special education classroom teacher." [Tr. at 110-111]

Still on cross-examination by Ms. Polikoff, ▬▬▬ observed that "the Department of Education specified that it had rejected the idea of a six to one to one setting even if that setting included a one to one aide, occupational therapy, speech or any combination of the above." [Exh. A][Exh. 2] Ms. Polikoff agreed. [Tr. at 113] ▬▬▬ added that the 6:1:1 was inappropriate whether the placement was in a public or a private school. [Tr. at 114] Dr. Aleem stated: "We'll defer to the CBST. Maybe they'll find something." [Tr. at 114-115]

▬▬▬ on further cross-examination said that there cane a time that a Doe-approved private school, the Hawthorne Country Day School, contacted the parents about a possible placement for 2006-2007. She investigated the particulars about the school through the internet and through materials supplied by the DOE. [Exh. 16] ▬▬▬ pointed out that on the 13th page of Exhibit 16 [Exh. 16-13], "it notes that the school

provides for those who are five to seven years old a ratio of 6:1:2 but is silent on the ratios provided for those who are nine [such as ▮▮▮▮." [Tr. at 117-118] She added: "On page 16-11 it refers to one of the measures of a teacher, in other words a way to measure teacher-supervised performance the ability to manage other students in the classroom that are not in one on one instruction." [Tr. at 118]

In response to Ms. Polikoff's question as to whether ▮▮▮▮▮ was "aware that the Hawthorne Country Day School provides one to one instruction," [Tr. at 119] ▮▮▮▮▮ responded, in part: "the student receives individualized instruction in a large group, small group and one on one environment.... What that basically means is that to the extent that ▮▮▮▮ is not in a one on one environment but instead is in a large group or small group it's a waste of his educational time because he's not yet able to learn in that format." [Tr. at 119]

The Hawthorne School contacted her, as ▮▮▮▮▮ recalled for Ms. Polikoff, in July or August of 2006. She recalled also that a school named Devereux Millwood contacted the parents in mid-September 2006 after the non-refundable deposit of $42,000 had already been paid to the McCarton School. [Tr. at 121] ▮▮▮▮ had also already started the school year.

2nd  Hearing Date: April 27, 2007

▮▮▮▮▮ continued the parents' case on re-direct examination. She noted that she had calculated closely since the last hearing date the costs of the child's home-based program to date, and such amount is approximately $35,000 with four months still to go for the 12-month school year. So the total cost will come to approximately $45,000 for just the home-based program. [Tr. at 130]

The parents' next witness was Dr. Carol Fiorile, an independent educational behavioral consultant. She has evaluated between 700 and 1000 children with autism. [Tr. at 135] She has taught or observed approximately 2000 autistic children. [Tr. at 135-136] She observed and evaluated ▮▮▮▮, both at school and at home (1 hour) [Tr. at 137-138] She found that the McCarton School's behavior plan for ▮▮▮▮ to be "effective". [Tr. at 139] Without McCarton's highly structured program, "▮▮▮ would emit high

Hearing Officer's Findings of Fact and Decision                                    10

Case No. ███████

_____

levels of interfering behaviors." [Tr. at 145] Dr. Fiorile noted that '█████ had difficulty demonstrating behavior flexibility that would enable him to attend a classroom with a ratio higher than 1:1." [Tr. at 145-146] To avoid regression, a major problem for autistic children, she opined that "the home program is an extremely important element of his entire program as well." [Tr. at 150] Her review of his records and his performance at McCarton showed great improvement in vocal imitation and social interaction. [tr. at 153] She found that a 6:1:1 setting would be inappropriate for him "since he is only now being introduced to small group instruction and the time that he is able to sustain attention to the group instruction is very limited to I think two minutes." [Tr. at 155]

Dr. Fiorile is familiar with the Hawthorne Country Day School, one of the private schools recommended for ██████ by the DOE. She has visited the school. To her knowledge, the Hawthorne School does not have a 1 to 1 staff ratio. She believed that "it's a class with a 6:1:1 or 6:1:2 staffing ratio." [Tr. at 160] She viewed Exh. 16, a printout from the Hawthorne website, and interpreted it to mean that the school has no consistent 1 to 1 program for its students. [Tr. at 161-162] She also felt that supervision at Hawthorne left something to be desired. [Tr. at 165-166]

When asked about the Devereux Millwood Learning Center, another private school that was offered by the DOE to Henry, she opined that the school is run by parents rather than professional educators and so is limited generally in its effectiveness. [Tr. at 168]

