UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.D. and T.D., on behalf of C.D.,

                    Plaintiffs-Appellants

    -against-

New York City Department of Education,
Region 9 (District 2)

                Defendant-Respondent.

07 Civ. 7967 (RMB)

## PLAINTIFFS-APPELLANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR MODIFIED *DE NOVO* REVIEW

Respectfully submitted,
Gary S. Mayerson (GSM 8413)
Mayerson & Associates
Attorneys for Plaintiffs-Appellants
330 W. 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (fax)
gamayerson@aol.com

## TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………......i

TABLE OF CASES, STATUTES AND AUTHORITIES…………………………..ii

I.    PRELIMINARY STATEMENT……………………………………….…….1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY…………………1

III.  THE APPLICABLE STANDARDS OF REVIEW……………………….…..3

IV.   ARGUMENT……………………………………………………………...5

    A.    Prong I:  The NYCDOE Failed to Offer C.D. a FAPE for the
        2006-2007 School Year and the Summer of 2007………………………...6

        1.    The NYCDOE's Procedural Violations of C.D.'s
            and His Parents' Rights Rose to the Level of a
            Denial of a FAPE……………………………………….………6

        2.    The NYCDOE Failed to Offer C.D. Substantively
            Appropriate and Sufficient Programming, Leading to a
            FAPE Denial……………………………..…………………13

        3.    The IHO and SRO Failed to Accord Appropriate
            Weight to the Testamentary Evidence……………….....20

    B.    Prong II:  C.D.'s Unilateral Program and Placement for the 2006-
        2007 School Year and the Summer of 2007 Were Appropriate for
        C.D.……………………………………………………………….20

    C.    Prong III:  The Equities Favor Reimbursement of the Costs and
        Expenses of C.D.'s Unilateral Program and Placement for the 2006-
        2007 School Year and the Summer of 2007……………………..…….27

V.    CONCLUSION………………………………………………………..30

# TABLE OF AUTHORITIES

## CASES

A.C. and M.C. v. Board of Educ. of the Chappaqua Central School Dist.,
2007 WL 1259145, 06 CV 4238 (CLB) (S.D.N.Y. April 27, 2007) (Slip Copy)...........12

Application of the Board of Education of the Carmel Central School District,
Appeal No. 05-031..............................................................................12

Application of a Child with a Disability, Appeal No. 95-15.....................................7

Application of a Child with a Disability, Appeal No. 98-75......................................7

Application of a Child with a Disability, Appeal No. 99-92.....................................7

Application of a Child with a Disability, Appeal No. 02-042...............................19

Application of a Child with a Disability, Appeal No. 03-054..............................30

Application of a Child with a Disability, Appeal No. 04-047..............................30

Application of a Child with a Disability, Appeal No. 05-087......................8, 11, 29

Bettinger v. New York City Board of Education, 2007 WL 4208560,
06 CV 6889 (PAC) (S.D.N.Y. November 20, 2007)(Slip Copy)...........................10

Board of Educ. of the Hendrick Hudson Central School District v. Rowley,
458 U.S. 176 (1982)......................................................................1, 4, 6, 7

Brown v. Ramsay, 167 F. Supp.2d 597, 603 (E.D.Va. 2000),
aff'd, 10 Fed. Appx. 131, No. 01-1041 (4th Cir. Va. May 21, 2001).......................19

Cerra v. Pawling Cent. School Dist., 427 F.3d 186 (2d Cir. 2005)...........................5

Deal v. Hamilton County Bd. of Educ., 392 F.3d 840 (6th Cir. 2004), reh'g and reh'g en
banc denied (2005), cert denied, Hamilton County Dept. of Educ. v. Deal,
546 U.S. 936 (2005)...............................................................2, 8, 9, 11

Doe v. Metropolitan Nashville Public Schools, 133 F.3d 384 (6th Cir. 1998)...............4

Evans v. Board of Educ. of Rhineback Cent. School Dist.,
930 F. Supp. 83 (S.D.N.Y. 1996)..........................................................5

Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993)...............1, 5, 6

Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006),
cert denied, Board of Educ. of Hyde Park Cent. School Dist. v. Frank G.,
2007 WL 2982269 (Oct. 15, 2007)………………………………......2, 3, 6, 8, 11, 21, 24

In Re Sara P, 1988-89 EHLR 401:260 (SEA Wash. 1988)………………………………7

J.D. v. Pawlet Sch. Dist., 224 F.3d 60 (2d Cir. 2000)……………………………………..6

Knable v. Bexley City School Dist., 238 F.3d 755 (6th Cir. 2001)……………..…………4

Mrs. B. v. Milford Board of Educ., 103 F.3d 1114 (2d Cir. 1997)…………..…………….5

M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers,
231 F.3d 96 (2d Cir. 2000), cert. denied, 532 U.S. 942 (2001)………...………………..4, 21

School Committee of Burlington v. Dept. of Educ., 471 U.S. 359 (1985)….…..…….1, 5, 6

Still v. DeBuono, 101 F.3d 888 (2d Cir. 1996)……………………………………..….…..6

Town of Burlington v. Dept. of Educ. of Mass., 736 F.2d 773 (1st Cir. 1984),
aff'd on other grounds, 471 U.S. 359 (1985)…………………………………………5, 27

T.P. v. Mamaroneck Union Free Sch. Dist., 2007 U.S. Dist. LEXIS 35288, 06 Civ. 0509
(CLB) (S.D.N.Y. May 11, 2007)……………………………………..……………..2, 8, 11

Walczak v. Florida Union Free School Dist.,
142 F.3d 119 (2d Cir. 1998)……………………………………….….4, 5, 6, 10, 13, 18

Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501 (E.D.N.Y. 1996)……………4

Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80 (3d Cir. 1999)……………...21

W.G. v. Board of Trustees of Target Range School Dist. No. 23,
960 F.2d 1479 (9th Cir. 1982)……………………………………………………..5, 8

Winkelman v. Parma City School Dist., 127 S.Ct. 1994 (2007)………….……….2, 10

Wolfe v. Taconic-Hills Cent. School Dist.,
167 F. Supp. 2d 530 (N.D.N.Y. 2001)………………………………………....4, 27, 29

## **STATUTES**

Individuals with Disabilities Education Improvement Act……………………..………3

N.Y. Educ. Law § 4401(1)…………………………………………………………30

20 U.S.C. § 1400 <u>et. seq</u>…………………………………………………………..……3

20 U.S.C. § 1414(e)……………………………………………………………..…………10

20 U.S.C. § 1415(c)………………………………………………………………………9

20 U.S.C. § 1415(f)(3)(E)(ii)………………………………………………………9, 10

20 U.S.C. § 1415(i)(2)(C)………………………………………………………………4

## <u>REGULATIONS</u>

8 N.Y.C.R.R. § 200.1(kk)…………………………………………………………….13

8 N.Y.C.R.R. § 200.1(qq)…………………………………………………………….14

8 N.Y.C.R.R. § 200.4(d)(2)(iii)(a)-(c)……………………………………………….7

8 N.Y.C.R.R. § 200.4(d)(2)(iii)(b)…………………………………………………...7

8 N.Y.C.R.R. § 200.4(d)(2)(v)(a)……………………………………………….13, 14

8 N.Y.C.R.R. § 200.5(a)(4)(i)(c)……………………………………………………9

8 N.Y.C.R.R. § 200.13(d)………………………………………………………..3, 13

34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Question 32…………………8

34 C.F.R. § 300.505(a)(2)…………………………………………………………9

## <u>OTHER SOURCES</u>

*NYCA Charter School, 2006-7 School Year Lottery, available at*
http://nyc4a.org/pdf/2006_instructions.pdf (last viewed December 18, 2007) …………...9

*NECTAC, 34 CFR Part 300, Assistance to States for the Education of Children with
Disabilities, available at* http://www.nectac.org/idea/300regs3.asp
(last viewed December 20, 2007)........................................................................................8

*Bridget Taylor, available at* http://en.wikipedia.org/wiki/Bridget_Taylor
(last modified November 7, 2007)………………………………………………………22

## I.    PRELIMINARY STATEMENT

This memorandum of law and the accompanying Affirmation of Gary S. Mayerson are respectfully submitted on behalf of plaintiffs-appellants in support of their motion for a modified *de novo* review of and appeal from the February 28, 2007 Findings of Fact and Decision of Impartial Hearing Officer ("IHO") Veronica C. Odom, Esq. and the June 14, 2007 Decision of State Review Officer ("SRO") Paul F. Kelly (except insofar as that Decision ordered enforcement of C.D.'s pendency entitlements). These administrative decisions both determined that for 2006-2007, defendant-respondent New York City Department of Education ("NYCDOE") offered C.D., a student diagnosed with autism, a free and appropriate public education ("FAPE"). Both the IHO and SRO denied plaintiffs-appellants' claims for declaratory, reimbursement and related relief.[1]

On this appeal, plaintiffs-appellants thus seek declaratory, reimbursement and related relief for the costs and expenses of C.D.'s unilateral educational program and placement for the 2006-2007 school year and the Summer of 2007, including (a) C.D.'s tuition at the ELIJA School, (b) twelve hours per week of Applied Behavior Analysis ("ABA") therapy outside of school, and (c) transportation. Neither the IHO nor the SRO bothered to make any determination as to the appropriateness of C.D.'s unilateral program and services, or as to the equities. It is respectfully requested that this Court exercise its independent judicial review function.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiffs-appellants M.D. and C.D. are the parents of C.D., a young boy diagnosed with a serious autism spectrum disorder who requires significant special

---

[1] Plaintiffs' claims are predicated upon the seminal authorities of <u>School Committee of Burlington v. Dept. of Educ.</u>, 471 U.S. 359 (1985) and <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 (1993). <u>See also</u> <u>Board of Educ. of the Hendrick Hudson Central School District v. Rowley</u>, 458 U.S. 176 (1982).

education services and supports that are tailored to meet his individual needs. The NYCDOE was obligated to provide C.D. with a FAPE.

The NYCDOE convened an IEP meeting for C.D. on April 7, 2006. (Exhibit P-C).[2] The NYCDOE's resulting IEP and placement offer reflect numerous significant procedural and substantive violations of C.D.'s right to receive a FAPE. Moreover, the NYCDOE's actions worked to deprive plaintiffs-appellants M.D. and T.D. of their right to participate as equal team members in devising C.D.'s program and placement. See Winkelman v. Parma City School Dist., 127 S.Ct. 1994, 2003 (2007); see also Deal v. Hamilton County Bd. of Educ., 392 F.3d 840 (6th Cir. 2004), reh'g and reh'g en banc denied (2005), cert denied, Hamilton County Dept. of Educ. v. Deal, 546 U.S. 936 (2005); T.P. v. Mamaroneck Union Free Sch. Dist., 2007 U.S. Dist. LEXIS 35288, 06 Civ. 0509 (CLB) (S.D.N.Y. May 11, 2007) at *19,24 (referencing Deal; Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006), cert denied, Board of Educ. of Hyde Park Cent. School Dist. v. Frank G., 2007 WL 2982269 (Oct. 15, 2007)).

The NYCDOE's proposed IEP failed to provide C.D. with the level of 1:1 instruction and home- and community-based ABA services that have proven critical to C.D.'s success. C.D. could not learn independently or in a group setting without individualized instruction, as he had "difficulty with comprehending instructions", "receptive and expressive delays and difficulty with attention and focusing" and an impaired "ability to comprehend questions regarding phonemic category and phonological awareness". See Exhibit P-S. The NYCDOE additionally failed to offer plaintiffs-appellants M.D. and T.D. the individualized parent counseling and training that

---

[2] All references to exhibits relate to the documents entered into evidence at the time of C.D.'s due process hearing. C.D.'s exhibits are identified as P-(letter), and the NYCDOE's exhibits are identified as D-(number). All references to testimony evidence relate to the transcript of C.D.'s due process hearing dates.

is statutorily mandated for parents of students with autism by 8 N.Y.C.R.R. § 200.13(d), and which they needed. These substantive shortfalls alone served to deprive C.D. of a FAPE. Moreover, as even the SRO agreed, the IEP's Goals and Objectives and Behavior Intervention Plan ("BIP") were vague. The NYCDOE failed to provide prior written notice of the reasons for rejecting C.D.'s parents' requests for programming. Hand in hand with that, the NYCDOE impermissibly *predetermined* C.D.'s IEP and placement, and, thus did not give meaningful consideration to plaintiffs-appellants' input regarding C.D.'s educational program and placement. The evidence of a FAPE failure is clear.

By due process complaint notice dated September 8, 2006, plaintiffs-appellants instituted claims for declaratory, pendency, reimbursement and other relief, for C.D.'s educational program and placement for the 2006-2007 school year and the Summer of 2007. (Exhibit P-A). The IHO and SRO both determined that the NYCDOE had offered C.D. a FAPE. However, even the SRO was forced to note critical faults in the NYCDOE's recommended program. Neither the IHO nor the SRO ruled on the issue of the appropriateness of C.D.'s unilateral program and placement, or on the equities. M.D. and T.D. seek reversal of the administrative decisions, and declaratory, reimbursement and related relief pertaining to C.D.'s program and services for 2006-2007.

### III.    THE APPLICABLE STANDARDS OF REVIEW

In an action involving rights provided by the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400 et. seq., the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party;[3] and (iii) basing its decision on the preponderance of

---

[3] This Court, for example, heard "additional evidence" in <u>Frank G.</u>. We respectfully request that this Court accept and consider "additional evidence" of: (a) a recent article from the *Wall Street Journal* concernng

the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).  See M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000), cert. denied, 532 U.S. 942 (2001).

The district court is charged with making an independent decision based on the preponderance of the evidence, granting "due weight" to the factual determinations made during the state administrative process.  See Rowley, supra, 458 U.S. at 206.  It is well settled that the district court's review of the record and proceedings below is in no way a pro forma, "rubber stamp[ing]" exercise.  See Walczak v. Florida Union Free School Dist., 142 F.3d 119, 129 (2d Cir. 1998)(quoting Rowley at 206, 208).  Rather, in this context, the district court satisfies its obligation to provide "due weight" to the factual determinations from below by employing "some deference" to the administrative findings.  See Walczak at 129; Knable v. Bexley City School Dist., 238 F.3d 755, 764 (6th Cir. 2001).  Moreover, "[t]he amount of weight given to the administrative proceedings is discretionary."  Wolfe v. Taconic-Hills Cent. School Dist., 167 F. Supp. 2d 530, 533 (N.D.N.Y. 2001)(referencing Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 507 (E.D.N.Y. 1996)).  Moreover, the court may undertake a critical look at the administrative determinations regarding witnesses' credibility.  Wolfe at 534-535.

A reviewing district court must not "...simply adopt the state administrative findings without an independent re-examination of the evidence."  Doe v. Metropolitan Nashville Public Schools, 133 F.3d 384, 387 (6th Cir. 1998).  Specifically, "the court is free to accept or reject the [administrative decisions'] findings in part or in whole".

---

the SRO, Exhibit C annexed to Complaint; (b) an information sheet concerning the New York Center for Autism charter school, Exhibit A annexed to Affidavit of Gary S. Mayerson; and (c) a decision from another child's due process hearing that provides important, previously undisclosed information concerning the bona fides of one of the NYCDOE's key witnesses in C.D.'s case, Exhibit B annexed to Affidavit of Gary S. Mayerson.

Town of Burlington v. Dept. of Educ. of Mass., 736 F.2d 773, 791-92 (1st Cir. 1984), aff'd on other grounds, 471 U.S. 359 (1985).  See also Cerra v. Pawling Cent. School Dist., 427 F.3d 186, 191 (2d Cir. 2005).  Where, as here, the underlying decisions that are being appealed are not supported by the record, the reviewing court need not accord due weight to the administrative fact-finding.  See Evans v. Board of Educ. of Rhineback Cent. School Dist., 930 F. Supp. 83, 93 (S.D.N.Y. 1996).  Moreover, deference to the administrative findings may not be "particularly appropriate" at all times.  See Walczak, supra, 142 F.3d at 129; compare Exhibit C annexed to Complaint.  Furthermore, it is axiomatic that where the underlying decision ignores or fails to make factual findings as to a particular claim or issue, there is no "finding" entitled to any deference.  Questions of law and mixed questions of law and fact in an IDEIA case (including the core issue of whether there was a denial of a FAPE) should be reviewed on a purely *de novo* basis.  See W.G. v. Board of Trustees of Target Range School Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1982).  Also, this court need not give any weight to conclusions of law concerning the interpretation of the IDEIA.  See Mrs. B. v. Milford Board of Educ., 103 F.3d 1114, 1221 (2d Cir. 1997)).

## IV.  ARGUMENT

In a tuition reimbursement case, the court looks to: (1) whether the IEP (placement and program) proposed by the school district was procedurally and substantively appropriate (Prong I); and (2) whether the services provided by the parents were "appropriate" under the IDEIA (Prong II).  Burlington, supra, 471 U.S. at 369-370; Carter, supra, 510 U.S. at 12-14.  Once the court has made a determination in favor of the parents on the first two Prongs, it may then determine whether equitable considerations

(Prong III) support the parents' claim, and order "appropriate" relief. See Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996)("appropriate" relief includes "the authority to order reimbursement for expenditures made to obtain appropriate educational services"). See also Frank G., supra, 459 F.3d at 363.

### A.  Prong I:  The NYCDOE Failed to Offer C.D. a FAPE for the 2006-2007 School Year and the Summer of 2007

Tthe IHO and the SRO ignored and/or gave insufficient weight to overwhelming evidence demonstrating that the NYCDOE failed, procedurally[4] and substantively[5], to offer C.D. a FAPE for 2006-2007 (September 1, 2006 through August 31, 2007).