On cross-examination by Ms. Polikoff, Dr. Fiorile observed about Hawthorne that since it has a ratio of 6:1:1, "each child gets about, if they're lucky, an hour and a half of individual instruction." [Tr. at 178] She noted that one of the Hawthorne School problems was a "high rate of turnover, and if you don't have consistent staff you're not going to develop the staff's skill." [Tr. at 192] Her testimony was that in her opinion the child would not have received a FAPE at hawthorne in 2006-2007. [Tr. at 202-203] Even had ██████ been given a 1:1 setting at Hawthorne, it would have been insufficient in terms of 1:1 time allotted and also because of noise level and lack of teacher experience at Hawthorne. [Tr. at 204-207] ██████ would not have had more than one and a half hours of

Hearing Officer's Findings of Fact and Decision                                    11

Case No. ███████

---

1:1 instruction a day at Hawthorne when he really needs it all day. [Tr. at 208-209]

The parents' next witness was Ms. Chigusa Haldeman, ABA supervisor at the McCarton School. During the 2006-2007 school year she has worked with ████ "to provide direct teaching as well as I develop programs, evaluate his challenging behavior and come up with behavior management programs. I also work with [the] home team and train home therapists to implement what he has acquired at school...." [Tr. at 229] The school and home settings are both 1:1. The school's behavior plan has worked because his behavior is much improved. [Tr. at 237] Goals were set for him to improve expressive and receptive language skills, and also to improve receptive identification and discrimination. Both goals are being achieved. He is able to listen and follow directions which he could not do at the start of the 2006-2007 school year. He needs thousands of repetitions to develop his skills incrementally. [Tr. at 240 and 246] He cannot make progress toward his goals unless he is in a 1:1 setting. [Tr. at 259-260]

Ms. Ivy Feldman, educational director of the McCarton Center, was the parents' next witness. Her testimony reiterated much of Ms. Haldeman's testimony. She noted that while not all McCarton School children need home schooling, ████ autism condition is so challenging that it requires a home program. [Tr. at 299]

3rd Hearing Date: May 2, 2007

███████ the child's father and co-counsel with ████████████ for the parents, was a witness for the parents' direct case. He testified extensively about what took place at the IEP meeting of June 23, 2006. ████ related how Joseph Pierce, the child's teacher at the McCarton School, told the IEP meeting which he was attending that the child needed a "very strict, 1 to 1" educational setting. [Tr. at 326 and 329] Then, "the representatives of the Department told us that they don't provide 1 to 1 teachers...." [Tr. at 330] They added "that they're not allowed to put 1 to 1 on the IEP form. That the best that they're allowed to put on it is 6 to 1 to 2." [Tr. at 331] The city did recommend occupational therapy and speech therapy on a 1:1 basis with the frequency to be increased from 5 to 7 times a week with 60 minute sessions. [Tr. at 331-333] Unlike previous years, no ratio was put down for ████ the matter was referred to the Central Based Support Team (CBST) without a

recommended ratio. He testified about the changing of check-off boxes by Dr. Dewey Aleem on the form which is part of the IEP of June 23, 2006 regarding your child's behavior needs, a matter which was covered in earlier testimony. The following page on the IEP had "crisis management para" written in even though such had not been discussed at the IEP meeting. [Tr. at 338]

The parents were subsequently contacted , ▬▬, continued, by some private schools from a DOE referral list. [Exh. 14] AMAC, one such school, exchanged phone calls with the parents but never invited the parents to consider placement. Brooklyn Blue Feather, another such school, previously visited by the parents, also contacted the parents but made no placement offer. Eden II Institute, also from the referral list, along with Eden II Institute Genesis Program, never contacted the parents. [Tr. at 343] Next on the list was the Hawthorne Country Day School which through its director of admissions, Anne-Marie Babcock, contacted the parents by telephone. [Tr. at 340-344] She left a message "saying that she was about to go out on maternity leave and I could either call her or call someone else. She gave me another, either name or extension or number to call." [Tr. at 344] ▬▬ did research on Hawthorne on the Internet, then called back and made contact with Ms. Babcock's assistant. This was about a month after the IEP meeting of June 23, 2006. He expressed concern to her, ▬▬ testified, about whether Hawthorne could provide Henry with the one-to-one all day program that he needed and also whether the long trip to Hawthorne would interfere with the child's charter-school program. [Tr. at 344-345] He discussed these matters with Ms. Babcock's assistant whose phone number was given to him as the Hawthorn telephone contact. He added that "whoever it was from the Hawthorne School I was speaking to agreed that it was not appropriate and so the result was similar to the conversation I had had with Brooklyn Blue Feather. They did not invite us for an interview and they did not offer a placement." [Tr. at 346-347] Another school from the referral list, the Learning Spring Elementary School, did not contact the parents and "indicated themselves that they had no vacancy appropriate." [Tr. at 347] The next one on the list, the Millwood Learning Center, sent a letter for a parent screening on September 12, 2006. [Tr. at 347-348] However, the child had started the McCarton