### 1.  The NYCDOE's Procedural Violations of C.D.'s and His Parents' Rights Rose to the Level of a Denial of a FAPE

C.D.'s parents both attended C.D.'s April 7, 2006 IEP meeting. (Exhibit P-C). At the IEP meeting, the NYCDOE failed to review C.D.'s "present levels." (Tr. 280). See Walczak, supra, 142 F.3d at 123 (reference omitted). During 2005-2006, C.D. attended the McCarton School and had 1:1 ABA instruction for the full day there (plus home ABA services). (Tr. 35). Had the NYCDOE exercised due diligence and discussed C.D.'s performance levels at the IEP meeting, the fact that C.D.'s behaviors erupted when he was not engaged in 1:1 instruction would have been apparent. (See Tr. 33, 36).

The NYCDOE committed additional hefty procedural violations denying C.D.'s right to receive a FAPE. For example, the NYCDOE prepared Goals that even the SRO

---

[4] The IDEIA's procedural guarantees are not mere procedural "hoops" through which Congress wanted educational agencies to jump. The Act's formality is a safeguard against arbitrary or erroneous decision making. See, e.g., Walczak, supra, 142 F.3d at 122. Material procedural violations often will rise to the level of a school district's failure to offer a FAPE. A single material violation of the IDEIA's guarantees can be, itself, a sufficient ground for establishing "Prong I" in favor of a family of a child with a disability. See, e.g., Burlington, supra; Carter, supra; J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 (2d Cir. 2000).
[5] In order to offer a FAPE, the recommended IEP must be tailored to the individual and unique educational needs of the child for whom such IEP is developed. See, e.g., Rowley, supra, 458 U.S. at 208. Moreover, the offered program and placement must be tailored to enable the child to make meaningful educational gains. See, e.g., Walczak, supra, 142 F.3d at 130.

found "were vague and not measurable." (Exhibit B annexed to Complaint, p. 14 (referencing Application of a Child with a Disability, Appeal No. 99-92; Application of a Child with a Disability, Appeal No. 98-75; Application of a Child with a Disability, Appeal No. 95-15)). (See also Tr. 69-80, 82-83, 85, 88-90, 177-178[6]). This is clear violation of the IDEIA's requirements. See Rowley, supra, 458 U.S. at 182. The SRO also noted correctly that "in some instances the child's short-term objectives should have been more objectively measurable". (Exhibit B annexed to Complaint, p. 14). See 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(a)-(c). The failure to include sufficiently specific and measurable Goals and Objectives, as committed in C.D.'s case, can itself be tantamount to the denial of a FAPE. In Re Sara P, 1988-89 EHLR 401:260 (SEA Wash. 1988). Moreover, it appears that the NYCDOE failed to attach due importance to the concept of actually monitoring C.D.'s progress: C.D.'s April 2006 IEP did not make clear who was to track C.D.'s progress; furthermore, not all of the Goals and Objectives were appropriate for C.D. (Tr. 77, 80, 86-87, 92, 402). See 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(b).

Equally egregious, the proposed Goals and Objectives for C.D.'s IEP were developed *without* the input of all of the IEP Team members. Dr. Dewey Aleem, the NYCDOE School Psychologist/District Representative, did not recall if all of the Goals "were discussed in detail," but in fact, according to plaintiff-appellant M.D., *none* of the Goals and Objectives were discussed or reviewed at the IEP meeting. (Tr. 285, 540, 567). Rather, the NYCDOE's representatives brought typed up Goals and Objectives to the IEP meeting, for the IEP document. (Tr. 285-286; see also Tr. 574, 578-579).

---

[6] The NYCDOE's counsel seemingly conceded that an instructor attempting to implement the proposed Goals and Objectives might have to first define the Goals, and John Gutman (who reportedly would have been C.D.'s teacher at the recommended site) proved that there could be multiple interpretations of the Goals included in C.D.'s proposed IEP. (See Tr. 177-178, 514-516, 520-521).

7

The SRO correctly noted that "[i]t is permissible under the IDEA for school district personnel to bring a draft IEP to the meeting, provided the parents are informed it is a draft subject to review and parents have the opportunity to make objections and suggestions…." (Exhibit B annexed to Complaint, pp. 14-15)(references omitted). The NYCDOE's proposed IEP was not labeled as a draft, and there was no discussion that the document was a draft. There is a clear difference between preparing for an IEP meeting for efficiency's sake, on the one hand, and totally leaving or keeping a disabled child's parents out of the process of creating Goals and Objectives, on the other hand. Moreover, it was the NYCDOE's responsibility to ensure that there was a "full discussion" regarding all aspects of C.D.'s IEP, including the Goals and Objectives. See Application of a Child with a Disability, Appeal No. 05-087 (quoting 34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Question 32 [see http://www.nectac.org/idea/300regs3.asp, *last viewed* December 20, 2007]). Instead, the NYCDOE delivered a fairly "signed-and-sealed" document to C.D.'s parents at the meeting. (Tr. 285-286).

The NYCDOE committed another gigantic procedural violation in giving short shrift to M.D. and T.D.'s concerns and excluding them from meaningful participation in the IEP meeting. See Deal, supra, 392 F.3d at 857-858; Frank G., supra, 459 F.3d at 363; T.P., supra, 2007 U.S. Dist. LEXIS 35288 at *19, 24; see also, e.g., W.G., supra, 960 F.2d at 1485. This impermissible predetermination was such a significant infringement upon the rights of C.D., as well as the rights of plaintiffs-appellants M.D. and T.D., that alone it amounted to a clear FAPE violation. See Deal at 857-858; T.P. at *19, 24.

At the IEP meeting, C.D.'s parents requested that a 1:1 school environment be considered for C.D. for 2006-2007. (Tr. 280-281). C.D.'s mother testified that the IEP

8

team agreed that a 1:1 placement would be appropriate for C.D. for 2006-2007, noting: "They agreed that it is what he needed. But they also conceded that they *couldn't* make that recommendation." (Tr. 281)(emphasis added).[7],[8]. It is respectfully submitted that the NYCDOE's IEP was only a reflection of programming that it had to offer to C.D., which was woefully inadequate for him. Merely listening to parents' concerns and requests, without actually considering them, reeks of predetermination. See Deal, supra.

The IEP Team failed to even *discuss* any specific school "placement" at the April 7, 2006 meeting. (Tr. 288). This was a clear violation of 20 U.S.C. § 1415(f)(3)(E)(ii), as the NYCDOE decided "placement" *without* C.D.'s parents. While Dr. Aleem testified that the IEP Team could have "referred" C.D. for placement in a non-public school if it believed that C.D. required a classroom setting more restrictive than a 6:1:1, plaintiff-appellant M.D. testified that at the IEP meeting there was no discussion of any programs more restrictive than a 6:1:1 for C.D. because "[t]hey said it *didn't exist*." (Contrast Tr. 288-289, Tr. 544). Following the IEP meeting, M.D. wrote to the NYCDOE, expressing disagreement with the 6:1:1 program. (Tr. 289; Exhibit D-14). The NYCDOE never followed up with C.D.'s parents. (Tr. 291). Also, the NYCDOE failed to provide plaintiffs-appellants with written notice of their reasons for rejecting the type of placement proposed by C.D.'s parents. (Exhibit P-C). See 20 U.S.C. § 1415(c); 34 C.F.R. § 300.505(a)(2); 8 N.Y.C.R.R. § 200.5(a)(4)(i)(c).

---

[7] In fact, no one at the IEP meeting stated that a 1:1 program would be too restrictive for C.D. (Tr. 289).
[8] The New York Center for Autism is a 1:1 charter school that was available to students who received services through the NYCDOE during 2006-2007. However, admission was strictly limited, and was conducted entirely by a "random" lottery. See http://nyc4a.org/pdf/2006_instructions.pdf (last viewed December 18, 2007). C.D. was not selected for a spot through the lottery. (Tr. 291-293). See also Exhibit A annexed to Affirmation of Gary S. Mayerson.

C.D.'s parents should have been included in *all* decision-making concerning the selection of an appropriate educational placement to C.D.. See Winkelman, supra, 127 S.Ct. at 2000 (referencing 20 U.S.C. § 1414(e), which states that "[e]ach local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of *any* group that makes decisions on the educational placement of their child")(emphasis added). See also 20 U.S.C. § 1415(f)(3)(E)(ii).

Here, however, the opposite transpired. The NYCDOE *failed* to identify, much less recommend, an actual placement for C.D. *at* the time of the IEP meeting, and C.D.'s IEP failed to indicate any specific class placement. See Exhibit P-C. See Walczak, supra, 142 F.3d at 123 (noting the requirement that an IEP include a specific class placement). See also Bettinger v. New York City Board of Education, 2007 WL 4208560, 06 CV 6889 (PAC) (S.D.N.Y. November 20, 2007)(Slip Copy), at *2, fn. 18 (noting that "[a]n IEP... is not 'finalized' until a specific school for a child has been identified"), and id. at *4, 5. In point of fact, after conducting an improper "shadow" IEP meeting that did not include plaintiffs-appellants' participation, the NYCDOE very belatedly made a placement offer for 2006-2007. This was a clear violation of petitioners-appellants' rights. See supra, Winkelman, 127 S.Ct. at 2000.

On July 25, 2006, C.D.'s parents sent a letter to the NYCDOE because they *still* were waiting for a placement recommendation. (Tr. 293-294, Exhibit P-I). Plaintiff-appellant M.D. testified credibly that the NYCDOE did not mail its Final Notice of Recommendation to C.D.'s parents until approximately August 10, 2006. (Tr. 294-295; Exhibit P-J, p. 2).[9] The NYCDOE made this placement recommendation and decision

---

[9] Dr. Aleem did not oversee the mailing of the placement offer. (Tr. 570). He was forced to concede that it was at least "possible" that the NYCDOE had not mailed its Final Notice of Recommendation until August

outside the IEP, *without* C.D.'s parents' input into the decision-making process. Moreover, despite C.D.'s parents' diligent efforts, they were unable to look at the recommended site (or any comparable site), or gain any specific information regarding the recommended school, prior to September, 2006. (Tr. 295-296).[10]

Mr. Gutman, the NYCDOE's witness, testified that he did not believe that he could recommend that the NYCDOE provide any home services for a child, despite any child's particular needs. (Tr. 493). NYCDOE Site Coordinator Rochelle Kossover "...[did] not think there is such a thing" as an offer of home-based services on a child's IEP, in addition to a full-day school placement, for a child of C.D.'s age. (Tr. 467-468). Clearly, the NYCDOE was following predetermined and impermissible *policies* that failed to take into consideration (and could not accommodate) C.D.'s individual educational needs. See supra, Deal, Frank G., T.P.

The development of C.D.'s Behavior Intervention Plan ("BIP") also was procedurally defective. (Exhibit P-C, p. 19). The BIP was not reviewed at C.D.'s IEP meeting; "Dr." Aleem independently developed the BIP without any input from IEP team members. (Tr. 287, 565). It was the duty of the NYCDOE to ensure that plaintiffs-appellants had the opportunity to participate in *all* aspects of the development of C.D.'s IEP, and that they were aware of such opportunity. See Frank G., supra, 459 F.3d at 363; Appeal No. 05-087, supra. The NYCDOE, once again, failed in that clearly prescribed duty.

---

10, 2006. (Tr. 571). Plaintiff-appellant M.D. testified credibly, despite the IHO's suggestion that M.D. and T.D. submitted an "alleged envelope" showing postal markings. (Exhibit A annexed to Complaint). Why would C.D.'s parents ever send a letter to the NYCDOE *requesting* a placement recommendation if they had already received one?

[10] Upon M.D.'s later observation of the recommended placement site, she saw no 1:1 instruction there. (Tr. 306-207).

Furthermore, the NYCDOE's BIP lacked a *corresponding* Functional Behavioral Assessment ("FBA"). The failure to conduct an appropriate FBA is itself sufficient to constitute a FAPE denial. See A.C. and M.C. v. Board of Educ. of the Chappaqua Central School Dist., 2007 WL 1259145, 06 CV 4238 (CLB) (S.D.N.Y. April 27, 2007) (Slip Copy) at *5. See also Application of the Board of Education of the Carmel Central School District, Appeal No. 05-031. A proper FBA would have incorporated interviews with people in direct contact with C.D., "ABC" (antecedent, behavior, consequence) data, direct observation with additional data collection, development of a hypothesis and a treatment plan. (Tr. 46).

Conducting an FBA is "[a]bsolutely" a prerequisite to developing a behavior plan. (Tr. 46, 445). Specifically, "if you just apply treatment and you have not determined why the behavior is occurring, you will run a risk of inadvertently maintaining and strengthening the problem behavior if not creating new problem behaviors." (Tr. 47). Also, the behavioral assessment or analysis must be done *every time* a BIP is developed. (Tr. 106). In light of the NYCDOE's duty to first establish C.D.'s "present performance levels", it was inappropriate to use a stale FBA dated December 6, 2005 (when C.D. was in school with 1:1 instruction and behavior plan in place and, hence, established control) to develop a BIP for C.D. for 2006-2007. (Tr. 107, see also Tr. 490; Exhibit D-6).

The BIP was also inappropriate because it was vague and invited various interpretations towards implementation, as even the SRO agreed. (See Tr. 94, 99; Exhibit B annexed to Complaint, p. 17). The SRO opined that Ms. Kossover and Mr. Gutman "…would have been able to appropriately develop and implement a specific BIP." (Exhibit B annexed to Complaint, p. 17). Yet, significantly, Mr. Gutman could not

12

pinpoint any training that he would have anticipated receiving on C.D.'s BIP. (Tr. 509-510). Furthermore, C.D.'s behaviors were not clearly enough defined in the NYCDOE's BIP, further marring it and the proposed IEP. Clarity is critical "[s]o that the people that are running the [BIP] know exactly what behavior they are going to be addressing" to avoid inconsistency of treatment that "can lead to an increase in problem behavior or shaping up new problem behaviors." (Tr. 95-97).

## 2. *The NYCDOE Failed to Offer C.D. Substantively Appropriate and Sufficient Educational Programming, Leading to a FAPE Denial*

The NYCDOE failed C.D. on many substantive accounts, and the IHO and the SRO failed to give due weight to the NYCDOE's serious transgressions. For example, despite the mandate of 8 N.Y.C.R.R. § 200.13(d), and despite C.D.'s parents' need for such a service, the NYCDOE failed to offer M.D. and T.D. any individualized parent counseling and training based on C.D.'s autism.[11] (Tr. 284-285, 288, 340, 348, 352; see also Tr. 503). The SRO even found that "[C.D.'s] April 2006 IEP does not reference the provision of parent counseling and training as defined in [8 N.Y.C.R.R. § 200.13(d)]" (references omitted). (Exhibit B annexed to Complaint, p. 13). Moreover, the SRO "agree[d] with [plaintiffs-appellants] that parent counseling and training should have been identified on the child's IEP…." (Exhibit B annexed to Complaint, p. 13). This finding is supported by the fact that the IEP is the blueprint for a child's educational program and "[t]he particular educational needs of a disabled child *and the services required to meet those needs* must be set forth at least annually in a written IEP." Walczak, supra, 142 F.3d at 122 (reference omitted)(emphasis added). See also 8

---

[11] "*Parent counseling and training* means assisting parents in understanding the special needs of **their** child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of **their** child's individualized education program." 8 N.Y.C.R.R. § 200.1(kk)(italics in original, bold emphasis added).

N.Y.C.R.R. § 200.4(d)(2)(v)(a); 8 N.Y.C.R.R. § 200.1(qq). Thus, parent counseling and training as a service should have been set forth within the four corners of C.D.'s IEP.

By its very definition, parent counseling and training is to be individualized for each family. See supra, fn. 11. The NYCDOE plainly was unable to offer M.D. and C.D. such assistance to enable them to work with C.D. outside of school. Despite the SRO's findings that the NYCDOE should have made provision for parent counseling and training on C.D.'s IEP, the SRO credited the testimony of Ms. Kossover and Mr. Gutman and found no FAPE denial. However, the evidence clearly shows that the NYCDOE would have been able to offer M.D. and T.D., at best, scant parent training that was not individualized for C.D.'s unique presentments. Ms. Kossover described available parent training at the school ultimately recommended for C.D. as notification of workshops open to all parents, through the school's Parent Coordinator. (Tr. 423). None of the instructors at the recommended site would have gone to C.D.'s home to model interventions. (Tr. 453). None of the instructors were required to be available after-hours to C.D.'s parents. (Tr. 454-455).

The NYCDOE's proposed IEP purported to place C.D. in a 6:1:1 class, a class setting wholly inappropriate for C.D.. To the extent that Dr. Aleem supported the recommended program – which goes hand in hand with the recommended placement – he was forced to admit: "I have no knowledge of the specific program." (Tr. 553-555).[12] The IHO characterized the class as a 6:1:2, but that would have been due to the ultimate class selected for C.D., not what the IEP purported to offer. (See Exhibit A annexed to Complaint). Regardless, C.D. required 1:1 instruction consistently *throughout the day*.

---

[12] This was not the only "double talk" offered by Dr. Aleem, who noted that a 6:1:1 class could offer C.D. an outlet to mainstream and inclusion opportunities, but who also testified that General Education was inappropriate for C.D.. (Tr. 534, 545).

The proposed IEP also was defective because it failed to offer C.D. any home-based therapy services. The SRO did not deem home-based, supplemental 1:1 instruction necessary for C.D. to receive an appropriate educational program. (Exhibit B annexed to Complaint, p. 20). However, the NYCDOE's decision on this issue was *not* based on C.D.'s needs, but rather on the NYCDOE's internal "policy". Moreover, the IHO and the SRO clearly failed to accord due weight to the testimony of Ray Cepeda, Board Certified Associate Behavior Analyst ("BCaBA") and Educational Director at the ELIJA School, who testified that C.D. "absolutely need[ed] to have some specific, not only parent training, but one to one teaching at home so he has to learn the same contingencies that apply in school apply at home [and] the same things that apply at home apply in school." (Tr. 110). At C.D.'s IEP meeting, plaintiffs-appellants M.D. and T.D. requested home services for C.D. in addition to a 1:1 school program. (Tr. 282). Plaintiff-appellant M.D. testified that the NYCDOE responded that "they couldn't do that but they were willing to issue me [a Related Services Authorization]." (Tr. 282). Later, though, the NYCDOE revoked its offer even for these home-based services. (Tr. 283).