School after Labor Day, and the first half of the non-refundable tuition, namely $42,000, had been already paid as required before the Millwood letter was sent. [Tr. at 348] Clearly, an investigation of a possible Millwood placement was not feasible at that point especially since they would not be making a placement decision until October 16, 2006. This would have been six weeks into ███████ school year. [Tr, at 350] Two other schools on the referral list did not contact the parents. None of the schools on the list, ███████, continued, offered the parents a tour of the school as a prelude to possible placement. [Tr. at 353]

The parents' next witness was Paul Fraioli, a paralegal employed at the law firm of the child's mother, ███████ He testified regarding his research on the Internet that showed that since Bern University was denied accreditation, the U.S. Department of Education held that it could not participate in the Federal student aid program. [Tr. at 445-446]  Moreover, the government denied the validity of 18 credits awarded for 4 weeks of classes at St. Kitt's campus. [Tr. at 446] The school catalog description pf courses and credits for the Masters degree indicated: "The Masters degree students would need to be sitting independently or in class for 405 hours within a two week period. A physical impossibility." [Tr. at 446]

4th Hearing Day: June 7, 2007

The parents' case on this date was confined to cross-examination and a closing statement.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Department of Education no longer bears the burden of demonstrating the appropriateness of the program recommended by its CSE. Schaffer, et al. v. Weast., et al., 2005 WL 302815 (2005). The parent now bears this burden. Until this recent change the Department (DOE) bore this burden. Application of a Child with a Disability, Appeal No. 93-9;  Application of a Child with a Handicapping Condition, Appeal No. 92-7; Matter of Handicapped Child, 22 Ed. Dept. Rep. 487, March 11, 1983. To meet its burden, the Department of Education was required to show that the recommended program is reasonably calculated to allow the child to receive educational benefits (Board of

Hearing Officer's Findings of Fact and Decision                                                14

Case No. ▇▇▇▇▇▇
_____

Education v. Rowley, 438 U.S. 176 [1982]) and that the recommended program is the least restrictive environment for the child. {34 C.F.R. 300.550[b]; 8 NYCRR 200.6[a][1]} An appropriate program begins with an IEP which accurately reflects the results of evaluations to identify the child's needs, establishes annual goals and short-term instructional objectives which are related to the child's educational deficits, and provides for the use of appropriate special education services to address the child's special education needs. Application of a Child with a Disability, Appeal No. 93-12; Application of a Child with a Disability, Appeal No. 93-9; Application of a Child with a Handicapping Condition, Appeal No. 92-7; Matter of Handicapped Child, 22 Ed. Dept. Rep 487, March 11, 1983.

It is clear that the legislative intent of 20 U.S. Code Section 1412 of the Individuals with Disabilities Act (IDEA) is to provide a free and appropriate public education to all children with disabilities so that these individuals may ultimately lead productive and independent lives as adults to the maximum extent possible. In furtherance of this, the IEP is designated, essentially, as the blueprint for ensuring the integrity and appropriateness of the child's education. The IEP team's determination of how that child's disability affects his involvement and progress in the general curriculum is the primary tool by which the protections of the IDEA are implemented per sections 1436(d) and 1414(d). It is hoped that, as a tool, the IEP will be proactive rather than merely responsive to crises in educational management. In furtherance of this goal, the Department of Education is constrained to develop a plan which meets the requirements of service delivery in the "least restrictive environment." Specifically, children with disabilities must be educated with children who are not disabled to the maximum extent possible. Separation or removal from the mainstream curriculum is indicated only where the nature or severity of the disability is such that an education in regular classes with the use of supplementary aids and services cannot be achieved successfully.