C.D.'s proposed IEP ostensibly offered C.D. the services of a crisis management paraprofessional ("para"). (Exhibit P-C, p. 18). At the April 2006 IEP meeting, plaintiffs-appellants M.D. and T.D. were told that the para's sole "role would be to watch [C.D.] carefully every second that he was there and make sure that... he did not escape the school." (Tr. 287, 362). Ms. Kossover described the role of a crisis management para as "offer[ing]... emotional-social support [and] sometimes they help with refocusing, redirecting. They do everything and anything that a classroom para would do to assist the child." (Tr. 425, 466). In other words, paras only "do support for the

instruction" and *not* actual instruction. (Tr. 436). Rather, Mr. Gutman was "deemed the only instructor" in his class. (Tr. 492).

The SRO found that C.D.'s parents "have not met their burden of persuasion that [C.D.] required full-time 1:1 instruction, or that the 1:1 services that the child needed could not have been provided by a paraprofessional." (Exhibit B annexed to Complaint, p. 19). However, the SRO seemingly based this conclusion solely on the basis of the testimony of the NYCDOE's witnesses without giving due import to the testimony of C.D.'s parents and instructors. For example, Mr. Cepeda testified that a para's services would not have amounted to the 1:1 instruction from highly trained individuals that C.D. required, especially without a system outlined for antecedent manipulations and implementation of a BIP (which was plainly missing from C.D.'s IEP, see supra). (Tr. 174-175, 199-200). ELIJA School Co-Executive Director Debora Harris, BCaBA, added that "[b]ehavior reduction is never done in a void of not replacing it with functional skills or communicative skills...." (Tr. 230).

C.D. could not make progress without the intense 1:1 instruction like that which he received in his unilateral placement at the ELIJA School and his home programming. C.D. was "very prone to distraction" and needed continuous 1:1 instruction (as compared with attention from someone who could just come in when there was a problem, as a para would function). (Tr. 235). Mr. Cepeda noted that "without one-to-one instruction... [C.D. would] have problem behavior the majority of the school day. He [would] be on the floor. He [would] be tantrumming. He [would] be self-injurious and he [might] be naked on top of that." (Tr. 65-66). Christine Malaysz, M.A., one of C.D.'s home ABA therapists, agreed, noting that without consistent 1:1 instruction, C.D.'s "behaviors would

increase and... he would lose a lot of learning time." (Tr. 329).[13]  A 6:1:1 program would not have met the NYCDOE's own requirement of that C.D. be placed in an "intensive" program. (Tr. 68).

C.D. lacked "some very specific prerequisite skills... that he really should master prior to having meaningful interaction with other kids." (Tr. 170).  Interaction with other students could be facilitated only when C.D. acquired the necessary prerequisite skills. (Tr. 170).  Quite simply, for 2006-2007 C.D. was not ready to move to a less restrictive setting than the one he attended at the ELIJA School and previously at the McCarton School, both with 1:1 instructional ratios.  (Tr. 198, 233-235).  In fact, a criteria for admission to ELIJA was that the applicant "needed to be in a one to one teaching environment [as the school was] not looking for children who could function in a higher ratio setting." (Tr. 230).  Even when "Dr." Aleem and McCarton School ABA Instructor Jayshree Patel tried to test C.D. for approximately two hours, in December 2005, C.D. only elicited "some type of responses." (Tr. 549).  This alone should have prompted the NYCDOE to consider programs more restrictive than 6:1:1 classes.

Mr. Gutman testified that he *tried* to provide each of the students in his classroom with some level of 1:1 instruction each day.  (Tr. 480).  (In Mr. Gutman's class, C.D. would have received 1:1 instruction for approximately one-sixth of the school day, amounting to less *than a half hour session* per day when Mr. Gutman could provide even that.  (Tr. 480, 498)).  The students had "downtime" to work in centers for a good portion of the day.  (Tr. 464-465, 496-497).  In fact, sometimes children who could not participate meaningfully simply were left to watch instruction, with the hope that the

---

[13] In September 2006, C.D. presented with a host of behavioral concerns, including screaming, crying, hitting himself in the head with his fist, hitting his head against a wall, throwing tantrums, and taking off his clothes. (Tr. 38; see also Tr. 123-124).

information would be "penetrating… [to be] making more of an understanding." (Tr. 522). Mr. Gutman testified that his class could not accommodate a student who required 1:1 instruction for the full day. (Tr. 499).[14] Such an environment would not have afforded C.D. the opportunity to make meaningful educational gains.

Moreover, the NYCDOE was required to place C.D. in a program with students who presented with similar educational needs. See Walczak, supra, 142 F.3d at 123. Within Mr. Gutman's class, the students' reading levels in September 2006 were "from pre-K to about emerging first grade," while their math levels were "[p]robably from pre-K to merging first, maybe second grade…." (Tr. 381). Yet one student in Mr. Gutman's class read at a "third grade level, emerging third grade level and his math was about like mid-second grade level." (Tr. 479). Though the SRO was "not persuaded that [C.D.] would have been inappropriately grouped in [the NYCDOE's] proposed placement", Mr. Gutman admitted that C.D.'s functioning levels were not the same as his students' levels. (See Exhibit B annexed to Complaint, p. 20; Tr. 479). Furthermore, the students in Mr. Gutman's class possessed "all different" social-emotional needs. (Tr. 382). Nevertheless, group instruction time was intended for *all* of the students. (Tr. 480). Sitting similarly functioning students together during such group exercises would not right this educational wrong that was recommended for C.D. (See Tr. 480-481).

Mr. Gutman employed "an umbrella of certain methodologies" for instruction. (Tr. 393-394). Yet the extent of Mr. Gutman's training in ABA and TEACCH

---

[14] Mr. Gutman later added (erroneously): "I do not think a one student to one teacher program, I do not think a program like that exists." (Tr. 499). Plainly, as demonstrated amply throughout the record, the NYCDOE was attempting to shoehorn C.D. into the type of program it had, rather than provide C.D. with the type of program that his individual educational needs mandated. (See also Tr. 558). No other placement type was considered other than what was offered – despite plaintiff-appellants' request for a 1:1 program for C.D.. (See Tr. 573-574).

methodologies, both used in his classroom, was limited to one to two workshops per year. (Tr. 473-475).   Ms. Kossover had attended three workshops to train her in these methodologies.  (Tr. 431).  During 2006-2007, Mr. Gutman's paras did not attend the ABA and TEACCH workshops.  (Tr. 476).[15]  Mr. Gutman testified that with regards to distinguishing presentments of children with autism spectrum disorders: "I would say, I am not a professional…."  (Tr. 477).[16]  Clearly the NYCDOE was not prepared to offer the intensive program with sufficient supervision and skilled instructors that C.D. needed.

In Mr. Gutman's class, behavioral needs were addressed reactively, i.e., the school "would have to wait until the first negative behavior [arose]." (Tr. 397).  Restraint would be used, despite staff members' lack of current training.  (Tr. 397-398, 511-512; see also Tr. 487).[17],[18]   Following a child's behavior episode(s), there would be an evaluation and the staff would "*try* and get them on some kind of behavior mod system." (Tr. 398)(emphasis added).  This was an approach of "too little, too late" and does not meet the "reasonably calculated" standard.

Mr. Gutman seemed unclear as to the exact path to take towards implementing a child's BIP, and none of the other students in Mr. Gutman's class presented with all of the behaviors that C.D. had, or were flight risks (as C.D. was).  (See Tr. 399-400, 482-485, 487).   Unfortunately, and again relevant to the "reasonably calculated" test, the NYCDOE had not *planned* adequately to reduce and redirect C.D.'s interfering behaviors.  Moreover, the NYCDOE's recommended program and placement was ill-

---

[15] To be hired as a paraprofessional one need not even complete college.  (Tr. 433).

[16] To his knowledge, Mr. Gutman was not supervised by any Board Certified Behavior Analyst ("BCBA") or BCaBA.  (Tr. 507).

[17] Restraint was not included anywhere on C.D.'s proposed 2006-2007 IEP.  (Exhibit P-C).  Contrast Brown v. Ramsay, 167 F. Supp.2d 597, 603 (E.D.Va. 2000), aff'd, 10 Fed. Appx. 131, No. 01-1041 (4th Cir. Va. May 21, 2001).

[18] Restraint often is recognized "only as a last resort".  See Application of a Child with a Disability, Appeal No. 02-042.

19

equipped to meaningfully handle and address all of C.D.'s behaviors. The proposed program would have not enabled C.D. to make meaningful educational growth, and it posed as an unsafe environment for him.

### 3.  The IHO and SRO Failed to Accord Appropriate Weight to the Testimony

Both the IHO and the SRO arbitrarily accorded more weight to the largely *uninformed* testimony of the NYCDOE's witnesses than it did to plaintiffs-appellants and C.D.'s instructors/ therapists, i.e., the people who actually worked with C.D. and knew him best. While Mr. Gutman testified that he believed C.D.'s needs could be met "*to the best of [Mr. Gutman's] ability*" in the recommended class, Mr. Gutman conceded that he had never met C.D. nor spoken to anyone who worked with him. (Tr. 471-472)(emphasis added). Nor had he reviewed any of C.D.'s reports. (Tr. 472). It is respectfully submitted that Mr. Gutman's testimony regarding C.D., then, should have been entitled to little if no weight. Likewise, Ms. Kossover's knowledge of C.D. "[was] limited to his IEP," and her testimony regarding C.D. also should have been afforded little, if any, weight. (Tr. 427). Plaintiffs-appellants' witnesses' testimony should have been given *at least* the same weight as that of the NYCDOE's witnesses, if not *greater* weight in light of the circumstances.[19],[20]

### B.  Prong II: C.D.'s Unilateral Program and Placement for the 2006-2007 School Year and the Summer of 2007 Were Appropriate for C.D.

---

[19] C.D.'s case reflects an unfortunate trend in the SRO's recent decision making. Upon information and belief, compounding the SRO's erroneous analysis of C.D.'s case was an apparent bias and appearance of impropriety. See Exhibit C annexed to Complaint.

[20] Dr. Aleem received his doctorate degree in psychology from Bern University (later, Bernelli University), a school that later lost its certification as an accredited educational institution. Governmental and educational authorities apparently discovered that Dr. Aleem's *alma mater* was declared to be "a fraudulent on-line diploma mill which awarded Ph.D. credits and degrees on the basis of payments but which were not truly earned." See Exhibit B annexed to Affirmation of Gary S. Mayerson.

As noted, C.D.'s 2006-2007 unilateral program and placement consisted of the ELIJA School, a 1:1 learning environment based on the principles of ABA,[21] ABA services outside of school, and transportation. The Second Circuit has embraced expressly the concept that the appropriateness of a unilateral educational placement is subject to a somewhat more *relaxed* standard of review than that used to determine whether the local educational agency offered the child a FAPE.

The unilateral placement need not be perfect, need not meet all of the child's special education needs, and need not be in the child's least restrictive environment. See Frank G., supra, 459 F.3d at 364. Furthermore, the unilateral placement need not offer the child an IEP or employ certified special education teachers. See id. In essence, "the test for the parents' private placement is that it is appropriate, and not that it is perfect." Id. (referencing M.S. v. Bd. of Educ., supra)(quoting Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999)). The test of appropriateness under Frank G. is that the placement and program is "reasonably calculated" to provide meaningful educational benefits to the child. Frank G. at 364. As noted, supra, neither the IHO nor the SRO weighed in to determine Prong II issues. Plaintiffs-appellants submit that the evidence amply establishes a finding of a FAPE failure on the NYCDOE's part, and that this court should review the Prong II issues now before it.

C.D.'s ELIJA School program focused on developing independence. Mr. Cepeda testified that the school's "goal is not to rotely [*sic*] teach skills, [but rather,] it is to [t]each a child that has a severe learning disability how to learn." (Tr. 41). For example, by employing errorless teaching procedures, C.D.'s therapists worked to fade back the

---

[21] ABA's efficacy in working with children with autism is supported by 30 years of research; most importantly, ABA "has proven to be very effective with [C.D.]…," per Mr. Cepeda. (Tr. 35, 195-196).

21

prompts they used with C.D. to facilitate appropriate responses. (Tr. 40-41). Further, by interspersing mastered skills amongst new skills, C.D.'s therapists ensured maintenance of learned skills and appropriate learning. (Tr. 42-43). C.D.'s program at the ELIJA School combined discrete trial instruction, task analysis, and natural environment teaching, components of a quality ABA program. (Tr. 171). Mr. Cepeda noted that "the goal of this kind of intensive teaching [was] to... give [C.D.] the foundation skills so that [he could] move to less restrictive teaching procedures...." (Tr. 172).

Five children attended the ELIJA School in 2006-2007. (Tr. 57). Five ABA instructors, all of whom Mr. Cepeda supervised, were responsible for providing 1:1 therapy to the students. (Tr. 57-58). Mr. Cepeda also supervised the ELIJA School's two head teachers, who collected comparative data; as well as monitored the students' data and ensured that the teachers were implementing teaching and behavior reduction procedures appropriately, on a daily basis. (Tr. 57-58, 61-62). Mr. Cepeda observed C.D. in his class every day. (Tr. 60). Moreover, the ELIJA School featured a high level of interaction between the Educational Director, Executive Directors, Head Teachers and instructors. (Tr. 60). Dr. Bridget Taylor, BCBA, Executive Director of the Alpine Learning Group and one of the foremost experts in the fields of autism and ABA served as an expert consultant and observed the students' programs on a monthly basis and provided feedback. (Tr. 60-61). (See http://en.wikipedia.org/wiki/Bridget_Taylor [last modified November 7, 2007]).

At the ELIJA School, C.D.'s instructors used a variable ratio schedule of reinforcement, i.e., C.D. did not know when he would be rewarded for appropriate behavior. Reinforcement occurred often enough, though, to promote consistent responses

22

from C.D. (Tr. 44). C.D.'s ELIJA School instructors established specific behavior protocols for problems that interfered with C.D.'s learning. (Tr. 44). For example, to address C.D.'s motor stereotypy involving his hands, therapists required C.D. to maintain his hands in his pockets whenever he was ambulatory. (Tr. 44-45). C.D. also had a behavior plan for more serious behaviors, such as throwing himself to the floor, based on an FBA and weekly data review. (Tr. 45).

At the ELIJA School, C.D.'s program goals "[were] really focused around [C.D.'s] language development and his independence...." (Tr. 92).[22] ABA instructors collected data on C.D.'s performance and independence, and implemented C.D.'s behavior plan, throughout the school day. (Tr. 52). C.D.'s program was individualized continuously based on C.D.'s needs and data results. (Tr. 135-136, 141-142, 145, 221-222). C.D.'s skill acquisition was "consistently on an upward trend" and he "made significant gains" through his programming. (Tr. 141, 164). He worked on a handwriting program fitted for his individual needs. (Tr. 81-82). He was "doing pretty well" with reading, and he also was learning to write. (Tr. 89, 120, 144). "[F]ollowing instructions [was] part of his daily routine and there [was] a significant reduction in problem behavior." (Tr. 112; see also Tr. 115). Staff effectively reduced C.D.'s vocal stereotypy, and as of the time of the due process hearing they were working to reduce further C.D.'s tantrums. (Tr. 114-115; see also Tr. 124-126).

C.D. only had "down time" at most in timed, one minute intervals at the ELIJA School. (Tr. 203). With the subtraction of just one staff member, though, C.D. "need[ed]

---

[22] While the goal was for C.D. to be able to work independently (i.e., without an ABA instructor), as of the time of the hearing he could not work alone in unstructured time yet. (Tr. 51). Thus, C.D. would have spent most of the day lost had he attended the NYCDOE's recommended placement in a 6:1:1.

a lot of redirection… if he [saw] the opportunity to go and do something else that he [was] not supposed to be doing, he [would] take that opportunity." (Tr. 148). (During lunch and gym, C.D.'s group had one to two less instructor(s). (Tr. 145-147)).

The ELIJA School targeted C.D.'s speech and language delays daily; as of the time of the due process hearing, C.D. had advanced from making single-word requests to using sentences, as his other skills further developed. (Tr. 109, 116-117). Furthermore, while C.D. had been working on social questions for years, at the ELIJA School he learned to "consistently emit… specific responses." (Tr. 117). The ELIJA School also addressed all of C.D.'s deficits identified in a prior occupational therapy ("OT") report. (Tr. 201-203). The stated concern that a program without OT would be inappropriate for C.D. rang disingenuous. (Tr. 537, 561). It also suggests an unduly elevated standard on Prong II that the Second Circuit rejected in Frank G.. Dr. Aleem noted the need to address C.D.'s deficits, and the ELIJA School did just that. (Tr. 201-203, 561).

Through "Natural Environment Teaching", a form of ABA, C.D. had opportunities to be "using [his] language naturally." He maintained "excellent eye contact" and greeted and smiled at the ELIJA School staff. (Tr. 119). Instructors collected daily data on C.D.'s behaviors, and updated C.D.'s Behavior Reduction Plan on an "as needed" basis. (Tr. 126-127). Mr. Cepeda trained all of the ELIJA School staff on the behavior interventions and plans used with C.D. (Tr. 128). The results spoke for themselves: Since beginning the ELIJA School program, C.D. had "significantly fewer, non-contextual vocalizations [and] significantly fewer tantrums in general." (Tr. 130). C.D. also "[s]ignificantly reduced" his behaviors when he wore long sleeves, an event which previously evoked difficult "problem behavior." (Tr. 134-135).