The instant matter additionally presents the question of whether an impartial hearing officer may order reimbursement for parents who reject both the public and private school offerings from a school district because such offerings are deemed to

Hearing Officer's Findings of Fact and Decision                    15

Case No. 

provide inappropriate education under the IDEA. They then enrolled their child in a private school of their choice. The Supreme Court has established a three-pronged test under <u>School Committee of Burlington v. Department of Education of Massachusetts, 471 U.S. 359 (1985)</u> which defines those circumstances in which a Board of Education may be compelled to reimburse a parent. Under these guidelines a unilateral placement may be reimbursed where: (1) the CSE's IEP is inappropriate; (2) the parents' placement is educationally appropriate; and (3) equitable factors do not militate against a finding of fairness. Moreover, there is no requirement that the placement be State-approved or even that it generates IEP's as part of its educational strategy. <u>Florence County School District Four v. Carter by Carter, 114 S.Ct. 361 (1993)</u>.

In the instant case, the DOE claims that there were no procedural or substantive defects in the CSE meeting of June 23, 2006, that the IEP issued as a result of that meeting was valid and that the placement and program recommended in that IEP provided the child in question with a FAPE pursuant to law. However, the testimonial and documentary evidence presented at this hearing raise certain serious questions about the deliberations of the CSE and the IEP that it issued.

The DOE while not conceding that the child requires a 1:1 pupil to teacher ratio does not object to and offers no testimony opposing the parents' claim that a 1:1 ratio is absolutely essential for the child to have a FAPE under the IDEA. Nor does the DOE case dispute in any way the parent description of the severity of the child's autism coupled with Landau Kleffner Syndrome. Yet the IEP issued by the CSE at its June 23, 2006 meeting offers no staffing ratio at all. There was conflicting testimony about whether or not the parents were told by CSE members Dr. Dewey Aleem and Lois Sigler that they know that the child needed a 1:1 ratio but that they are not permitted to write that ratio as an IEP recommendation. The final CSE recommendation on the IEP was to "defer to CBST" [Tr. at 63] so that the Central-Based Support Team (CBST) would decide both the pupil to teacher ratio and the child's placement.

Where there is conflicting testimony based on verbal assertions which cannot be substantiated or refuted by documentary evidence, a hearing officer must decide the

Hearing Officer's Findings of Fact and Decision                                    16

Case No. ▓▓▓▓▓▓

conflict on the basis of the credibility of the witnesses. Dr. Dewey Aleem, the school
psychologist whose input was the basis of the IEP recommendations, testified that he
observed the child "very briefly. Very brief. Maybe ten minutes or something like that."
[Tr. at 436] Dr. Aleem also showed on his IEP notations marked inconsistencies in how
he evaluated ▓▓▓▓▓ behavioral needs. The inconsistencies were obvious in how he
checked off three different boxes (out of a total of 4) with respect to whether the child's
behavior interferes with instruction and can be addressed by the classroom teacher. Each
of the three boxes was different, and designed to be so, from the other two, and Dr.
Aleem's job was to make an informed selection based on careful deliberation over the
three choices represented by the three boxes. Instead the unrebutted facts are that he first
checked off "Behavior does not seriously interfere with instruction and can be addressed
by the special education teacher." [Tr. at 110-111] [Exh. 4-4 and Exh. P-9] When the
mother, ▓▓▓▓▓▓▓▓▓ objected to that, he then checked off the next box: "Behavior
seriously interferes with instruction and requires additional support." When ▓▓▓▓▓▓
objected to that as well, Dr. Aleem then checked off: "Behavior requires highly intensive
supervision." The last box checked off was a complete about-face from the first box.
What was at stake here was a child's educational future. Such casual checking off of
boxes does not enhance the credibility of Dr. Aleem as a psychologist or as a member of
the IEP team.

    Dr. Aleem allegedly explained regarding the IEP recommendation of "defer to
CBST" without a recommended ratio  that "we'll defer to CBST. Maybe they'll find
something." [Tr. at 114-115] The statement was allegedly made despite the fact that the
IEP also said: "a special class in a special school would not provide enough support for
Henry." [Exh. 4-11 and Exh. B-9] [Tr. at 64]