24

The ELIJA School stayed in close contact with C.D.'s parents. (Tr. 151, 317-318, 350-351). Mr. Cepeda modeled interventions for C.D.'s parents and C.D.'s home ABA therapists to ensure consistent programming between home and school. (Tr. 153, 155, 317-318). School staff members were available to C.D.'s parents for set hours every day, and "24/7" by email. (Tr. 160). C.D.'s parents made use of the ELIJA School's open door policy. (Tr. 151). While Mr. Cepeda envisioned a more expansive parent training program for the ELIJA School, C.D.'s program already included a great deal of home-school / instructor-parent coordination. (Tr. 162-163). Despite this level of communication and training, though, C.D.'s parents were not equipped to take over the work of C.D.'s trained home ABA therapists. (Tr. 188-189).

Mr. Cepeda testified that the ELIJA School was an appropriate component of C.D.'s educational program. (Tr. 164). Ms. Harris agreed, citing C.D.'s "significant gains" including "a significant reduction in his non-contextual vocalizations... compliance [which] has been wonderful... a wonderful increase in eye contact... [and s]ocial greetings [that] improved tremendously." (Tr. 247-248). C.D. also became more independent. (Tr. 248). Ms. Malaysz joined in her support of the ELIJA School as an appropriate component of C.D.'s educational program, noting a decrease in C.D.'s behaviors and a corresponding increase in C.D.'s academic skills. (Tr. 343).

Like the ELIJA School program, C.D.'s home ABA program also was an appropriate component of C.D.'s overall educational program for 2006-2007. The NYCDOE's logic that the ELIJA School was not appropriate because C.D. required additional home- and community-based services to meet his needs is misguided. Such a

25

position runs contrary to the spirit of the IDEIA, which precludes using a "one size fits all model" in developing an appropriate educational program for a child with a disability.

C.D.'s mother, plaintiff-appellant M.D., reported that left to his own devices C.D. would revert to engaging in inappropriate behavior. (Tr. 275-276). Unfortunately, C.D. could not confine his needs to the school day hours, as autism is a 24-7 "workaholic" that does not limit its reach. Furthermore, C.D. had difficulty with generalization, or "the ability to demonstrate a skill across settings or environments, across time and across stimuli." (Tr. 62-63). To build C.D.'s skills across multiple domains, the ELIJA School instructors used "multiple exemplars," multiple skilled ABA instructors, and teaching in different settings. (Tr. 63-64). Working with ABA instructors outside of school also facilitated consistency in C.D.'s instruction. (Tr. 65). Mr. Cepeda, Ms. Harris and Ms. Malaysz all testified that C.D. "absolutely" needed home-based services in addition to his school program, for after school and weekends. (Tr. 110, 191, 227-228, 254, 325-326). Mr. Cepeda recommended that C.D. receive 10-15 hours per week of ABA services outside of school. (Tr. 159), and Ms. Malaysz recommended that C.D. receive at least 12 hours per week of home ABA services. (Tr. 327-328, 345). Regression ensued when C.D. missed any home therapy hours. (Tr. 337-338, 353-354). To ensure consistency between home and school programming, Mr. Cepeda and C.D.'s Head Teacher Rocio Chavez worked with C.D.'s parents and ABA therapists in C.D.'s home. (Tr. 111).

Mr. Cepeda testified that Christina Nitsa, M.S. and Ms. Malaysz, C.D.'s home instructors, both possessed the traits of quality ABA therapists, including high energy, focus, and the ability to acquire new skills quickly. (Tr. 56-57; see also Tr. 330). Ms. Malaysz testified about progress she witnessed during 2006-2007: Tantrums during

home therapy sessions were reduced from approximately forty minutes, to five to ten minutes each. (Tr. 331). C.D.'s attention "enormously" improved, as did his eye contact. (Tr. 333). His expressive language skills and academic skills expanded. (Tr. 334). C.D. also made gains in functioning within the community. (Tr. 335).

### C.    Prong III:    The Equities Favor Reimbursement of the Costs and Expenses of C.D.'s Unilateral Program and Placement for the 2006-2007 School Year and the Summer of 2007

The evidence amply demonstrated that the NYCDOE failed to offer C.D. a FAPE (Prong I), and that C.D.'s unilateral program and placement were appropriate for C.D. to make meaningful educational growth (Prong II).    The equities also support reimbursement (Prong III).    Equitable considerations include the parents' compliance with the law, and the reasonableness of the parents' position. See Wolfe, supra, 167 F. Supp. 2d at 533 (citing Town of Burlington, supra, 736 F.2d at 801-02).

Plaintiffs-appellants participated in C.D.'s IEP meeting, and followed up with the NYCDOE when they *still* had not received a placement recommendation for C.D. by late July, 2006. (Exhibit P-I). The NYCDOE waited until mid-August to issue its (unilateral) placement recommendation, but just as a patient must be able to give "informed consent", C.D.'s parents could not be required to blindly accept the recommended placement (about which they had no information) without seeing it. Unfortunately, the NYCDOE's actions and delay and precluded a site visit prior to the start of the school year. (Exhibit P-J; Tr. 296-297).[23]    The NYCDOE effectively made it impossible for C.D.'s parents to accept the placement, leaving them without a spot for C.D. come September 2006.

---

[23] M.D. ultimately did see the recommended placement, well after the start of the school year. (Tr. 297). This school was highly inappropriate for C.D. (See Tr. 297-304, 306, 368-370; see also 458-459).

The NYCDOE noted that C.D.'s parents "signed an enrollment contract in April [2006] for the [ELIJA] School, only two days after the CSE met" and argued that "[C.D.'s] parents clearly never intended to consider the Department of Education's proposed placement." (Tr. 26). Yet the evidence demonstrates otherwise. Ms. Harris also works with the not-for-profit ELIJA Foundation, through which she has assisted families with educational placement issues (which is a "highly individualized" process). (Tr. 210). She testified that parents seeking an appropriate placement for their child investigate schools many months in advance, as "generally the waiting lists are anywhere from 100 to thousands on a waiting list." (Tr. 239). M.D. testified that in her experience, a particular school's application and admissions process could take one to two years. (Tr. 307). In fact, the ELIJA School was opened to "be able to provide a service to children who were unable to seek appropriate services." (Tr. 260). There is nothing wrong with parents exploring alternative options.

The NYCDOE also argued that "as [C.D.'s] parents are founding members of the [ELIJA] School and have made sizeable donations to the school beyond their tuition obligations this lends credence to the notion that they intended to enroll [C.D.] at the [ELIJA] School for the '06-07 school year regardless of what the Department of Education offered." (Tr. 27; see also Tr. 258). However, at the ELIJA School, the term "founding parents" merely refers to the parents of the first children to attend the school site. (Tr. 257). Also, as Ms. Harris testified, many families in the autism community donate to autism-related not-for-profit organizations and charities, including schools that their own children do not attend. (Tr. 263-264). To attempt to paint C.D.'s parents as somehow unreasonable or uncooperative for making a donation to a worthy autism

28

school was offensive. Moreover, Ms. Harris testified that plaintiffs-appellants' donation did not influence C.D.'s acceptance into the ELIJA School program. (Tr. 264).

The ELIJA School required an application package with video footage and an intake evaluation, as well as an observation at a behavior intervention clinic. (Tr. 235-237). Approximately 50 students applied for the school's five available spots. (Tr. 237-238). At the time of C.D.'s IEP meeting in April 2006, plaintiffs-appellants were beginning to apply C.D. for consideration by the ELIJA School, after C.D.'s rejection from the New York Center for Autism charter school. (Tr. 307-308). When C.D. was accepted to the ELIJA School in June 2006, payment was necessary to hold C.D.'s spot. (Tr. 309-310). At that time, the NYCDOE had not offered C.D. a placement yet. (Tr. 311).[24] Plaintiffs-appellants acted as responsible parents who knew the potential perils of not having an educational placement in place for C.D. for the start of the 2006-2007 school year. See, e.g., Wolfe, supra, 167 F. Supp. 2d at 535. Ms. Harris testified that "it would not have been an issue" for the ELIJA School to issue at least a partial refund to C.D.'s family if C.D. were withdrawn from the ELIJA School prior to the start of the school year. (Tr. 244). Indeed, approximately 10 students remained on the ELIJA School's waiting list at the time of C.D.'s acceptance, and plaintiffs-appellants were aware of this waiting list of families ready, willing and able to send their child to the ELIJA School should C.D.'s spot become available. (Tr. 245, 263, 312). M.D. and T.D. were under the distinct impression that the ELIJA School "would work with [them]" if the NYCDOE offered C.D. an appropriate placement. (Tr. 311-312).

---

[24] The SRO has recognized that "[t]he equities do not prevent a parent from entering into a contract with a preferred private school prior to the date of the relevant CSE meeting...." See, Appeal No. 05-087, supra.

Other equitable considerations to consider include the cost of C.D.'s unilateral program and placement. C.D.'s tuition at the ELIJA School was $90,000 for the twelve-month (September, 2006 through August, 2007) "all inclusive" program, and represented a fraction of the cost to educate C.D. at the school. (Tr. 225, 240-242). This price compared favorably with the tuition charged by other 12-month 1:1 programs for children with autism, in New York City and on Long Island, falling "right in the middle." (Tr. 241-242). C.D.'s home ABA costs also were "definitely within market range." (Tr. 341). Transportation costs were based on the distance between C.D.'s home and the ELIJA School, which T.D. drove. (Exhibit P-Q; Tr. 358-359).[25]

## V.    CONCLUSION

It is respectfully requested that this Court grant plaintiffs-appellants' motion for a modified *de novo* review and reversal of the administrative decisions (except insofar as the SRO's Decision correctly ordered enforcement of C.D.'s pendency entitlements) as well as grant plaintiffs-appellants declaratory, reimbursement and related relief. This Court should declare plaintiffs-appellants as the substantially prevailing party.

GARY S. MAYERSON (GSM 8413)
Mayerson & Associates
Attorneys for Plaintiffs-Appellants
330 W. 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (fax)

---

[25]The NYCDOE failed to offer C.D. transportation. (Tr. 359).Transportation is available to students in order so that they may receive a FAPE. See Application of a Child with a Disability, Appeal No. 04-047 (citing N.Y. Educ. Law § 4401(1)). See also Application of a Child with a Disability, Appeal No. 03-054 (references omitted)("Boards of Education are obligated to provide transportation to publicly placed private school students with disabilities").

Westlaw.

Slip Copy                          FOR EDUCATIONAL USE ONLY                                    Page 1
Slip Copy, 2007 WL 1259145 (S.D.N.Y.)
**(Cite as: Slip Copy)**

A.C. ex rel. M.C. v. Board of Educ. of the Chappaqua Central School Dist.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
A.C. and M.C. on behalf of their child, M.C.,
Plaintiffs,
v.
BOARD OF EDUCATION OF THE CHAPPAQUA CENTRAL SCHOOL DISTRICT, Defendant.
**No. 06 Civ. 4238(CLB).**

April 27, 2007.

### *Memorandum and Order*

BRIEANT, J.

**\*1** Plaintiffs initiated this action pursuant to the Individuals with Disabilities in Education Act, *20 U.S.C. § 1400, et. seq.,* ("IDEA") alleging that Defendant school district failed to provide their child with "a free and appropriate education", as is required by the IDEA, and seeking reimbursement for their private school placement of the child. Before the Court for decision is Plaintiffs' "Motion for modified *de novo* review" from the February 6, 2006 decision of State Review Officer ("SRO") denying reimbursement. (Doc. 4). The SRO held that the Individualized Education Plan ("IEP") developed by Defendant Chappaqua Board of Education provided Plaintiffs' son with a free and appropriate education ("FAPE") as is required pursuant to the IDEA. Also before the Court for decision is Defendant School District's motion for summary judgment to uphold the SRO's decision. (Doc. 5).

### *Facts / Background*

M.C. was born on June 10, 1994, and is twelve years old. His disabilities, as described by the IHO, include " 'Pervasive Developmental Disorder' ("PDD"), significant language disabilities, significant learning disabilities, motor development issue, and sensory dysfunction, including visual defects and auditory processing difficulties."(IHO at 5-6).

The IHO further reported that "M's marked attention deficit compromises his cognitive, academic, behavioral and social functioning. M's parents and teacher reported that he had a short attention span, poor social skills, and was easily distracted by extraneous stimuli. His adaptive behaviors, i.e., daily living skills, communication and socialization, were below age expectant levels. Projective tests suggested that M is easily overwhelmed by emotional or complex stimuli, and he may cope with this by generating fantasies or scripting."(IHO at 26.) M.C. "displays features of an autistic disorder; however, he was characterized as 'high functioning' within that diagnostic category."(SRO at 1).

M.C. entered the District as a pre-school student and attended school in the District's Roaring Brook Elementary School from Kindergarten through fourth grade. When M.C. was nine years old, the District conducted a psychological evaluation, after which the evaluators reported that he exhibited difficulty sustaining his attention in order to understand test directions and required frequent breaks. (SRO at 2.) IQ tests indicated that M.C.'s performance (which put him in the fourth percentile or below in every category) was hindered by severe attention and executive function deficits as well as significant language processing difficulties. (*Id.*)

During the 2003-04 school year M.C. attended the District school in a "co-teaching support program", in which M.C. was educated within the general education environment with special educational support. The special education services were provided by a special education teacher and a special education assistant. M.C. was also provided with a full time 1:1 aide, and speech language therapy. (SRO at 2-3).

**\*2** Defendant's Committee on Special Education ("CSE") met in March, May, June and July of 2004, in order to develop M.C.'s Individualized Education Plan ("IEP") for the 2004-05 school year. The final 2004-05 IEP called for full-time 6:1 co-teaching support program in the general education environ-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment with a full-time (5:1) program assistant. (SRO at 5). The IEP also called for daily integrated individual math instruction and daily individual reading instruction in a separate location, along with occupational therapy and psychological consultation.

At the final CSE, the parents voiced their concerns about M.C.'s progress, and discussed private placement of M.C. The parents specifically requested placement at the Eagle Hill School, a private school for students with disabilities. Defendant's CSE nevertheless recommended the District School as M.C.'s placement, reporting that "the Committee recommended Co-teaching Support Program with Program Assistant and Related Services as an appropriate program in the least restrictive environment."(SD-9 at 3). The parents rejected this conclusion, and by letter dated August 25, 2004, they informed Defendant that they would be enrolling M.C. in Eagle Hill and requested an impartial hearing for the purposes of obtaining reimbursement for the 2004-05 school year.

An Impartial Hearing was held over six days before the IHO. On October 31, 2005, the IHO issued a decision in favor of the Parents, concluding that "M's parents are entitled to reimbursement for the 2004/05 tuition at Eagle Hill, because the CSE's IEP was substantively flawed, M's parents have shown that Eagle Hill is an appropriate placement for him, and there are no equitable considerations which would bar an award of reimbursement."

The IHO found that there was "a serious substantive error in the IEP process."(IHO at 35.) This substantive error was the failure of the CSE to obtain a Functional Behavioral Assessment ("FBA") for M.C. Citing state and federal regulations, the IHO found that an FBA was required because M.C.'s behavior, including "poor attention, lack of focus, tangential speech and 'fantasy episodes' all significantly interfere with his instruction."(IHO at 36) (citing 8 NYCRR 200.4(d)(3) and 34 C.F.R. 300.346(a)(2)). The IHO also found that the District's use of a 1:1 aid, without a plan to reduce dependance on the aide, "may be viewed as a crutch or a palliative measure, especially where, as here,

lack of independence is one of the student's most significant deficits."(IHO at 36).

The IHO found that the parents' placement of M.C. at the Eagle Hill school was appropriate, because it provided him a "highly-structured, multi-sensory instruction and intensive remediation in math, reading, and other language arts" and because "M has progressed in the program, academically and socially."The IHO further held that the equities favored the parents.

### SRO

Defendant appealed the IHO decision, and on February 6, 2006, the SRO reversed the IHO's decision. The SRO held that the IHO had erred in concluding that Defendant's failure to conduct a FBA deprived M.C. of a FAPE. The SRO noted testimony by Defendant's professionals indicating "that during the 2003-04 school year the student's 'primary behavior that needed to be monitored was really with regard to attention."(SRO at 10) The SRO held that:

**\*3** "[Defendant's] CSE considered appropriate strategies, including positive behavioral interventions and supports to address the student's attentions deficits, and developed an IEP which accurately reflected the results of evaluations that identified the student's needs, established annual goals and short-term instructional objectives related to those needs, and provided for the use of appropriate special education services in its creation of an IEP that was reasonably calculated to enable the student to receive educational benefits in the LRE. Petitioner's decision not to conduct an FBA did not rise to the level of denying the student a FAPE."

For the reasons set forth below, the Court holds that the SRO erred in reversing the IHO and finding that Defendant provided M.C. with a FAPE.

### Discussion

States that receive funding under IDEA must provide "a free appropriate public education" to each student with a disability. 20 U.S.C. sec. 1400(d)(1)(A)."When a state receiving IDEA funding fails to give a disabled child such an education,

Slip Copy                          FOR EDUCATIONAL USE ONLY                                    Page 3
Slip Copy, 2007 WL 1259145 (S.D.N.Y.)
**(Cite as: Slip Copy)**

the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state."*M.S. v. Yonkers Bd. of Educ.,* 231 F.3d 96, 102,*citing School Comm. of Burlington v. Department of Educ.,* 471 U.S. 359, 369-70 (1985).

Initial determinations of the appropriateness of the IEP are made by the IHO and SRO, which "are then subject to 'independent' judicial review."*Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir.1998)*quoting Board of Educ. v. Rowley,* 458 U.S. 176, 205 (1982). The Court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan."*Walczak at* 130. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' " *Id at* 129 (*quoting Rowley at* 206, 208).