    To a parent seeking a placement for their child by September 2006, such a deferral
to another body, CBST, made on June 23, 2006 is not very reassuring and cannot inspire
confidence in the deliberations of the CSE. If the school psychologist charged with the
responsibility for a child's educational future spent only ten minutes of his time observing
the child and then casually checked off three inconsistent boxes regarding the child's



behavioral needs, then how credible would a CBST decision be when receiving this deferral from the CSE? How seriously could the CBST consider the child's obvious 1:1 pupil to teacher educational needs when these needs do not appear to be taken seriously by the school psychologist and the IEP team.? Dr. Aleem's credibility was further undermined by irrefutable documentary evidence that his Ph.D. degree in psychology was received from Bern University (later re-named Bernelli University) which, after he received his Ph.D., was decertified as an accredited educational institution and declared by governmental and educational authorities to be a fraudulent on-line diploma mill which awarded Ph.D. credits and degrees on the basis of payments but which were not truly earned. [Tr. at 418-420, 424, 445-446, 562, 582-589, and 592-611] [Exh. 22, J-1, J-2, K-1, L-1, M-1, M-2, and M-3]

It is the decision of this court that the parents are more credible than the DOE's witnesses on the matter of the staffing ratio and that Dr. Aleem, despite his denials, did offer verbal assurances to the parents that the child was entitled to a private school placement that offered a 1:1 staffing but also told them that he would not write this on the child's IEP. These verbal assurances were in conflict with what was written as an IEP recommendation. Moreover, the IEP, as if to placate the parents, had added to it a "crisis management para" [Exh. 4-12] even though there is no evidence offered by the DOE to indicate that this addition was discussed at the IEP meeting. The parents have denied that it was discussed. [Tr. at 338] It is not explained satisfactorily by the DOE how a child who needs an intensive 1:1 relationship with a teacher skilled in dealing with autistic children would have his educational needs addressed by a "crisis management para" whose focus is on preventing and addressing behavioral problems and crises.

The next credibility issue that must be addressed is whether the DOE offered this child a FAPE in the programs and placements offered by the CBST to which this case was deferred. The parents offered testimony that they went through the DOE's referral list of potential private placements after being contacted. [Exh. 14] The parents found that none of the potential placements were suitable either in terms of program or in terms of timeliness. The parents allegedly spoke to representatives of 7 schools: AMAC, Brooklyn

Hearing Officer's Findings of Fact and Decision                    18

Case No. ▓▓▓▓▓▓

Blue Feather, Eden II Institute, Eden II Institute Genesis Program, the Hawthorne Country Day School, the Learning Spring Elementary School, and the Devereux Millwood Learning Center. (There were apparently no contacts from the last three schools on the ten-school referral list.) Of the 7 schools with whom contact was made, only 2, Hawthorne and Devereux Millwood, made pre-placement screening offers. However, Devereux Millwood's parent screening offer could not reasonably be considered by the parents since it was sent and received after the child had started classes, after the parents had made a non-refundable part-tuition payment of $42,000, and with a placement decision date of October 16, 2006, six weeks into the school year.

The DOE focuses its challenge to the parents' claim for reimbursement on the alleged availability of a possibly suitable placement for the child at the Hawthorne Country Day School. The DOE's case is based on testimony from Ann-Marie Babcock, Hawthorne's director of admissions, and Tina Covington, the director of the Hawthorne School. Ms. Babcock stated that it was possible for a student to receive a 1:1 program throughout the day at Hawthorne. [Tr. at 544] She also stated that her assistant, Katherine O'Dell, had no authority to make placement decisions for Hawthorne. [Tr. at 546] Ms. Covington testified that the school was able to provide 1:1 ABA instruction for students with severe impairments. [Tr. at 615 and 618]

The parents argue that they contacted Katherine O'Dell, Ms. Babcock's assistant, who was designated by Ms. Babcock to take calls about possible Hawthorne School placements in Ms. Babcock's absence due to maternity leave. ▓▓▓▓▓ did in fact call Ms. O'Dell after receiving a message to do so on Ms. Babcock's telephone answering machine. He testified that after a brief conversation with her they agreed that Hawthorne was not an appropriate placement for his son. Significantly, Ms. O'Dell is not a witness for the DOE to rebut the parents' testimony at this hearing. In the absence of rebuttal testimony, the parents' version of this telephone conversation is both credible and convincing. It must also be noted that, under the law of agency, even if Ms. O'Dell had no actual authority to make placement decisions, the parents had no way of knowing that. Since the father was given Ms. O'Dell's telephone number to call in Ms. Babcock's

Hearing Officer's Findings of Fact and Decision                                        19

Case No. ███████

---

absence, Ms. O'Dell had apparent authority to make the placement decision in the brief telephone conversation that she had with the child's father. Therefore, the parent at that point could reasonably assume that he had exhausted the DOE's referral list before making arrangements for a private placement not on the referral list, the McCarton School.