The inquiry for this Court in assessing a claim for reimbursement by parents for their unilateral placement of their child is: (1) "was the IEP proposed by the school district inappropriate"; (2) "was the private placement appropriate to the child's needs"; and (3) do "equitable considerations" support the parents' claim for reimbursement. *Frank G. v. Board of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir.2006). The Court will examine each of these considerations in turn.

In determining whether the IEP proposed by the district was appropriate, the Court must determine "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.' " *Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir.1998)*quoting Board of Educ. v. Rowley,* 458 U.S. at 206-07.

**\*4** "The IDEA requires any State educational agency that receives federal assistance to establish and maintain procedures to safeguard the right of children with disabilities to a free appropriate public education."*J.D. ex rel. J.D. v. Pawlet School Dist.,* 224 F.3d 60, 68 (2d Cir.2000) (citing 20 U.S.C. § 1415(a)). Plaintiffs argue that there were several procedural flaws that they claim invalidate Defendant's proposed IEP for M.C. They claim that Defendant failed to secure the attendance of a parent member at the CSE meeting, and also failed to provide "prior written notice" of its recommendations to the Plaintiffs, which are both requirements under New York law. The Court agrees with the IHO that these technical deviations did not constitute a denial of a FAPE. The failure to provide "prior written notice" to Plaintiffs caused no harm or prejudice to M.C. or his parents, because the record shows that the parents in fact knew of the CSE's determination regarding their preferred placement at Eagle Hill. As to the Defendant's failure to secure the attendance of the parent member at one of the CSE meetings, it is clear that the parent member was at the meeting where the 2004-05 IEP was promulgated. This deviation is also insufficient to constitute a deprivation of a FAPE.

Plaintiffs also attack the sufficiency of the IEP by arguing that its "goals and objectives were inappropriate and failed to promote M.C.'s independence and progress." Plaintiffs claim that M.C. goals and objectives were written before his progress was even assessed from the previous school year. They also argue that testimony during the proceedings showed that his teachers and therapists provided by the district did not alter the goals and objectives for M.C. after they tested him. This, plaintiffs argue, constituted impermissible "predetermination" under the IDEA.

The Court also concludes, as did the IHO, that these procedural faults in the IEP process were insufficient to constitute a deprivation of a FAPE. As the IHO noted, the fact that some of M.C.'s goals and objectives were drafted before the CSE meeting in which the final goals and objective for that year were promulgated did not in itself deny M.C. a FAPE.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

Plaintiffs also argue that defendant's failure to assess M.C.'s behavior was a FAPE deprivation, citing New York State Commissioner of Education's Part 200 Regulations, which requires "a functional behavioral assessment ("FBA") for a student whose behavior impedes his or her learning or that of others."*8 NYCRR 200.4(b)(1)(v)*. Plaintiffs argue that, notwithstanding defendant's representations to the contrary, M.C.'s behavior was clearly detrimental to his learning and required an FBA.

Defendant argues that an FBA was unnecessary, because most of M.C .'s "interfering" behaviors had to do with his attention span, which was addressed in substance by the IEP. Defendant argues that "[t]echnical deviations in an IEP do not render it invalid and in determining its adequacy procedurally, deference should be given to the SRO's decision."*8 NYCRR 200.4(b)(1)(v)*.

**\*5** The Court concludes, as did the IHO, that Defendant's failure to conduct an FBA constituted a deprivation of a FAPE to M.C. Defendant's own IEP for the 2004-04 school year expressly states that the student's "[b]ehavior seriously interferes with instruction due to frequent tuning out and inattention."As the IHO noted, it is clear from the record that "M's poor attention, lack of focus, tangential speech and 'fantasy episodes' all significantly interfered with his instruction."Although the CSE Chairperson, Dr. Jerry Wishner, opined that an FBA would be necessary only where the child's behavior was "challenging" or "hostile", the regulation is clear that an FBA is required to assess a child's behavior where it "impedes his ... learning." "The initial procedural inquiry is no mere formality."*Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir.1998). The record is clear that M.C.'s behavior did impede his learning, and therefore Defendant's failure to conduct an FBA in accordance with state regulations constituted a deprivation of a FAPE.

Plaintiffs also argue that the IEP developed by the defendant school district was substantively inappropriate. Plaintiffs argue that Defendant provided M.C. with one-on-one support without attempting to increase his independence and ability to function without that help. Plaintiffs claim that this "essentially kept M.C. in a state of learned helplessness", and even caused M.C. to regress.

Defendant argues that the IEP was reasonably calculated to afford M.C. a FAPE and the SRO decision to that effect is to be afforded deference. Defendant argues that the IEP was developed by experienced educators who sought to balance the goals of allowing MC to remain in the middle school with his peers, with his needs for individualized attention.

The Court holds that the IEP was not reasonably calculated to afford M.C. a FAPE. It is true that the District provided M.C. with extensive "support", most notably in the form of a 1:1 aide throughout the day. But as the IHO noted, "the constant presence of a 1:1 aide may be viewed as a crutch or palliative measure, especially where, as here, lack of independence is one of the student's most significant deficits. The 1:1 aide may have been very inhibiting in the proposed middle school placement, where he or she would have followed M from class to class."

Defendant's failure to address the need to increase M's independence conforms to the pattern of "learned helplessness" that was being fostered by the District's IEP. This approach is epitomized by the District's designation of a separate bathroom facility for M.C., and the fact that the District admitted that there was no "instruction goal aimed to have M. use a community bathroom."By failing to address M.C.'s need to increase his independence, and indeed by fostering "learned helplessness" through the indefinite use of a 1:1 aide, the Court concludes that the IEP was substantively inadequate and not reasonably calculated the provide M.C. with a FAPE.

**\*6** In order to award reimbursement under the IEP, the Court must also determine "that the private education services obtained by the parents were appropriate to the child's needs."*Walczak at 129.*"The test for the parents' private placement is that it is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appropriate, and not that it is perfect."*Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir.1999) (quoted by M.S. v. City of Yonkers at 104).*

The Court concludes, as did the IHO, that the parents have carried their burden of showing that Eagle Hill was an appropriate placement for M.C. As the IHO noted, the record amply demonstrates that "M has progressed in the program, academically and socially."Perhaps most important is M.C.'s "ability to function in classes and navigate the Eagle Hill campus without a 1:1 aide indicate increased independence, and important goal for him."

As M.C.'s instructors at Eagle Hill, as well as his parents, testified, the progress that M.C. made at Eagle Hill only highlight the very deficiencies of the District IEP. He no longer needed to use a private bathroom, and his independence dramatically improved. (Tr. 1276-1277); his eye contact improved (Tr. 1285); he no longer needed "squish balls" and pillows that had been used to regulate his sensory issues, that had been necessary at the District placement.

The Court holds that the parents have clearly demonstrated the appropriateness of M.C.'s placement at Eagle Hill.

The Court also concludes that the equities favor the Plaintiffs in this case."[B]ecause the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.' " *Frank G. at* 363-364 (*quoting Burlington at* 374.) As the IHO found in the administrative hearing, "the cost of tuition at the program is reasonable, there was cooperation and communication on the parents' part, and the hearing request was timely." (IHO at 38).

### *Conclusion*

The parties shall attempt to agree on a proposed form of judgment, or settle a judgment on ten (10) days notice if unable to agree. Plaintiffs' counsel shall submit his lodestar with the proposed judg-

ment, which shall be received no later than May 31, 2007.

SO ORDERED.

S.D.N.Y.,2007.
A.C. ex rel. M.C. v. Board of Educ. of the Chappaqua Central School Dist.
Slip Copy, 2007 WL 1259145 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                          FOR EDUCATIONAL USE ONLY                          Page 1
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
(Cite as: Slip Copy)

Bettinger v. New York City Bd. of Educ.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
    Nava BETTINGER and Daniel Bettinger, collect-
ively and individually on behalf of Elan Bettinger,
    a minor, Plaintiffs,
        v.
NEW YORK CITY BOARD OF EDUCATION,
d.b.a. New York City Department of Education,
and Joel Klein, Chancellor of the New York City
        Schools, Defendants.
        No. 06 CV 6889(PAC).

        Nov. 20, 2007.

        OPINION & ORDER
Honorable PAUL A. CROTTY, District Judge.
*1 Plaintiffs Nava and Daniel Bettinger ("the parents"), on behalf of their son Elan, (collectively "Plaintiffs" or "Bettingers") and Defendants New York City Board of Education, doing business as New York City Department of Education, and Joel Klein, Chancellor of New York City Schools, (collectively "Defendants" or "the City") cross-move for summary judgment on an administrative decision providing partial private school tuition reimbursement to the Plaintiffs under the Individuals with Disabilities Education Act ("IDEA"). For the reasons discussed below, Plaintiffs' motion is denied and Defendants' motion is granted.

        SUMMARY OF FACTS[FN1]

    FN1. On these cross-motions for summary judgment, all facts are derived from the parties' Rule 56.1 statements, their motions and the exhibits attached thereto, abbreviated, respectively, as "Pl.Ex." and "Def. Ex." Also, both parties have submitted a transcript of the hearing held before the impartial hearing officer on Oct. 28, 2005 and Dec. 7, 2005. This transcript is separately abbreviated as "Hr. Tr." Finally, the transcript of the oral argument held before

this court on Oct. 11, 2007, is abbreviated as "Arg. Tr."

At the time of the events at issue in this lawsuit, Elan Bettinger was a five-year-old emotionally disturbed student who exhibited aggressive tendencies and had been diagnosed with a number of personality and learning disorders.[FN2] Despite Elan's emotional and developmental disabilities, testing revealed that he had a performance Intelligence Quotient ("IQ") of 140 and a verbal IQ of 101, yielding a full scale IQ of 122, placing him in the "superior range" of cognitive abilities.[FN3] Def. Ex. F at 3-1. Due to Elan's special needs and his difficulties in his pre-school class, Elan's parents anticipated that he might require special attention in kindergarten, attention that might not be possible in a regular public school. Hr. Tr. at 92. Indeed, Elan was already in danger of being expelled from his preschool class mid-year due to his behavior. See id. at 98, 102.As such, in January 2005, Elan's parents applied for him to attend the West End Day School (hereinafter "West End"), a private school on the Upper West Side of Manhattan. See id.

        FN2. In his pre-school program, Elan had been known to hit, kick, and bite other students, and to behave aggressively toward teachers. See Pl.Ex. E at 1. His diagnoses include: Oppositional Defiant Disorder, Mixed Receptive-Expressive Language Disorder, Attention Deficit Hyperactivity Disorder, and Developmental Coordination Disorder. Pl.Ex. G at 4-1.

        FN3. Despite the "superior" results of the IQ testing, his kindergarten teacher testified that he demonstrated only "average" cognitive abilities in the classroom environment. Hr. Tr. at 79, 86.

The timing of the Bettingers' application to West End in January 2005 was designed so that Elan would have an appropriate placement for kindergarten in the fall, but also so that if he were ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                    FOR EDUCATIONAL USE ONLY                                    Page 2
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
**(Cite as: Slip Copy)**

pelled from his regular pre-school program, he could continue his 2004-2005 pre-school school year there. *See id.*Indeed, the Director of Admissions at West End testified that:

[W]e [at West End] never were sure whether we were going to admit him at the middle of [his pre-school] year or not because it wasn't clear whether [Elan] was going to be asked to leave his other school. But we did accept him for [the regular academic year program starting in] September.

*Id.* at 102.

She further explained that administrators at his pre-school school "were going to ask him to leave in mid-year. And they only reconsidered because ... the family had a shadow for him."*Id.* at 98.The presence of the "shadow," [FN4] and limiting his attendance to a half-day (as opposed to a full day) of school allowed him to stay at his regular pre-school program for the remainder of the 2004-2005 school year. Ultimately, therefore, his parents only sought admission to West End commencing in July, 2005, after his pre-school year ended. *Id.*

> FN4. A "shadow" is an adult who continually monitored Elan's behavior at his pre-school program.

*2 In February, 2005, Elan was formally accepted at West End for both the "Summer Learning Program," a six-week program which ran from July 1, 2005, until August 11, 2005, and the academic year program, which began in September and ran during the course of the traditional school year. *Id.* at 94-95.While the two programs are separate, for students with special needs, the fall placement is contingent on successful completion of the summer program.[FN5]

> FN5.*See* Hr. Tr. at 104-05 ("[O]n children that are coming to us with significant behavior problems in their previous school, we do talk to the parents about the possibility that we may not be able to keep a child after we see him for the summer .... If we felt that he was tearing the place apart in the summer, we would have returned their

check and not accepted him for September.").

After securing Elan's admission to West End on February 14, 2005, Elan's parents paid the school two deposits on two separate dates to secure his place in both the 2005 summer program and the 2005-2006 regular academic year term, respectively.[FN6]Tuition for the 2005 Summer Learning Program was $10,500 and tuition for the 2005-2006 academic year was $30,500.00.[FN7]In March, 2005, after Elan had already been admitted to both the summer program and the regular school year term at West End, and deposits made, a psychiatrist found that the structure of year-round school attendance would benefit Elan, and recommended that he attend a 12-month program. Pl.Ex. E at 3.

> FN6.*See* Pl.Ex. D at 1-2, checks from Mr. Daniel Bettinger to the West End Day School for: (1) the amount of $1000.00 dated Feb. 20, 2005 (for the summer program), and (2) the amount of $10,500 dated Feb. 23, 2005 (a non-refundable deposit for the regular school year).

> FN7. Hr. Tr. at 83, 100; *see also* Letter from West End Day School, Feb. 14, 2005, submitted by Plaintiffs to the Court on Oct. 16, 2007.

In Spring, 2005, Elan's parents requested that the Department of Education's Committee on Special Education ("CSE") develop a suitable educational plan for Elan pursuant to IDEA and New York law. Elan's parents cooperated with the CSE and an "Individualized Education Program" ("IEP") designed for him was issued on June 9, 2005. The IEP called for Elan to be placed in a 12-month, small-group, non-public school program, but did not specifically recommend a non-public school for Elan to attend.[FN8]Pursuant to their placement procedure, the CSE contacted the Central Base Support Team ("CBST") which then sought an appropriate non-public school for Elan which would be paid for entirely by public funds. On July 1, 2005, three weeks after the IEP was developed, but before the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                    FOR EDUCATIONAL USE ONLY                                    Page 3
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
(Cite as: Slip Copy)

CBST had contacted them regarding a non-public school placement, Elan began his summer program at the West End Day School.

> FN8. An IEP recommending placement in a non-public school is not "finalized" until a specific school for the child has been identified.

During the summer months, Elan's parents were contacted by at least two CBST-referred non-public schools.[FN9] Arg. Tr. at 5. One of those schools was the Lorge School, located in the Chelsea section of Manhattan. The Lorge School invited Elan and his parents to visit and interview at the school to determine if Lorge was an appropriate placement given his special needs. Arg. Tr. at 5, Hr. Tr. at 71. Elan's parents refused to interview at the school, and claimed that taking Elan out of his West End summer school would traumatize him.[FN10] Since there was no interview, Elan could not be admitted to the Lorge School, and, in accordance with school policy, Lorge School administrators sent a letter to the CBST informing them that the Bettingers were not interested in placing Elan at their school.[FN11]

> FN9. The CBST sent Elan's file to approximately twelve state-approved, non-public schools. Arg. Tr. at 3. According to Plaintiffs' letter of Aug. 15, 2005, at least two of these schools contacted the Bettingers between July 1 and August 15, 2005. See Pl.Ex. A. One of those schools was the Lorge School, and the details of that contact are discussed at length here. Neither the identity of the other school, nor any details regarding what transpired between that school's administrators and the Bettingers, is contained in the record.

> FN10. Elan's parents contend that a Lorge school administrator advised them that they could not visit the school without Elan since Elan's presence at the school was a prerequisite to his admission. See Hr. Tr. 41-42, 74. Elan's parents further claim that they told the administrator they

did not wish to pull Elan out of his regular day school program without first assessing whether the Lorge School was an appropriate placement for him. In contrast, the Lorge School administrator, Ms. Whiteman, testified that she invited the Bettingers for an interview, but advised them that it was not very efficient to come without Elan because they would eventually have to return with the child. Id. at 74.According to Ms. Whiteman, Ms. Bettinger responded by saying that "she had other interviews and she was not interested in interviewing at [the Lorge School] then."Id. at 71.The impartial hearing officer, who heard the testimony and observed the witnesses first-hand, credited Ms. Whiteman's testimony. Pl.Ex. B at 8-9.

> FN11. Hr. Tr. at 74-75.

Since the parents chose not to pursue the CBST's non-public school options, no publicly-funded, special-needs schools were selected to meet the requirements of his IEP. By the fall of 2005, Elan had two options: a regular public school kindergarten, which the IEP recognized as inappropriate, and the West End Day School, which his parents had selected for him in January 2005. The parents placed him in the West End Day School's program and sought reimbursement pursuant to IDEA for the cost of this private school tuition.

*3 In accordance with IDEA requirements, the parents requested a hearing before an impartial hearing officer to adjudicate their request for reimbursement of the cost of both West End's summer program and the regular academic year program. This request was made by letter dated August 15, 2005, four days after the summer school program ended and three weeks before the start of the 2005-2006 academic school year.[FN12] The hearing, which took place on October 28 and December 7, 2005, resulted in a denial of tuition reimbursement for the parents. The hearing officer found that:

> FN12. In 2005, the first day of New York

Slip Copy                    FOR EDUCATIONAL USE ONLY                                    Page 4
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
**(Cite as: Slip Copy)**

City public schools was Thursday, Sep. 8, 2005. *See* the 2005-2006 academic year calendar available at http://schools.nyc.gov. The Lorge School was considered and rejected by Elan's parents prior to August 11, 2005. The Court notes that there were four weeks between the end of the West End summer program on August 11 and the start of school on September 8 when further inquiries into City-referred, non-public schools could have been made. But the record reveals that no such effort to inquire about other options was made by the Bettingers.