Another credibility issue is whether Hawthorne actually has a suitable program for the child aside from what transpired in the conversation between ███ and Ms. O'Dell. The parents introduced evidence from the DOE's own published materials and a Hawthorne website [Exh. 16-13] that, while somewhat ambiguous, implied that the school's focus is on group teaching, both large and small groups, and that even 1:1 teaching is done in proximity to small or large groups being taught at the same time. ]Tr. at 118-119] In fact under cross-examination from the parents, Ms. Covington, Hawthorne's director testified that "when a student has a 1:1 aide that student has that 1:1 aide during small group instruction" or "during large group instruction." [Tr. at 624] Dr. Carol Fiorile, an independent behavioral consultant, also testified that the Hawthorne School did not have a true 1:1 program all day apart from the other children. [Tr. at 208-209] Significantly, there is no unambiguous testimony from any DOE witness that the DOE had a 1:1 placement and program for the child throughout the day, every day, where the child would not be in proximity to other children. The parents direct case which is not rebutted by the DOE is that, under present circumstances, the presence of other children nearby creates negative behaviors in the child and interferes

While the DOE is required to seek a placement and program for a disabled child under the least restrictive environment, the DOE is not bound by this doctrine where it is shown that the nature or severity of the disability is so extreme as to require a highly restrictive environment such as 1:1 all day and not in proximity to any other children. The parents' witnesses, Dr. Carol Fiorile and Ms. Chigusa Hakdeman, ABA supervisor at the McCarton School, and Ivy Feldman, educational director of the McCarton School, provided testimony that the child, to be afforded a FAPE [Tr. at 259-260], required intensive 1:1 instruction all day which must be provided outside of a classroom setting

with other children. [Tr. at 145-146 and 155] The DOE provided no rebuttal evidence with respect to the issue of least restrictive environment. The parents' witnesses along with the parents' own testimony established that the child was making progress at the McCarton School. [Tr. at 53-56, 139, 153, and 237]

The evidence presented with respect to the CSE meeting of June 23, 2006, the deferral of recommendations to CBST, the DOE's referral list of private school offerings, and the Hawthorne School offering establish that the DOE did not offer this child a FAPE for the 2006-2007 school year. The parents, therefore, have satisfied prong one of Burligton/Carter. It follows then that since the parents have satisfied prong one of Burlington/Carter, they have also met their burden of proof and their burden of persuasion under Schaffer of demonstrating that the DOE has deprived their child of a FAPE.

I am now drawn to prong two in which I must determine the appropriateness of the parents' requested relief. It should be noted that there is broad discretion in determining the appropriateness of a program initiated by a parent. The Supreme Court in Burlington held that a parent who can show that the education offered by the public schools (or as in this case a district-approved private school) is inappropriate may unilaterally place the child in a private educational setting and obtain reimbursement for tuition and other expenses provided that the child's privately funded service is appropriate. 471 U,S. 359, 105 S.Ct 1996 (1985). What was to be deemed "appropriate" received a broad and flexible interpretation in Florence County School District Four v. Carter by Carter, supra, and Frank G. and Dianne G. v. Board of Education of Hyde Park, 2006 U.S. App. LEXIS 19029 (2d Cir. 2006). The school district contends that the ABA home therapy program is unnecessary and that the child's needs at home can be adequately addressed by his parents. However, the school district offers no witnesses or documentary evidence in support of this position. The parents' witnesses and the parents testified that the ABA home therapy program is an integral and critical component of the education which the child receives daily at the McCarton School. Moreover, each of the parents' witnesses testified that the child continues to make slow but steady progress in both his behavior and educationally as a result of the combined school and after school

Hearing Officer's Findings of Fact and Decision                                  21

Case No. ▬▬▬

---

programs. They point out that the home program is absolutely necessary for the child to generalize the skills learned during the day and to avoid his regression. The school district's cross-examination of the parent's witnesses did not cast any doubt on the parents' assertion that the combined McCarton School and ABA home program is an appropriate educational placement and program for their child.