[I]t [was] clear from the evidence that, as early as January 2005, it was the parents' intention to enroll the child in the West End Day School, and it appeared that the parents had no interest in exploring the options offered by [the Department of Education]. I conclude that the parents did not cooperate with [the Department of Education] and that their claim is not supported by equitable considerations .... The parents' request for tuition reimbursement is denied.[FN13]

> FN13. The impartial hearing officer also found that the alternative offered by the Department of Education, the Lorge School, was an appropriate placement for Elan. Pl.Ex. B at 8. Such a finding is relevant to the first factor of the reimbursement test articulated in *Burlington Sch. Comm. v. Dep't of Educ.,* 471 U.S. 359, 367-70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).*See infra* Part II.B. Since that factor (adequacy of services offered by the City) is conceded here, the critical part of the decision for our purposes is the hearing officer's findings regarding the parents' cooperation and the equitable considerations as they relate to the third prong of *Burlington.*

Pl.Ex. B at 9.

The parents appealed this determination to the Office of State Review. On appeal, the State Review Officer (hereinafter "SRO") agreed that Elan had special needs, but denied the request for full tuition reimbursement despite the parents' contention that Elan was unable to receive a free appropriate public education ("FAPE") as required by the IDEA.

The SRO noted that Elan's June 9 IEP did not indicate a specific school placement, as required for finalization. Instead, his case was referred to the CBST, which is charged with locating an appropriate non-public school. SRO at 6. Since no placement was ultimately found, and the IEP never finalized, the SRO found that the child was not offered a FAPE "because, although the June 9, 2005 IEP recommended a 12-month school year, the child was not offered an educational placement prior to the July 1, 2005 beginning of the West End summer program."*Id.* Moreover, the SRO found that West End was an appropriate placement for Elan because it offered "a small, highly structured, therapeutic special education," with "significant individualized attention," and "speech therapy, occupational therapy, and counseling."*Id.* at 7.

That does not end the matter, however. The SRO went on to find that even though the New York City Department of Education failed to provide Elan with the requisite FAPE, the equities did not favor full tuition reimbursement because Elan's parents failed to cooperate with the City's efforts to place Elan and instead unilaterally chose to place him elsewhere. The review officer, in agreement with the impartial hearing officer, held that:

A parent's failure to make their child available for an intake evaluation interview at the district's recommended placement option is relevant in determining whether equitable considerations support their claim for reimbursement. Where a parent deprives the district of its ability to make an appropriate program recommendation and obstructs the district's ability to finalize the student's IEP, equitable considerations will not support an award of tuition reimbursement.

*4 *Id.* at 8. The officer further explained that "[e]quitable principles dictate that parents cannot deliberately withhold their child from an intake in-

Slip Copy                    FOR EDUCATIONAL USE ONLY                    Page 5
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
**(Cite as: Slip Copy)**

terview and impede a district's ability to offer a FAPE and also secure a future award of tuition reimbursement at a private school of their choosing."*Id.* The SRO did, however, authorize partial tuition reimbursement for the West End Day School summer program, since Elan's IEP recommended a 12-month program and the City failed to provide an appropriate 12-month placement by July 1, 2005.[FN14] The parents now appeal to this court claiming that denial of tuition reimbursement for the regular academic school year constitutes a violation of both IDEA and New York State law.

> FN14. Thus, the SRO awarded the Bettingers reimbursement for West End's Summer Learning Program only. As previously stated, the cost of that program was $10,500. The Defendants do not appeal from this award and the Court accepts that the Bettingers are entitled to partial reimbursement because the City failed to provide a summer program for Elan to attend, and therefore failed to fulfill their own recommendation that he attend a 12-month program.

## DISCUSSION

### I. Applicable Standard

A parent dissatisfied with a state review officer's decision to deny tuition reimbursement may bring a civil action in federal district court. 20 U.S.C. § 1415(i)(2)(A). The reviewing court:
(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(B).[FN15]

> FN15. At the oral argument of these cross-motions on Oct. 11, 2007, the Court inquired as to whether either party wanted to offer additional evidence or conduct another hearing before this Court. Both parties said they would rest on the record as developed by the administrative proceedings below. Arg. Tr. at 22, 29.

While an IDEA appeal is in the form of a summary judgment motion, the existence of a genuine issue of material fact will not result in a denial.*J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.,* 345 F.Supp.2d 386, 394 (S.D.N.Y.2004). Instead, the federal court reviewing an administrative decision under IDEA bases its decision on an independent review of the record using a "preponderance of the evidence" standard. *Bd. of Ed. v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In reviewing an IDEA action, the Second Circuit has held that "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."*Sherman v. Mamoroneck Union Free Sch. Dist.,* 340 F.3d 87, 93 (2d Cir.2003) (quoting *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir.1998)). A district court must conduct an independent review of the record and exercise its own judgment in deciding whether to grant tuition reimbursement, but it also must give due deference to the decisions of the experts below.

### II. Education Law

#### A. The IDEA and FAPE

The New York City Department of Education is responsible for providing a FAPE to New York City resident students with disabilities who are in need of special education programs. 20 U.S.C. §§ 1400-1487; N.Y. Educ. Law §§ 4401-4410-a (McKinney's 2005).[FN16] A FAPE includes " 'special education and related services' tailored to meet the unique needs of a particular child, and [must] be 'reasonably calculated to enable the child to receive educational benefits.' "*Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir.2006) (quoting *Walczak,* 142 F.3d at 122);*see also*20 U.S.C. § 1401(8). In relation to these requirements, when a child is identified as having

special needs, the City's Department of Education and the child's parents work together to develop an IEP which defines the child's educational needs and delineates how those needs will be met and a FAPE provided. A denial of a FAPE occurs when procedural inadequacies result in a loss of educational opportunity for the student or seriously infringe on the parents' opportunity to participate in the IEP formulation process, or when procedural inadequacies compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that plan. *Werner v. Clarkstown Cent. Sch. Dist.,* 363 F.Supp.2d 656, 659 (S.D.N.Y.2005); *see also* SRO at 5. Part of the City's responsibility in ensuring a FAPE to all eligible students includes providing tuition reimbursement when the City's public schools are unable to provide the FAPE, or the City is unable to place the child in an appropriate non-public school, and a child must go elsewhere to receive the education to which he or she is entitled by law.

> FN16. New York State participates in the IDEA statutory scheme through Article 89 of the New York State Education Law.

### B. Tuition Reimbursement and *Burlington'* s Three-Prong Test

**\*5** If the state fails to provide a FAPE for the child, the parent may remove the child from public school, place him in an appropriate private school program, and seek retroactive tuition reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C); *Burlington Sch. Comm. v. Dep't of Educ.,* 471 U.S. 359, 367-70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). The Supreme Court, in evaluating a request for tuition reimbursement, explained that tuition reimbursement for private schooling is not the normal remedy that Congress intended in a typical IDEA case. *Carter,* 510 U.S. at 12. Instead, "Congress intended that IDEA's promise of a 'free appropriate public education' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen

jointly by school officials and parents." *Id.* Thus, the remedy of tuition reimbursement is not the remedy of first choice; it is available in unusual or extraordinary circumstances.

Since the right to tuition reimbursement is not available in ordinary circumstances, the Supreme Court has fashioned a multi-part inquiry, the so-called "*Burlington* test," which a reviewing court must conduct to determine whether tuition reimbursement is appropriate. *Burlington,* 471 U.S. at 367-70. This test has alternately been characterized as a two-part test, with an added evaluation of equitable considerations,[FN17] or a three-part test, with an evaluation of equitable considerations as an enumerated factor;[FN18] either way, "[i]t is well established that equitable considerations are relevant in fashioning relief under the IDEA."[FN19] *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.,* 226 F.3d 60, 68 (2d Cir.2000) (citations omitted). Regardless of the formulation of the test, the same questions must be asked: (1) whether the services offered by the board of education were inadequate or inappropriate, (2) whether the services selected by the parents were appropriate, and (3) whether equitable considerations support the parents' claim for reimbursement. *Burlington,* 471 U.S. at 367-70.

> FN17.*See Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363-64 (2d Cir.2006) ("In determining whether parents are entitled to reimbursement, the Supreme Court has established a two pronged test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs. Moreover, because the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'") (citations omitted).

> FN18.*See, e.g., Matrejek v. Brewster Cent. Sch. Dist.,* 471 F.Supp.2d 415, 418 (S.D.N.Y.2007) ("[When] dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A

Slip Copy                    FOR EDUCATIONAL USE ONLY                    Page 7
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
(Cite as: Slip Copy)

Board of Education may be required to pay for educational services ... if and only if, three conditions are met: (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim."); *Perricelli v. Carmel Cent. Sch. Dist.,* No. 06 Civ. 2114(CM), 2007 WL 465211, at *2 (S.D.N.Y. Feb.9, 2007) ("[I]n order to determine whether the Plaintiffs are entitled to summary judgment on the issue of reimbursement ... the court must address the three *Burlington* factors."); *Sinan L. v. Sch. Dist. of Phila.,* No. 06-1342(MMB), 2007 WL 1933021, at *5 (E.D.Pa., July, 2, 2007) ("Under the Supreme Court's precedents in *Burlington* and *Carter,* a three-step analysis should be applied to determine whether to order tuition reimbursement.").

FN19.*See, e.g., L.B. ex rel. K.B. v. Nebo Sch. Dist.,* 379 F.3d 966, 979 n. 18 (10th Cir.2004) ("The Supreme Court held, in [*Burlington*] and in [*Carter* ] that equitable considerations can limit the amount of recovery."); *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 771 (6th Cir.2001) ("[W]e are mindful of the Court's mandate in *Burlington* that equitable considerations are relevant in fashioning relief under [the IDEA].... [I]t is the district court's role in the first instance to weigh the equities in this case to determine the appropriate level of reimbursement to be awarded."); *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E.,* 207 F.3d 931, 937-38 (7th Cir.2000) ("[O]nce a court holds that the public placement violated IDEA, it is authorized to 'grant such relief as the court determines is appropriate.'Under this provision, 'equitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing.") (citations omitted); *Sellers by Sellers v.*

*Sch. Bd. of City of Manassas,* 141 F.3d 524, 527 (4th Cir.1998) ("The purpose of [IDEA's] procedural mechanisms is to preserve the right to a free appropriate public education, not to provide a forum for tort-like claims of educational malpractice. Accordingly, the Supreme Court has noted that 'equitable considerations are relevant in fashioning relief.'") (citations omitted).

In the instant case, the inadequacy of services offered by the Board of Education, the first prong of *Burlington,* is not challenged by the parties. According to the SRO, Elan's IEP required placement in a non-public school, and when no such placement was identified or finalized by the City's staff, the services offered by the Board of Education were inadequate under the first prong. SRO at 6. But it is also clear from the record that the alternative school at which the Bettingers refused to interview was found to be an appropriate placement by the impartial hearing officer. Pl.Ex. B at 8.[FN20] As such, had the Bettingers visited the school, and had Elan been admitted there and his IEP finalized, the services provided by the Board of Education might very well have been adequate under *Burlington's* first factor. Under such circumstances, the City would have provided a FAPE and no tuition reimbursement would be awarded. The Bettingers' actions, however, preclude the Court from knowing whether or not the City might have offered adequate services, therefore, *Burlington's* first factor remains unchallenged.

> FN20. The impartial hearing officer concluded that "the child would have been suitably grouped at the Lorge School with students having similar abilities and needs .... Based on the evidence before me, I find that the services offered by [the Department of Education] were appropriate."*Id.*

*6 Nor do the parties challenge the appropriateness of services selected by the parents under the second prong of *Burlington.*Arg. Tr. at 27. According to the SRO, West End was an appropriate placement in light of its small-group structure, individualized

Slip Copy                    FOR EDUCATIONAL USE ONLY                    Page 8
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)
**(Cite as: Slip Copy)**

attention, and special classes. SRO at 7. Thus, this case presents the narrow question of whether the parents are barred from receiving full tuition reimbursement because, under the third *Burlington* factor, equitable considerations do not support their claim.

When engaging in a review of equitable considerations under the third prong of *Burlington,* "the court enjoys 'broad discretion.' " *Carter,* 510 U.S. at 16 (quoting *Burlington,* 471 U.S. at 369). In addition to a thorough review of the administrative record, the Court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."*Id.* Certainly a major consideration in deciding whether the third factor is satisfied is whether the parents have cooperated with the City throughout the process to ensure their child receive a FAPE. If courts cannot read a parent's failure to cooperate with the City's efforts to place a child as "equitably disentitl[ing] them to tuition reimbursement, then the third prong of the *Burlington* test is essentially meaningless."*Carmel Cent. Sch. Dist. v. V.P.,* 373 F.Supp.2d 402, 418 (S.D.N.Y.2005).[FN21]

> FN21. In *Carmel,* the Court rejected a claim of tuition reimbursement when the parents "never had the slightest intention of allowing the child to be educated in the public school [and] did everything possible to frustrate a timely review of [the child's] condition" before enrolling the child at private school. *Carmel,* 373 F.Supp.2d at 416.

Moreover, what Congress guarantees to parents is a free *appropriate* public education, not a free *optimal* public education, nor a private education of their own choosing. As other courts have noted, "[w]hile the mother ... may want the 'best' for her handicapped child, that is not what the law provides."*M.S. and D.S. v. Mullica Twp. Bd. of Educ.,* 485 F.Supp.2d 555, 565 (D.N.J.2007) (citing *Rowley,* 458 U.S. at 203-04). The Supreme Court has rejected the argument that Congress intended the IDEA to mandate the "achievement of maxim-

um potential" for each student. Instead, the IDEA is satisfied when the state provides an education at public expense, which meets the state's educational standards, approximates the grade levels used in public schools, and comports with the student's IEP. *Rowley,* 458 U.S. at 203.[FN22] Nothing more is required.

> FN22. In the footnote associated with this passage, the Supreme Court goes further: "[m]oreover, even were we to agree that [Congress'] statements evince a congressional intent to maximize each child's potential, we could not hold that Congress had successfully imposed that burden upon the States." *Id.* at 204, n. 26.

[P]ublic educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, *or place the child in an appropriate private setting of the State's choice.*This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.
*Carter,* 510 U.S. at 15 (emphasis added). It is clear that "[w]hile the IDEA does not require states to maximize the potential of handicapped children, ... it must provide such children with meaningful access to education."*Frank G.,* 459 F.3d at 364 (citations omitted).

**\*7** Parents, of course, can pursue whatever educational choices are best for their child; that is not in dispute here. The issue is under what circumstances parents may receive public reimbursement for an educational choice which they made. It is clear that parents seeking reimbursement must comply with the law throughout the entire process and not merely to the point where they think they have achieved what they want. Where parents unilaterally place their child in a private school and then frustrate the public educational authorities' ability to "place the child in an appropriate private setting of the State's choice," thus making it impossible to conform to IDEA's mandate, equitable considerations demand that the court deny reimbursement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### III. Analysis

In this case, the Court must determine what degree of cooperation between parents and school officials satisfies *Burlington's* third factor. Here, the parents contacted the CSE to notify them of their child's special needs. They worked cooperatively with the CSE to formulate an IEP delineating the child's specific educational requirements. When the matter was referred to the CBST to explore an appropriate placement, however, the parents' cooperation ceased. In these circumstances, the Court finds that the Plaintiffs failed to satisfy the third factor of *Burlington* and accordingly, they are not entitled to tuition reimbursement.

### A. The Parents' Actions

The record establishes that the Bettingers made plans to send Elan to West End as early as January 2005, and had no plans to entertain the non-public school options the City presented. In addition to making early application to West End and submitting large, non-refundable deposits, Ms. Bettinger visited the school no less than three times prior to Elan's admission, and she brought Elan to the school at least twice even though he was actively enrolled in another program.[FN23] The Bettingers interviewed at West End, and made Elan available for interview. The Bettingers were in frequent contact with West End about Elan's condition and his status at his regular pre-school program. In fact, based on the record it seems that Elan likely would have started at West End-even before his IEP was developed-in early 2005, had he been dismissed from his other pre-school program.

> FN23. The hearing transcript reveals that Ms. Bettinger made at least three visits to West End to determine if it was an appropriate placement for Elan. Ms. Bettinger testified, "first of all, I went in; I went in for an interview. I was given the information of what the school is like and, you know, [the West End administrator] looked at his IEP to determine if that school would fit Elan than [sic] we had Elan come

in and we had Elan sit in on a classroom. And then there was a third appointment where the psychologist of the school assessed Elan."Hr. Tr. at 48.

Between February and June, 2005, after Elan had been admitted to West End, the Bettingers contacted the CSE concerning Elan's status. The need to develop an IEP was recognized, and the IEP was formulated on June 9, 2005. With regard to the formulation of the IEP, it seems that the Bettingers wholly cooperated. It was in their interest to do so. Once the IEP was developed, however, at least two non-public schools, Lorge and another unidentified school,[FN24] contacted the Bettingers about placing Elan, but Ms. Bettinger simply did not engage with them. When placement became an issue, the Bettingers no longer cooperated as they had prior to the formulation of the IEP. It was no longer in their interest to do so.

> FN24.*See* discussion *supra* note 9.

**\*8** A Lorge School administrator testified that when she contacted the Bettingers about an interview sometime in July 2005, Ms. Bettinger indicated that they had other interviews scheduled and were not interested in pursuing Lorge. Hr. Tr. at 71. Ms. Bettinger, in contrast, testified that she was told she could not come to Lorge without Elan, and that she had concerns about disrupting Elan's daily routine in order to visit a school that might not be an appropriate placement. This concern was not present, however, when Ms. Bettinger had Elan interviewed on several occasions at West End early in 2005.*Id.* at 48.