While the IDEA promotes special education children to be educated in their least restrictive environment ("LRE"), it must be found educationally appropriate to do and to provide some educational benefit. <u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1120 (2d Cir. 1997) In this case, the evidence was overwhelming that the child would acquire educational benefits only in a very restrictive 1:1 special educational setting. The evidence is clear and obvious that the McCarton School and ▬▬▬ home ABA program provided the appropriate and necessary educational setting for this child. The McCarton School coordinates learning between the home and school settings. Ms. Chigusa Haldeman visits the home and coordinates home and school learning. Under prevailing law and based on the unrebutted testimony of the parents' witnesses, therefore, the parents' choices of school and after-school programs are entirely appropriate. The unrebutted evidence of appropriateness satisfies the second prong of <u>Burlington/Carter</u>.

The third prong addresses the equitable considerations for the relief requested. The evidentiary record demonstrates that there are no equitable considerations present to deny the parents their claim for reimbursement. The parents cooperated fully in the CSE's meeting of June 23, 2006 and in contacting the private schools on the DOE's referral list. The parents when they chose the McCarton School and continued the home-based ABA program along with related services for the 2006-2007 school year kept the DOE informed at all times. The parents have fully cooperated with the school district on requests for evaluations, reports and attendance at CSE meetings including the CSE meeting of June 23, 2006. The parents, as indicated by testimonial and documentary evidence, have always worked cooperatively with the DOE and provided all necessary documents and notices to the DOE. Therefore, I find that equity supports the parents' claims under prong three.

Hearing Officer's Findings of Fact and Decision                          22

Case No. ███████

_____

Accordingly, I find that the evidence supports the parents' claim for reimbursement by the DOE to the parents for $129,000, comprising $84,000 in tuition payments to the McCarton School and $45,000 in payments for the home-based program for the 2006-2007 school year.

WHEREFORE, it is hereby ordered that :

1. The Department of Education (DOE) failed to provide the child, ███████, with a free and appropriate education (FAPE) for the 2006-2007 school year.

2. The parents acted appropriately in enrolling their child at the McCarton School for the 2006-2007 school year and in  providing their child with ABA home therapy services.

3. The DOE shall reimburse the parents of ███████ for a total of $129,000 for tuition paid to the McCarton School and for the 1:1 ABA home therapy services received by the child, both for the 2006-2007 school year. The parents shall be required to document their tuition payments and all home therapy service payments.

4. This decision is subject to appeal to and review by the State Review Officer.

Dated:  July 18, 2007

_Martin Schiff (B)_
MARTIN SCHIFF, ESQ.
Impartial Hearing Officer

MS:ds

Hearing Officer's Findings of Fact and Decision                                    23

Case No. 

---

**PLEASE TAKE NOTICE**

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                          24

Case No. 

---

## DOCUMENTATION ENTERED INTO RECORD FEBRUARY 16, 2007

| A-1 | Letter from Dr. Theodore Shapiro, 6/1/00, 3 pp. | Parent |
| A-2 | Article "Autism Spectrum Disorders", 1/07, 17 pp. | Parent |
| A-3 | NYU Mount Sinai Comprehensive Epilepsy Center Reports, 69 pp. | Parent |
| A-4 | Landau Kleffner Syndrome Fact Sheet, 2/21/06, 3 pp. | Parent |
| B-1 | IEP, 5/15/01, 17 pp. | Parent |
| B-2 | CSE Final Notice of Recommendation, 10/9/01, 1 p. | Parent |
| B-3 | IEP, 10/9/01, 17 pp. | Parent |
| B-4 | IEP, 11/14/01, 27 pp. | Parent |
| B-5 | IEP, 5/28/02, 22 pp. | Parent |
| B-6 | IEP, 6/1/04, 16 pp. | Parent |
| B-7 | Letter to Patrick Heany Superintendent of Region 9, 7/30/05, 2 pp. | Parent |
| B-8 | IEP, 6/20/05, 15 pp. | Parent |
| B-9 | IEP, 6/23/06, 14 pp. | Parent |
| B-10 | IEP Recommendation Summary Chart, 1 p. | Parent |
| C-1 | McCarton School Educational Progress Report, 6/14/05, 4 pp. | Parent |
| C-2 | McCarton School Speech and Language Progress Report, 6/7/05, 2 pp. | Parent |

Hearing Officer's Findings of Fact and Decision                                        25

Case No. 