This Court finds that the determination made by the impartial hearing officer that the Lorge School administrator's testimony is more credible-a determination that was affirmed by the state review officer-is supported by a preponderance of the evidence. While Ms. Bettinger might have been discouraged from visiting Lorge without Elan since his presence would be required before any ultimate offer of admission could be made, the Court cannot accept that the school wholly precluded Ms. Bettinger

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from visiting without her son. Such a policy would serve neither the parents nor the school because both have an interest in exploring the fit between the school and the child to determine if placement is appropriate. Furthermore, there is nothing in the record to indicate that a visit to Lorge could not have been made in the weeks after the West End summer program ended but before the regular school year had begun.[FN25] Despite the fact that Ms. Bettinger would undoubtedly have been allowed to visit Lorge, she expressed no interest in doing so.

> FN25. Or, alternatively, in the afternoons following the summer school day program.

Having secured Elan's admission to West End, the Bettingers' failure to cooperate with the City's attempts to place Elan continued throughout the summer. Indeed, the Bettingers began to seek reimbursement for their West End tuition payments on August 15, 2005, four days after the West End summer program ended, but three weeks before the regular 2005-2006 school year began on September 8, 2005. Pl.Ex. A. By this time, the Bettingers had at least two schools referred to them by the CBST: they never visited Lorge, and there is no record of their contact with the other school. There is also no record of the Bettingers returning to the CSE to review their status in the placement process, or to express their dissatisfaction with the referrals received. The Court agrees with the IHO and the SRO that the Bettingers had already made up their mind that Elan would attend West End for the entire year.

**B. The 12-Month Program**

In support of their request for tuition reimbursement, the Bettingers also argue that because the IEP recommended a 12-month program for Elan, and the City failed to provide such a placement by July 1, 2005, when Elan started at West End's Summer Learning Program, the Bettingers are entitled to full tuition reimbursement for Elan's entire year at West End.[FN26] Arg. Tr. at 4-5, 13; *Burlington,* 471 U.S. at 367-70. This argument is not persuasive.

> FN26. With respect to this argument, the

Bettingers rely on 20 U.S.C. § 1414, requiring that the Department of Education have a valid IEP in effect "at the beginning of each school year." 20 U.S.C. § 1414(d)(2). The Bettingers assert that since Elan's IEP recommended a 12-month, non-public school placement, and no specific appropriate recommendation had been finalized by July 1, the Department had, by definition, failed to have a valid IEP in place "at the beginning of the school year." We reject that argument. The Department had failed to provide services in July and August as required by the IEP, but the Department still had time to find an appropriate placement for Elan for "the beginning of the school year" in September.

**\*9** The IEP's 12-month recommendation does not require that Elan be enrolled in a single program for an entire year, but rather, that he attend a structured program for a full 12 months. Nor does the IEP's 12-month recommendation mean that the parents' obligation to participate in the City's placement process ended on July 1, 2005. Indeed, even the West End Day School's program-which the Bettingers deemed appropriate for Elan within the meaning of his IEP-is not a single, continuous 12-month program. West End's 6-week summer program took place from July 1 to August 11. The school-year program, beginning a month later in September, was separate. Each program requires separate applications, deposits, and tuition payments. The separateness of the two was confirmed by the testimony of the West End school administrator. Elan's admission to the September class was contingent upon his successful adjustment to the summer program. If he did not adjust, he would not be admitted and his tuition deposit returned. Hr. Tr. 104-05.

Thus, the Bettingers' argument that the IEP required a single 12-month program, and when that program was not provided by July 1 their obligations ended, is unavailing. The regular school year did not begin for another ten weeks after July 1. The Bettingers' obligation to cooperate with public entities in locat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing a placement for their child during this period was not less than their obligation to participate in the preparation of the IEP. Had the Bettingers cooperated with the City's attempts to place Elan throughout July and August, they might have found the Lorge School, or another city-funded non-public school, to be an appropriate placement.[FN27] Alternatively, they might have established a reasoned basis for arguing that the placement was inappropriate. Here, the Bettingers' refusal to entertain the City options precludes the Court from knowing whether another appropriate placement would have been found.[FN28]

FN27. Plaintiffs argue that the Lorge School "admitted that it was not appropriate" for Elan given his high IQ. *See* Hr. Tr. at 26. It is clear from the record, however, that the Lorge School administrator stated that the school was not appropriate based on Elan's performance IQ of 140, not on his full-scale IQ of 122.

Hearing Officer: "Had you known what his IQ was, would you still have invited the parent to come in?"

Lorge School Administrator: "Probably not, no, I mean, if we're talking 140, no." *Id.* at 28. Nevertheless, when informed that Elan's full-scale IQ was 122, and asked the same question again, the administrator responded, "I might have depending on what the other issues are. We do work with some children who are quite bright." *Id.* at 29.

FN28. It is true that the public educational authorities may not have been able to place Elan in an appropriate private setting, but we need not consider that hypothetical. The parents' actions precluded them from trying, and under those circumstances, full reimbursement is not warranted.

In the circumstances of this case, the parents' lack of cooperation after July 1 and their refusal to visit a state-approved, non-public school frustrated the placement process. IDEA does not allow parents to unilaterally select a school of preference for their child, enroll him, and then frustrate the City's placement system in order to gain tuition reimbursement for their school of choice from the courts.

In accordance with the standards set forth by IDEA and the Supreme Court, the Court has conducted a thorough review of the record in this case. In addition to examining the transcripts and exhibits in detail, the Court has also given due deference to the administrative findings and expertise of the IHO and SRO below, and paid careful attention to credibility assessments based on first-hand observance of the witnesses. In light of its review, the Court exercises its "broad discretion"[FN29] with regard to equitable remedies and reaches an independent judgment that the Plaintiffs failed to demonstrate that they have complied with the third *Burlington* factor. Equitable considerations do not support their claim and they are not entitled to tuition reimbursement for the 2005-2006 academic year.

FN29. *Carter,* 510 U.S. at 16 (quoting *Burlington,* 471 U.S. at 369).

## CONCLUSION

**\*10** Defendants' motion for summary judgment is GRANTED and Plaintiffs' is DENIED. The Clerk of the Court is directed to close out this case.

SO ORDERED.

S.D.N.Y.,2007.
Bettinger v. New York City Bd. of Educ.
Slip Copy, 2007 WL 4208560 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2007 US DIST LEXIS 35288

**T.P. and S.P., on behalf of S.P., Plaintiffs, v. MAMARONECK UNION FREE SCHOOL DISTRICT, Defendant.**

**06 CIV 0509 (CLB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 35288*

**May 10, 2007, Decided**
**May 11, 2007, Filed**

**COUNSEL:** [*1] For T.P., on behalf of S.P., S.P., on behalf of S.P., Plaintiffs: Gary S Mayerson, LEAD ATTORNEY, Mayerson and Associates, New York, NY.

For Mamaroneck Union Free School District, Defendant: Mark Craig Rushfield, LEAD ATTORNEY, Shaw & Perelson, LLP (Highland), Highland, NY; David Scott Shaw, Shaw & Perelson, LLP, Poughkeepsie, NY.

**JUDGES:** Charles L. Brieant, U.S.D.J.

**OPINION BY:** Charles L. Brieant

**OPINION**

*Memorandum and Order*

Brieant, J.

Before the Court is an action initiated under the Individuals with Disabilities in Education Act, *20 U.S.C. § 1400 et. seq.* ("IDEA"). Plaintiffs filed a motion (Doc. No. 15) for a "modified *de novo* review" and summary judgment reversing the underlying administrative decision of the State Review Officer ("SRO"), which affirmed the decision the Impartial Hearing Officer ("IHO"). Defendant ("District" or "School") also moves for summary judgment (Doc. No. 12). The administrative record on appeal was received by the Court in February 2007.

The June 26, 2005, administrative decision of IHO Christine Moore and the September 29, 2005 decision of

the SRO Paul F. Kelly held that the Individualized Education Plan [*2] ("IEP") implemented for Plaintiffs' child, S.P. (the "child") for the 2004-2005 school year was reasonably calculated to provide the child with a free and appropriate public education ("FAPE"). Plaintiffs claim that the District failed both procedurally and substantively to provide the child with a FAPE, that the supplemental Applied Behavioral Analysis ("ABA") services and speech services that petitioners secured for the child were appropriate and reasonably calculated to provide the child with a meaningful benefit, and that there are no compelling equitable circumstances sufficient to preclude or diminish a reimbursement award. Plaintiffs claim *inter alia* that the District engaged in impermissible predetermination because "the most important aspects of [the child's] IEP were, for all intent and purposes, a 'done deal' when [his] parents walked into the IEP meeting room," that "no amount of participation by [his] parents could have changed a thing," and that the Parents were accordingly deprived of the right to meaningful participation in the IEP development.

Plaintiffs' minor child, S.P., was born August 21, 1998, and is now approximately 8 years old. In November 2000, [*3] at age two, he was diagnosed by the McCarton Center for Developmental Pediatrics, with a "pervasive development disorder, not otherwise specified" ("PDD-NOS"), and at age four he was additionally diagnosed with an auditory processing disorder, fine and gross motor delays and an expressive and receptive language disorder. The child's current classification by the Committee on Special Education

2007 U.S. Dist. LEXIS 35288, *3

("CSE") as "autistic" is not in dispute.

In his preschool year, the child received 40 hours of ABA, which included 20 hours of 1:1 discrete trial training, and attendance in a preschool accompanied by a special education itinerant teacher (SEIT) for 12 1/2 hours per week. He also received speech-language therapy and occupational therapy ("OT"). *SRO at 1-2.*

For the 2003-2004 school year the child was referred to the District's CSE, which recommended placement in a non-integrated 8:1+2 special kindergarten class, and afternoon mainstreaming with a 1:1 aide, as well as some speech-language therapy and OT. The parents disagreed with the CSE recommendations and the parties entered into a settlement agreement, the terms of which are not part of the record in this case, but the child apparently [*4] received 30-35 hours of ABA therapy per week at home; 5 hours of ABA supervision per week; speech language therapy four times per week; and occupational therapy two times per week. The child also attended a regular education preschool class with a full time 1:1 behaviorally-trained teacher for 10 hours per week. *SRO at 2.*

The CSE convened for a review of the child's program in January 2004, at which time the child was reported as demonstrating progress in interacting with peers and making progress in language use, although the ABA service provider noted that the child was scripting at a high frequency throughout the day. Scripting was defined by the use of perseverative language not on topic with the language occurring at that time in the environment, for example, language from television shows used as a calming or an avoidance technique. *SRO at 2.*

During the summer of 2004, the child attended a special education camp for a few hours a day and also received 30 hours of ABA therapy per week; occupational therapy three times per week; and speech therapy five times per week. *See IHO at 7.*

In May and June of 2004, the Child was reevaluated by the McCarton Center, which recommended, [*5] *inter alia,* that the child receive: ABA 1:1 services at least 25 hours per week at home; 2 hours per week of parent training with an ABA specialist, at least 3 hours per week of ABA supervision, individual speech-language therapy five times per week; individual occupational therapy five times per week; and enrollment in a structured,

language-based special education kindergarten class with a behaviorally trained aide and low student to teacher ratio. *See Dist. Exh. 9.*

In May and June of 2004, several District consultants also conducted evaluations: Susan Varsames Young, M.A..Ed, conducted an Education Evaluation; Lisa Barone Kovac, M.A., CCC, SLP, conducted a Speech and Language Evaluation on May 3, 2004; Michael Fox, PhD., conducted a Psychological and Educational Evaluation on June 3, 2004; Jill Greenberg, OTR/L, conducted an Annual Review and Related Service Report Occupational Therapy Report.

The "Speech and Language Evaluation" dated May 3, 2004, reported that since the child was originally evaluated by Dr. McCarton at the age of two and given the diagnosis of PDD-NOS, he had been receiving speech/language therapy since August 2002 from Diane Happas as part of a home-based [*6] program, focusing on the child's deficits in play, socialization and communication skills. The District's consultant recommended placement in a small structured special education class with children of similar needs, but thought that the child did not need the intensive instructional services typically provided to children with autism, despite noting, *inter alia,* that he had delays in auditory processing; that if there were auditory or internal distractions, the child needed repeated directions or gestural prompts; and that his expressive language was limited and included scripting.

The District's June 2004 evaluator found that the child's cognitive potential was not known, and that his use of verbal reasoning was minimal. He was found to require a good deal of external direction for the performance of tasks, but exhibited average number knowledge and his letter and work recognition skills were in the high average range. The evaluator recommended that the child would benefit from a small group kindergarten placement.

A language therapy summary was also conducted in June 2004 by the child's private speech-language therapist. The therapist noted advancements in the child's word [*7] utterances and ability to sustain play interactions. The therapist recommended placement in a special education kindergarten class that targeted among other goals, social and communication skills.

The District's CSE convened on June 11, 2004 for an

annual review and recommended an IEP, which included placement in a 12:1+2 special class; 30 minutes of group speech therapy three times per week; 30 minutes of individual OT two times per week; 30 minutes of individual speech therapy one time per week; access to a slant board, and adaptive seating.

At the request of the Parents, the CSE reconvened on July 16, 2004, with the stated purpose to review the McCarton evaluation, and other information. The parents there expressed concern for the child's transition from a 1:1 program to a full-day school program, and requested: a 1:1 full-time aide for the child; an extended day of service after school; and permission for the ABA home instructor to be able to accompany him to school for part of the day.

By letter dated August 25, 2004, Parents notified the District that it had not yet offered their son an education plan and placement for the 2004-2005 school year and that they would be providing [*8] him with an appropriate placement and seeking reimbursement. By letter dated September 2, 2004, Parents indicated that in an effort to help the child's transition into the District's full day classes, they intended to have the child leave the District's school early on Wednesdays and Fridays, and that his progress would dictate when he could attend on a full time basis.

The District did not mail the IEP to the parents until September 1, 2004, and parents claim that they did not receive it until after the school year had commenced on September 8, 2004. The committee's recommendation was: placement in a 12:1+2 special class during which time the child would receive 10 hours per week of discrete trial instruction (similar to ABA), two sessions of occupational therapy per week; individual speech therapy one time per week; group speech therapy three times per week; and parent training one time per month in a group. Other technology services and devices remained the same as in the June 2004 IEP.

By letter dated September 22, 2004, the Mother indicated that the Parents' acceptance of the IEP was done on a "without prejudice" basis. *See IHO at 7, SRO at 6; District Exh. 13.* In September [*9] of 2004 and through the school year, the Child continued to receive, at the Parents' expense, approximately 20 hours of ABA therapy at home as well as speech and language therapy twice a week for thirty minutes. *Transcript at 1930-34.* From September 15-October 15, 2004, the Child bit people in the classroom six times.

The Parents requested an impartial hearing by letter dated November 1, 2004 and the IHO was appointed on November 4, 2004. The Parents complained, *inter alia*, that the District: failed to provide extended day ABA instruction and support; failed to consider a full continuum of services for the child; failed to address adequately the child's performance levels; failed to develop specific supports for school personnel; failed to provide staff with appropriate training; failed to issue frequent progress reports; failed to give written notice for rejecting the Parent's requests; and failed to provided sufficient and appropriate related services. Parents specifically sought reimbursement for 25 hours of home-based ABA per week, 10 hours of ABA supervision, 2 hours of parent training per week, team meetings and staff training, and 5 hours of individual speech-language [*10] therapy per week.

The hearing was conducted over the course of ten days from January 18, 2005 through May 24, 2005, and a decision by the IHO was rendered on June 26, 2005. The IHO ordered that the "parents' request [] for reimbursement/funding for 25 hours a week of 1:1 home-based ABA, 10 hours a week of ABA supervision and consult for the ABA home program with overlap into the school program, 2 hours a week of parental training, team meetings on going staff training [sic] and 5 hours of 1:1 speech and language therapy is denied without prejudice." *IHO Decision at 44-45.* The SRO affirmed the denial.

Plaintiffs claim that the July 16 IEP meeting was a sham, which deprived Plaintiffs of meaningful and genuine participation in the IEP development process, because Mamaroneck had impermissibly predetermined what services the child would receive at a private meeting without the child's parents present, conducted just minutes before the start of the July 16 meeting. They also claim that Mamaroneck failed to give appropriate "prior written notice" of the rejection for the requested services, as required by law, and that the parents did not receive their child's IEP until after [*11] the start of the school year. They contend that the District failed to provide an appropriate transition plan, as it failed to include the Parents' request for extended services after school, a 1:1 ABA aide in school and the inclusion of ABA home therapists in the new class for at least the start of the school year. *See IHO decision at 9.* They assert that the

District's transition plan failed to consider the McCarton report of 2004, and the ABA home specialists, who provided 30 hours per week of direct services to the child in the Summer of 2004.

Parents contend that the District also failed to develop appropriate goals and objectives for the child's IEP, and that the Parents were effectively denied meaningful participation because the goals were unilaterally drafted by the District before the Parents were participating. They contend further that the District's IEP contained goals and objectives that were not sufficiently challenging.

Parents also contend that the District failed to timely perform a Functional Behavioral Assessment ("FBA") when the child starting hand-biting and scripting, early in the 2004-2005 school year, which constituted a denial of a FAPE. The District [*12] argued before the IHO that an FBA was not required because the behaviors exhibited by the child did not impede his learning and that it was therefore not an essential element of the Child's program, but that it nevertheless conducted an FBA in January 2005, and developed a Behavioral Intervention Plan ("BIP").