---

| C-3 | Occupational Therapy Progress Report, 2/4/05, 4 pp. | Parent |
|---|---|---|
| C-4 | McCarton School Speech/Language Progress Report, 1/06, 5 pp. | Parent |
| C-5 | Occupational Therapy IEP Goals, 9/06, 2 pp. | Parent |
| C-6 | McCarton School Speech/Language Progress Report, 7/06, 12 pp. | Parent |
| C-7 | McCarton School Individual Education Plan, 06-07, 10 pp. | Parent |
| C-8 | McCarton School Educational Progress Report, 1/10/07, 3 pp. | Parent |
| C-9 | Occupational Therapy Progress Report, 1/23/07, 4 pp. | Parent |
| C-10 | Program Progress Chart, 21 pp. | Parent |
| D-1 | Evaluation by Dr. Carole Fiorile on 2/1/07, 16 pp. | Parent |
| D-2 | Dr. Carole Fiorile CV, 4 pp. | Parent |
| E-1 | Dr. McCarton School Enrollment Contract, 7/14/06, 3 pp. | Parent |
| E-2 | Affidavit of Harvey Weisman, 2/8/07, 1 p. | Parent |
| E-3 | Daily Attendance Record, 07, 1 p. | Parent |
| F-1 | Photograph of ▮▮▮ Outdoors, 1 p. | Parent |
| F-2 | Photograph of ▮▮▮ at the Beach, 1 p. | Parent |
| G-1 | Notes from Meeting/Evaluation with Lois Siegelar, J. Cerano, and Dr. Lim, 6/23/06, 3 pp. | Parent |
| 1. | CSE Referral to CBST, 6/27/06, 1 p. | Department of Education |
| 2. | Notice of LRE Efforts, Undated, 1 p. | Department of Education |

Hearing Officer's Findings of Fact and Decision                    26

Case No. 

---

| 3. | Letter from Parent, 6/23/06, 1 p. | Department of Education |
| 4. | IEP, 6/23/06, 14 pp. | Department of Education |
| 5. | Social History Update, 6/23/06, 2 pp. | Department of Education |
| 6. | Social History Update, 5/10/04, 2 pp. | Department of Education |
| 7. | Social History Update, 6/22/05, 2 pp. | Department of Education |
| 8. | Psychoeducational Update, 6/21/06, 3 pp. | Department of Education |
| 9. | Speech Report, 1/06, 5 pp. | Department of Education |
| 10. | Occupational Therapy Report, 1/12/06, 3 pp. | Department of Education |
| 11. | Observation, 1/27/05, 1 p. | Department of Education |
| 12. | Epilepsy Follow-Up, 3/22/06, 2 pp. | Department of Education |
| 13. | Medical Report, 6/5/06, 3 pp. | Department of Education |
| 14. | CBST Student Case Profile, 2 pp. | Department of Education |
| 15. | Devereux School Description, 5 pp. | Department of Education |
| 16. | Hawthorne Country Day School, 8/15/06, 19 pp. | Department of Education |

## DOCUMENTATION ENTERED INTO RECORD MAY 2. 2007

| H-1 | Devereux Millwood Screening Offer, 9/12/06, 10 pp. | Parent |
| J-1 | U.S. Department of Education Letter on Berne University, 4/29/03, 5 pp. | Parent |
| J-2 | Website on Berne University, 2/15/06, 2 pp. | Parent |
| K-1 | NY State Education Department Materials from The Office of College and University Evaluation, 3/31/04, 4 pp. | Parent |

Hearing Officer's Findings of Fact and Decision                                   27

Case No. ~~████████~~

---

| L-1 | Accredited Programs in School Psychology, 07, 6 pp. | Parent |
| M-1 | Subpoena to Dewey Aleem, 5/2/07, 1 p. | Parent |
| M-2 | Subpoena (Unsigned) for Personnel Records of Dewey Aleem, Undated, 1 p. | Parent |

## DOCUMENTATION ENTERED INTO RECORD MAY 30, 2007

| 17. | Letter from Provost of Berne University, 10/19/01, 1 p. | Department of Education |
| 18. | Letter from US Department of Education, 4/12/01, 1 p. | Department of Education |
| 19. | US Department of Education Employee Locator, 5/6/07, 1 p. | Department of Education |
| 20. | Certificate of Incorporation for Berne University, 11/13/98, 1 p. | Department of Education |
| 21. | List of Publications to Verify Berne University Status, 5/7/07, 1 p. | Department of Education |
| 22. | Article Released by White House on International Education Policy, 4/24/00, 3 pp. | Department of Education |

## DOCUMENTATION ENTERED INTO RECORD JUNE 7. 2007

| M-3 | Transcripts from Berne University in Summer of 1998, 12/14/01, 2 pp. | Parent |