The District argues that the educators and professionals involved in the development and implementation of the IEP for the child all agreed that an FBA was not required for the child prior to the promulgation of his 2004-2005 IEP, because his scripting and biting behavior in September and October of 2004 did not impede his learning. Plaintiffs contend that the school officials backdated certain documents to make it appear as though they acted more timely than they actually did. Roni Kramer, the District's Assistant Director of Special Education, testified that the child's biting behavior occurred only during the first two weeks of school, but Susan Young, the School's autism consultant, testified that it started in mid-September and that there was no discussion of doing an FBA until mid-October, at which time they were more concerned with the child's scripting. *Tr. at 407-408 [*13]* .

*Discussion*

Under the IDEA, states that receive federal assistance must provide "a free appropriate public education" to each student with a disability. *20 U.S.C. sec. 1400 (d)(1)(A)*. "When a state receiving IDEA funding fails to give a disabled child such an education,

the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *M.S. v. Yonkers Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000), citing School Comm. of Burlington v. Department of Educ., 471 U.S. 359, 369-70, 105 S. Ct. 1996, 85 L. Ed. 2d 385, (1985)*.

Initial determinations of the appropriateness of the IEP are made by the IHO and SRO, which "are then subject to 'independent' judicial review." *Walczak v. Florida Union Free School Dist. 142 F.3d 119, 129 (2d Cir. 1998), quoting Board of Educ. v. Rowley, 458 U.S. 176, 205, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)*. The Court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak at 130*. "While federal courts do not simply rubber [*14] stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id at 129 (quoting Rowley at 206, 208)*.

The inquiry for this Court in assessing a claim for reimbursement by parents for the supplemental services provided to their child is: 1) whether the IEP proposed by the school district was appropriate; 2) whether the private placement was appropriate to the child's needs; and 3) whether equitable considerations support the parents claim for reimbursement. *See Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006)*. The Court will examine each of these considerations in turn.

In determining whether the IEP proposed by the district was appropriate, the Court must determine "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak., 142 F.3d at 129, quoting Rowley, 458 U.S. at 206-07*. [*15] As earlier noted, Plaintiffs in this case contend that Defendant failed to meet both the procedural and substantive requirements of the IDEA.

The process to challenge an IEP and to obtain reimbursement for tuition first requires the parents to request an "impartial due process hearing" before an IHO appointed by the local board of education. *See 20 U.S.C. § 1415(f); N.Y. Education Law § 4404(1)*. It is then the School District's burden to show the appropriateness of

its proposed IEP. *Grim v. Rhinebeck Central School District, 346 F.3d 377, 379, 74 Fed. Appx. 137 (2d Cir. 2004).* The IHO's decision may be appealed to an SRO, *see N.Y. Educ. Law § 4402(2); 20 U.S.C. § 1415(g),* and either party objecting to the SRO decision may bring a civil action in this court. *20 U.S.C. § 1415(i)(2).*

*Procedural Defects and Predetermination*

Parents contend that the District deprived them of meaningful participation in the IEP process, by having "predetermined" their son's IEP for the 2004-2005 school year by entering the CSE meeting with a preconceived plan for the child's [*16] services; by recommending the child's placement or program before the development of the child's goals and objectives, and by failing to consider the full continuum of services available regarding extended day services and parent training. While not all procedural errors render an IEP inadequate under the IDEA, it is well established that parents must not be deprived of meaningful participation in the IEP process and that where a procedural defect causes a substantive harm, a child is deprived of a FAPE. *See e.g., Burlington, 471 U.S. at 368* ("In several places, the Act emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness.").

Susan Young runs an entity called the "Holistic Learning Center," which provides occupational therapy, special education, and ABA therapy in the office, but not in the home. She is nevertheless the District's ABA supervisor and autism consultant. *See Tr. at 428.* In support of the theory that the services planned for the child were predetermined, Plaintiffs point to a comparative chart or note of sorts, prepared by Young in her role as Mamaroneck's autism consultant, just [*17] moments before the July CSE meeting, which Young curiously did not attend. *See Pl. Exh. BB.* This handwritten document lists in column-style comparison format the treatment and support "Recom. by McC," and next to those, the "School Respon." As to the comparative chart, Young testified that the "school respons." category on her chart referred to the school's responsibility, as opposed to "response," because "she wouldn't just leave out an "e." *Tr. at 520, 522.*

Where Dr. McCarton recommended 12 months of schooling, the District responsibility was listed as 10 months; where Dr. McCarton recommended additional programs in the summer and holidays, the school responsibility was listed as 6 weeks; where Dr. McCarton

recommended 25 hours of ABA at home (3 with a supervisor), the school responsibility was listed as 10 hours in school; where Dr. McCarton recommended 2 hours per week of parental support, the school responsibility was listed as monthly meetings; where Dr. McCarton recommended special education "K" w/ 1:1 aide, the school responsibility was special education "K" with ABA aide. There are other comparisons as well, including McC's recommendation for "Fast Forward" and the [*18] school's responsibility listed as "not on IEP."

While Young attended the June IEP meeting, as noted above, she did not attend the July IEP meeting, as she felt she had "already written everything that [she] needed to present." *Id. at 431-432.* This presumably includes the side by side comparison chart prepared before the meeting on July 16. Although she was in Kramer's office on the morning of, and just before the July IEP meeting, which she had no intention of attending, Young denied that she discussed the chart's contents with Kramer that morning. She also testified that prior to the July meeting, she met with Kramer and Peter "to talk about appropriate placement options and to look at staffing patterns and building different programs in different buildings to see what would be appropriate placements and staffing and training needs" and responded "yes," when asked whether the child's name came up at that meeting. *Id. at 433-434.*

The services listed on the comparative list prior to commencement of the July IEP meeting, are just the services that the District ultimately provided, despite the Parents' protests and request for some at-home ABA services [*19] to aid in the child's transition and to ensure continued progress rather than regression. While the Court is not oblivious to the difficult nature and necessities of planning and administration, it cannot conclude mere coincidence or that proper decision mechanisms resulted in the IEP's ultimate recommendation of 10 hours of in-school ABA services, the same "responsibility" listed by Young in contrast to McCarton's recommendation of 25-30 hours of home-based ABA.

While prior contemplation does not necessarily rise to the level of predetermination, the Court cannot ignore this evidence, which tends to show that the District did not come into the IEP meeting with an open mind, but rather predetermined at least one very significant component, namely the location and extent of ABA

services that the District was willing to provide. This failure precluded genuine individualization of the child's IEP and deprived the Parents of a meaningful opportunity to participate in the development of the child's IEP. *See e.g. Deal v. Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004)*(child was deprived of a FAPE where the school district did not come to the IEP meeting [*20] with an "open mind" and had predetermined the IEP as to the important component of ABA therapy, but held an IEP meeting to "listen" to the child's parents); *see also Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006)*(the IEP is to be *collaboratively* developed by the parents, educators and other specialists). In this case, the District's predetermination deprived the child of a FAPE.

The Court additionally finds evidence of a procedural problem in that the child's placement and programs appear to have been determined before meaningful development and finalization of the child's goals and objectives. As acknowledged by the SRO, witnesses "disagreed about the extent to which goals and objectives were developed or discussed at the June CSE meeting." *SRO Decision at 5, citing Transcript.* For example, Susan Young attended the June IEP meeting during which they "did not speak about specifics" but they "talked about whether or not there would be an appropriate placement in terms of the physical location, the staff ratio, the recommendations from the McCarton report" and that "goals were not ironed out with percentages at that point." *Id. at 433-434.* [*21] That the goals and objectives were not established and thoroughly discussed at the June meeting comports with the parents' contention that the District impermissibly determined placement issues before the child's goals and objectives were developed, as does the fact that Young, Kramer and Peter had spoken of what would be appropriate placement before the July meeting development of goals and objectives. Kramer admitted that the June 2004 IEP, which she believed had been mailed to the parents, "would [have been] almost exactly the same except for the additional services that we put in for S. and any changes in the goals and objectives that we might have made." *Tr. at 359.*

This Court disagrees with the SRO, who "could not conclude that the student's placement and program were finalized prior to the development of goals and objectives" because while "both a program and placement were recommended at the June 11, 2004 CSE meeting, []

the student's program and services were later modified at the July 16, 2004 CSE meeting in response to petitioners' concerns regarding the student's ability to transition." *SRO at 10.* By Kramer's own testimony, the additional services added in [*22] July did not change the basic placement determined in June. Since the IEP mailed September 1 was basically the same as that developed at the June meeting, it can be fairly and reasonably inferred that there were placement recommendations that predated the finalization in July of the child's goals and objectives and this procedural defect also deprived the child of a FAPE. [1]

> 1   Because the Court finds this procedural defect in the development of the goals and objectives deprived the child of a FAPE, it declines to decide whether the goals and objectives were also substantively inadequate by virtue of being vague, not objectively measurable, or insufficiently challenging.

In relation to the District's denial of Parent's request to continue extended day services for the child, the SRO determined that the District's witness "testified credibly" that extended day services were not necessary for the Child to receive a FAPE, because he was provided an appropriate program during the school day. This Court disagrees, [*23] as set forth *infra*, and finds a substantive deficiency in the refusal to provide any extended day or at-home services to the Child who had theretofore made progress with the help of substantial time in ABA treatment each week, and who had exhibited difficulty with transitions, as is customary for autistic children and was true for this child.

As to parent training, Kramer testified that "it was our responsibility to provide monthly parent training and so we offered it as, you know, the way we offer it to parents." *Transcript at 222.* This rings of a failure to individualize the child's program. Although the IEP rings of minimalism in providing at-school group parent training for only one hour per month to the parents, and although there is some evidence of an impermissible policy as to "how" parental training is provided, the Court does not reverse the SRO's conclusion that the District's refusal to provide parental training at home was justified for the reason that the parents were already very knowledgeable about their son's circumstances. While the Court finds that rationale dubious in a case involving the changing and evolving needs of an autistic child, the

record does [*24] not provide a sufficient independent basis on which the Court could determine that the District's refusal to provide any at-home parental training caused the child substantial harm, so as to constitute denial of a FAPE.

With respect to the remaining procedural issues raised by Parents, the Court agrees with the SRO's conclusions. Parents were not seriously prejudiced by late receipt of the IEP, since by letter dated September 2, they already wrote of their intent to modify the District's plan, a copy of which they had not yet received by mail. Nor did the District's procedural defect in failing to provide Parents with written notice and an explanation of the District's rejection of their requests for extended day services constitute denial of a FAPE for the child.

In this case, the predetermination of the child's IEP deprived the parents of meaningful participation in the IEP process, which along with other procedural defects caused substantial harm and deprived the child of a FAPE.

*Substantive IEP*

Parents primarily claim that the recommended services were inadequate to provide the Child with a FAPE, as they lacked a meaningful transition plan, and failed to offer the [*25] development of an FBA and BIP.

An FBA is required "for a student whose behavior impedes his or her learning or that of others." *8 NYCRR 200.4(b)(1)(v)*. When the 2004-2005 IEP was developed, the Child hadn't yet begun biting and the failure to include an FBA in the IEP on the basis of biting behavior was reasonable, as at that time his biting could not have interfered with his learning. The Court agrees with the SRO that an FBA was not required on the basis of the child's scripting behavior, which was not apparently a primary concern at the time of the IEP's formulation. The District sought permission to institute an FBA as early as October 6, 2004, and the Court does not find that the child was substantively deprived of a FAPE for failure to earlier institute and FBA and development of a BIP.

As to a meaningful transition plan, Roni Kramer, who is, or was during relevant times, the District's Assistant Director of Special Education, chaired the June and July IEP meetings and during the impartial hearing in January 2005, she admitted that ten hours of discrete trial

ABA was added because "they made the case that it was an important way for S.P. to learn." *Transcript at 100.* [*26] The record reveals, as the SRO noted, that the child had difficulty with transitioning into new circumstances. *SRO at 15; Dist. Exh. 1.* The District had knowledge of the Child's difficulty with transitions, and the IEP containing no at-home ABA therapy failed to address the Child's individual needs. Examining the evidence of record and giving due weight to the proceedings below, the Court cannot conclude that the child was likely to make progress under a plan that would bluntly change his routine, and in which no at home ABA therapy was provided, despite his being accustomed for the prior years provided with 30-35 hours per week of at home ABA services, and under which program he made meaningful advances. *See Walczak, supra.*

The Court concludes that the IEP, which failed to include any transitional provisions for at-home ABA services, was not reasonably calculated to enable the child to receive an educational benefit and deprived him of a FAPE.

*Retrospective Evidence*

Plaintiffs ask the Court to accept and consider the post-hearing deposition transcripts and certain progress reports from the end of the 2004-2005 school year, which reveal regression by [*27] the child in certain significant areas. Defendant acknowledges that the Court is permitted to expand the administrative record in accordance with *20 U.S.C. § 1415(i)(2)(C)(ii)*, upon the request of a party, but argues that the reports constitute retrospective evidence not relevant to whether the July 2004 was reasonably calculated to provide the child with a free appropriate public education, and also argue that they are improperly submitted without additional evidence to place them in context. *Rushfield Aff. at PP 15-17.*

Plaintiffs submitted the "Annual Review Special Education Teacher Report" by the Mamaroneck School District for testing conducted March 9, 2005, during his Kindergarten year, which indicated that while the child obtained a percentile rank of 75 in reading, he obtained a percentile rank of only 50 percent in spelling and very low rank of 16 percent for arithmetic. *Pl. Exh. I.* He showed weaknesses in comprehending short stories, his "spelling and math scores indicate delays in those areas," and he was unable to state the time when presented with a picture of a clock. *Id.*

The District's "Annual Review Speech-Language Report" dated [*28] April 27, 2005, indicate that the child fell into the 5th percentile for Picture Vocabulary Test IIIB and into the 1st percentile for both his Auditory and Expressive Communication Language skills. *Pl. Exh. J.*

While the Court does not purport to be an expert in the medical or educational fields, to suggest that the Court cannot find contextual meaning in a statement such as "spelling and math scores indicate delays in those areas" without testimony as to what that means is unavailing, and the Court will in its discretion consider evidence relevant to its determinations, where that evidence imposes no prejudice on the other party.

While these particular reports are not outcome determinative to the question of whether the July 2004 IEP was reasonably calculated, and the Court does not rely on them for its conclusion that the IEP was not reasonably calculated, the Court nevertheless points to these results as confirmation that the IEP was insufficiently calculated to meet the child's needs.

*Reimbursement*

In order to award reimbursement under the IEP, the Court must also determine "that the private education services obtained by the parents were appropriate to the child's [*29] needs." *Walczak at 129.* "The test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G.v. Cumberland County School District, 190 F.3d 80, 84 (3d Cir. 1999)*(quoted by *M.S. v. City of Yonkers, supra*).

The parents have carried their burden of showing that the ABA services and speech and language services that they provided their child for transitional support and progress was appropriate, and the Court also concludes that the equities favor the Plaintiffs in this case. "[B]ecause the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G., 459 F.3d at 363-364 (quoting Burlington at 374).* The record evinces the Parents' good faith efforts to ensure an appropriate plan and transition for their child, and the District's failure both procedurally and substantively to ensure the same. Relevant to the Court's view on the equities, is the fact that the Parents were not uncooperative with the District, and did not disregard its recommendations or

IEP's in their [*30] totality. Rather, as the adults indisputably best able to perceive their child's well-being and development, they sought programming supplemental to that which they did not challenge, so as to ensure some meaningful measure of consistency and to avoid any regression, in the inherently delicate and demanding effort of working for the development of their child challenged with autism.

Nor should the Parents have been expected to ignore the McCarton Center diagnosis and recommendation (to which the District paid lip service by adding 10 in-school ABA hours) for at least 25 hour of at home ABA therapy and greater 1:1 speech and language services. This was the Center for Developmental Pediatrics that had first known, diagnosed and sought to help the child, and it was only reasonable for the Parents and other professionals to fear that the District's plan to abruptly bring to a halt all at-home services would result in regression for the Child.

In light of the prior years' programs, which included intensive ABA services, and in consideration of the demanding nature of ushering an autistic child through his critically formative young years, these requests for transitional assistance were [*31] not grandiose or inappropriate. Indeed, without purporting to be an expert in the field, the Court notes that it is widely understood that uniformity and routine are considered to be crucial components of the development of individuals with autism.

The Parents requests for modest supplemental programming to sustain the progress of the Child's theretofore intensive ABA services, when his educational circumstances were so appreciably altered between 2003-2004 and 2004-2005 was in no way unreasonable. The Court finds that Plaintiffs acted reasonably in providing the supplemental ABA services for the child, which would afford him the best possible chance of not regressing, and of maintaining the developmental advancements that had thus far been achieved in the first years of this child's education.

*Conclusion*

The totality of the circumstances in this case reveal that Defendant procedurally deprived Plaintiffs of the opportunity to participate meaningfully in the EIP process, and substantively deprived the child of a FAPE. In contrast to *Grim v. Rhinebeck CSD, 346 F.3d 377 (2d Cir. 2003)*, in which the Court of Appeals considered the

2007 U.S. Dist. LEXIS 35288, *31

procedural defects insufficient [*32] to warrant relief due to the "substantive propriety" of the IEP, here the procedural defects were significant and the IEP was also substantively insufficient. The supplemental at-home ABA services and speech and language services provided by the parents were reasonable and appropriate, such that the parents should be reimbursed for them, according to the provisions and purpose of the IDEA.

Accordingly, Defendant's motion (Doc. No. 12) is denied. Plaintiffs' motion (Doc. No. 15) is granted. The parties shall attempt to agree on a proposed form of judgment, or settle a judgment on ten (10) days notice if unable to agree. Plaintiffs' counsel shall submit his application for fees with the proposed judgment.

SO ORDERED.

Dated: White Plains, New York

May 10, 2007

Charles L. Brieant, U.S.D.J.

SO ORDERED.

Dated: White Plains, New York

May 10, 2007

Charles L. Brieant, U.S.D.J.