07 Civ. 7967 (RMB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.D. and T.D., on behalf of C.D.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, Region 9 (District 2),

Defendant.

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFFS' MOTION**

# MICHAEL A. CARDOZO

*Corporation Counsel of the City of New York*
Attorney for Defendant
100 Church Street
New York, NY  10007

Of Counsel:  Toni Gantz
Tel:  (212) 788-0908

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ................................................................. 1

**STATEMENT OF FACTS** ....................................................................... 2

**ARGUMENT** ............................................................................................. 2

Statutory Scheme and Standard of Review......................................................2

**POINT I**

DEFENDANT OFFERED THE STUDENT A FREE
APPROPRIATE PUBLIC EDUCATION FOR THE 2006-
2007 SCHOOL YEAR...........................................................................6

A. Defendant Complied with the Procedural Requirements
Set Forth in the IDEA .........................................................................6

    1. The Student's IEP Met Federal and State
       Requirements .................................................................................7

    2. The Student's "present levels" were reviewed at the
       CSE meeting ..................................................................................8

    3. The IEP states appropriate annual goals and short-
       term objectives ..............................................................................9

    4. Plaintiffs had a meaningful opportunity to
       participate in the development of the IEP.................................10

    5. The Student's Behavioral Intervention Plan was
       procedurally and substantively proper ......................................13

B. The Student's IEP Was Reasonably Calculated to
Confer Educational Benefit...............................................................14

    1. The IEP was likely to produce progress ...................................15

    2. The Student did not require full-time 1:1 instruction
       to receive a FAPE .......................................................................17

    3. Defendant offered plaintiffs appropriate parent
       counseling and training ...............................................................20

**Page**

**POINT II**

    PLAINTIFFS' UNILATERAL PRIVATE PLACEMENT
WAS INAPPROPRIATE FOR THE STUDENT....................................................21

    A. The ELIJA School Is Not the Least Restrictive
Environment for the Student...........................................................................21

    B. The ELIJA School Cannot Provide Required
Occupational Therapy Services ......................................................................23

**POINT III**

    THE EQUITIES FAVOR DEFENDANT ............................................................24

**CONCLUSION** ...................................................................................................... 27

# TABLE OF AUTHORITIES

**Pages**

**Cases**

A.C. v. Board of Education,
06 Civ. 4238, 2007 U.S. Dist. LEXIS 31417 (S.D.N.Y. Apr. 27, 2007)................................14

Antkowiak v. Ambach,
838 F.2d 635 (2d Cir. 1988)....................................................................................... 24

Board of Education v. Rowley,
458 U.S. 176 (1982)........................................................................2, 4, 5, 14, 15, 17

Bettinger v. New York City Board of Education,
06 Civ. 6889, 2007 U.S. Dist. LEXIS 86116 (S.D.N.Y. Nov. 20, 2007) ................................11

Carmel Central School District v. V.P.,
373 F. Supp. 2d 402 (S.D.N.Y. 2005)................................................................................4, 24

Cerra v. Pawling Central School District,
427 F.3d 186 (2d Cir. 2005).............................................2, 5, 10, 12, 15,
17, 18, 20, 26

Christopher P. v. Marcus,
915 F.2d 794 (2d Cir. 1990)........................................................................................12

Concerned Parents & Citizens v. New York City Board of Education,
629 F.2d 751 (2d Cir. 1980).........................................................................................12

D.F. v. Ramapo Central School District,
430 F.3d 595 (2d Cir. 2005)..........................................................................................5

Florence County School District Four v. Carter,
510 U.S. 7 (1993)..........................................................................................................3

Frank G. v. Board of Education,
459 F.3d 356 (2d Cir. 2006)......................................................................................5, 21

Gagliardo v. Arlington Central School District,
489 F.3d 105 (2d Cir. 2007).......................................................................................4, 23

J.R. v. Board of Education,
345 F. Supp. 2d 386 (S.D.N.Y. 2004)......................................................................5, 17, 19

M.C. v. Voluntown Board of Education,
226 F.3d 60 (2d Cir. 2000).....................................................................................4, 5, 21

i

M.S. v. Yonkers Board of Education,
   231 F.3d 96 (2d Cir. 2000)..........................................................................21, 22, 24

Matrejek v. Brewster Central School District,
   471 F. Supp. 2d 415 (S.D.N.Y. 2007)......................................................................4

Pinn v. Harrison Central School District,
   473 F. Supp. 2d 477 (S.D.N.Y. 2007)....................................................................23

San Antonio Independent School District v. Rodriguez,
   411 U.S. 1 (1973)...................................................................................................5

School Committee of Burlington v. Department of Education,
   471 U.S. 359 (1985)...........................................................................................3, 4

Schaffer v. Weast,
   546 U.S. 49 (2005).................................................................................................4

Tucker v. Bay Shore Union Free School District,
   873 F.2d 563 (2d Cir. 1989)............................................................................24, 27

Viola v. Arlington Central School District,
   414 F. Supp. 2d 366 (S.D.N.Y. 2006).....................................................................5

W.S. v. Rye City School District,
   454 F. Supp. 2d 134 (S.D.N.Y. 2006)..............................................6, 9, 11, 12, 18

Walczak v. Florida Union Free School District,
   142 F.3d 119 (2d Cir. 1998)...........................................................2, 4, 5, 7, 12, 15,
                                    17, 19, 21, 22, 23

## Statutes

20 U.S.C. § 1400.......................................................................................................1, 2

20 U.S.C. § 1401..........................................................................................................3

20 U.S.C. § 1412...............................................................................................3, 4, 20, 22, 24

20 U.S.C. § 1414.............................................................................................3, 7, 8, 12

20 U.S.C. § 1415.....................................................................................3, 5, 6, 10, 11

N.Y. Educ. Law § 4404 .................................................................................................3

N.Y. Educ. Law § 4402 .................................................................................................7

**<u>Rules & Regulations</u>**

S.D.N.Y. Local Civil Rule 56.1 ................................................................................................2

8 N.Y.C.R.R. § 200.1 ..............................................................................................13, 20, 22

8 N.Y.C.R.R. § 200.4 ..................................................................................................7, 8, 12

8 N.Y.C.R.R. § 200.6 ............................................................................................................19

8 N.Y.C.R.R. § 200.13 ..........................................................................................................20

## PRELIMINARY STATEMENT

Plaintiffs, the parents of a student with a disability, appeal the administrative decision by the New York State Department of Education Office of State Review affirming an Impartial Hearing Officer's finding that defendant New York City Department of Education ("DOE") offered plaintiffs' child ("the Student") a free appropriate public education for the 2006-2007 school year, and accordingly denying plaintiffs reimbursement for tuition and transportation costs related to the Student's attendance at the ELIJA School, a five-student private school at which plaintiffs unilaterally placed the Student. Defendant submits this memorandum of law in opposition to plaintiffs' motion for "modified *de novo* review" and in support of its cross-motion for summary judgment.

The Court should dismiss the instant Complaint and grant summary judgment to defendant because, as found by both the State Review Officer and Impartial Hearing Officer, defendant offered the Student a free appropriate public education under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., for the 2006-2007 school year. Specifically, and as discussed more fully below, the record amply demonstrates that defendant formulated an Individualized Education Program for the Student that conformed to the procedural requirements of the IDEA and that was reasonably calculated to enable the Student to receive educational benefits.

Because defendant offered the Student a free appropriate public education, the Court need not reach the questions of whether plaintiffs' unilaterally chosen placement is appropriate to the Student's needs or whether the equities favor plaintiffs. However, should the Court consider those questions, plaintiffs cannot prevail on either ground. First, plaintiffs failed to enroll the Student in a private placement appropriate to his needs because the ELIJA School is neither the least restrictive environment for the Student nor able to provide the Student with

1

necessary services.  Second, the equities favor defendant because the record makes clear that plaintiffs never intended to consider the public school placement recommended by defendant and intended only to place the Student in the ELIJA School and retroactively seek tuition reimbursement.

Accordingly, defendant is entitled to judgment as a matter of law, and its motion should be granted.

## STATEMENT OF FACTS

Defendant respectfully refers the Court to Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts dated January 21, 2008 ("Def.'s 56.1 Statement"), for a statement of the relevant undisputed material facts on which this motion is based.

## ARGUMENT

### Statutory Scheme and Standard of Review

The purpose of the Individuals with Disabilities Education Act ("IDEA") is to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  The free appropriate public education ("FAPE") must be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).  Under this mandate, school districts are not required to maximize the potential of the disabled child, but rather must provide a "basic floor of opportunity" to allow the child meaningful access to a free public education. Id. at 192, 200; see also, e.g., Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005); Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 130 (2d Cir. 1998).

The special education and related services provided must meet the standards of the State educational agency and conform with an Individualized Education Program ("IEP") designed for the child. 20 U.S.C. § 1401(9).  Broadly speaking, the IEP must delineate the child's present levels of academic achievement and functional performance, measurable annual goals for the child, and the special educational program and related services that will be provided to help the child advance towards those goals.  See § 1414(d)(1)(A). The IEP is developed by an "IEP team" that includes, at minimum, the parents of the child with a disability, a special education teacher, and a representative of the local education agency. See § 1414(d)(1)(B).  A child with a disability is to be educated in the least restrictive environment to the "maximum extent appropriate." § 1412(a)(5).

If parents are dissatisfied with an IEP, they may request an impartial due process hearing before an Impartial Hearing Officer ("IHO"). § 1415(f)(1)(A); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to the State Review Officer ("SRO"), who independently reviews the findings and decision rendered by the IHO. 20 U.S.C. § 1415(g)(1); N.Y. Educ. Law § 4404(2).  Although the SRO's decision is considered final, a party aggrieved by that decision may bring an action for relief in state or federal district court.  20 U.S.C. § 1415(i)(1)(B), (2)(A).

Parents challenging an IEP may also unilaterally enroll their child in a private school of their choice, without the consent of state or local officials, and request retroactive reimbursement. However, they do so "at their own financial risk." Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993) (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-74 (1985)); see generally 20 U.S.C. § 1412(a)(10)(C)(i). This is because parents are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Carter, 510 U.S.

3

at 15. Moreover, the Supreme Court has explained that tuition reimbursement for a parent's unilateral placement is not the normal means of obtaining a FAPE. See id. at 12 ("Congress intended that IDEA's promise of a 'free appropriate public education' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents.").

Thus, parents who challenge an IEP and seek tuition reimbursement for private school must demonstrate that (1) the proposed IEP prepared by the school district was inadequate to provide the student with a FAPE, and (2) the private educational services obtained by the parents were appropriate to the student's needs. See, e.g., M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000); Walczak, 142 F.3d at 129; see generally Burlington, 471 U.S. at 370. The party seeking relief bears the burden of satisfying both prongs of this inquiry. Schaffer v. Weast, 546 U.S. 49, 62 (2005); Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007). If the challenged IEP was adequate, "the necessary inquiry is at an end," and the court does not examine the appropriateness of the parents' private placement. M.C., 226 F.3d at 66. Where courts reach both prongs of the analysis, they often also examine whether equitable considerations support the parents' claim. See, e.g., M.C., 226 F.3d at 68-69; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 418 (S.D.N.Y. 2007); Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 417-18 (S.D.N.Y. 2005); see generally 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

A proposed IEP is considered adequate when (1) the educational agency complied with the procedural requirements of the IDEA, and (2) the IEP was "reasonably calculated" to confer "educational benefit" on the student. Rowley, 458 U.S. at 206-07. In determining the appropriateness of the parents' placement, generally "the same considerations and criteria that

apply in determining whether the School District's placement is appropriate should be considered," but there are certain requirements that do not apply (for example, a unilaterally chosen private placement need not furnish an IEP). Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006).

Federal courts normally resolve IDEA actions by examination of the administrative record via the parties' summary judgment motions. Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). In an IDEA action, however, the existence of a disputed issue of material fact will not defeat the motion. Id.; see also, e.g., J.R. v. Bd. of Educ., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Rather, federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence. 20 U.S.C. §1415(i)(2)(C). Furthermore, the United States Supreme Court and the Second Circuit "have interpreted the IDEA as strictly limiting judicial review of state administrative proceedings." D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005) (citing Rowley, 458 U.S. at 204; Walczak, 142 F.3d at 129). Thus, "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."'" Walczak, 142 F.3d at 129 (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973)); see also, e.g., Rowley, 458 U.S. at 206; Cerra, 427 F.3d at 191 ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."). Judicial deference "is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." Walczak, 142 F.3d at 129; see also, e.g., M.C., 226 F.3d at 66.

**POINT I**

**DEFENDANT OFFERED THE STUDENT A FREE APPROPRIATE PUBLIC EDUCATION FOR THE 2006-2007 SCHOOL YEAR**

Plaintiffs should not be awarded any relief related to their unilateral placement of the Student in the ELIJA School because defendant offered the Student a FAPE for the 2006-2007 school year. This determination was made by both the IHO, after hearing four days of testimony and reviewing a total of thirty-eight exhibits, and the SRO, whose twenty-one-page, single-spaced decision affirming the IHO's findings demonstrated a careful and thorough review of the administrative record. (See Compl. Exs. A, B.) This Court should uphold these decisions, because, as the record makes clear and as is discussed in detail below, the Student's IEP was both procedurally and substantively proper under the IDEA.

**A.    Defendant Complied with the Procedural Requirements Set Forth in the IDEA**

While the IDEA delineates certain procedural requirements, the Act also provides that denial of a FAPE cannot be found on procedural grounds alone unless the alleged procedural inadequacies "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Thus, procedural flaws must either "result in the loss of educational opportunity or *seriously infringe* on a parent's participation in the creation or formulation of the IEP." W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006) (emphasis added).

Here, plaintiffs allege a host of procedural violations, all of which were properly deemed insignificant by the IHO and the SRO.  Moreover, a review of the evidence demonstrates that the Student's IEP comported with the procedural provisions of the Act and applicable regulations.

### 1. The Student's IEP Met Federal and State Requirements

Under the IDEA and New York regulations, an IEP must delineate (1) the student's present levels of academic achievement and functional performance, (2) measurable annual goals for the child, (3) how the student's progress towards those goals will be measured, (4) the special education program and related services that will be provided to help the child advance towards those goals, (5) the reasons for and extent to which the student will not be educated with nondisabled peers in a regular education environment, (6) any accommodations necessary for assessments, (7) when the services and special education must begin, and (8) as the student approaches the age of sixteen, goals and services related to training, education, employment, and independent living skills. 20 U.S.C. § 1414(d)(1)(A); 8 N.Y.C.R.R. § 200.4(d)(2). In addition, New York regulations require that, for a student who takes an alternative assessment, that student's IEP include "short-term instructional objectives and/or benchmarks that are the measurable intermediate steps between the student's present level of performance and the measurable annual goal." 8 N.Y.C.R.R. § 200.4(d)(2)(iv).

The Student's IEP meets all of these requirements. The IEP that was finalized at the April 7, 2006 Committee on Special Education ("CSE")[1] meeting was developed using data and reports about the Student from a variety of sources, and was based on and reflected this information as well as the input of the CSE meeting participants, who included plaintiffs, a representative from the McCarton School, a DOE special education teacher, a social worker, a DOE school psychologist, and a parent member. (See Def.'s 56.1 Statement ¶¶ 12, 13.) The IEP indicated the Student's reading, spelling, and math levels and his levels of social/emotional performance and health and physical development. (Id. at ¶ 16; see also Pls.' Ex. C at 3-5.) It

---

[1] In New York, IEPs are developed by local Committees on Special Education. See N.Y. Educ. Law § 4402(1); Walczak, 142 F.3d at 123.

contained fourteen annual goals and approximately seventy short-term objectives, and stated how the Student's progress towards the goals would be measured and reported. (Def.'s 56.1 Statement ¶ 16; see also Pls.' Ex. C at 6-15.) It recommended placement in a twelve-month 6:1:1 (six students to one teacher and one paraprofessional) special class in a specialized school, a full-time individual crisis management paraprofessional, seven thirty-minute 1:1 (one-to-one) occupational therapy sessions per week, and seven thirty-minute 1:1 speech/language therapy sessions per week. (Def.'s 56.1 Statement ¶ 16; see also Pls.' Ex. C at 1, 16, 18.)  It stated the reason the Student was not recommended for participation in the general education environment. (Pls.' Ex. C at 16.)  It provided that the Student would participate in alternate assessments and described how the Student would be assessed. (Id. at 18.) Finally, it stated that the recommended program would be initiated on September 5, 2006. (Id. at 2.) In sum, the Student's IEP was proper under the relevant federal and state provisions, and it accurately reflected the Student's needs and goals and recommended appropriate educational services to assist the Student to advance towards those goals. See 20 U.S.C. § 1414(d)(1)(A); 8 N.Y.C.R.R. § 200.4(d)(2).

### 2. The Student's "present levels" were reviewed at the CSE meeting

Plaintiffs' contention that defendant did not review the Student's "present levels" (see Pls.' Mem. 6) is flatly contradicted by the record evidence. First, the IEP clearly indicates the Student's math, reading, and spelling levels, his social/emotional performance levels, and his health and physical development levels, and it is undisputed that plaintiffs discussed and received a copy of this IEP at that meeting. (See Def.'s 56.1 Statement ¶ 16; Pls.' Ex. C at 2-5; see also Compl. Ex. B at 5, 11.)  In addition, and as the SRO discussed in detail, various additional data about the Student's present levels of performance were before the group at the CSE meeting—including progress reports from the McCarton School, a psychological evaluation, a Functional Behavioral Assessment (FBA), tables and charts tracking the Student's

problem behaviors, and a social history. (See Def.'s 56.1 Statement ¶¶ 12, 13; Compl. Ex. B at 11.)  There is simply no basis for plaintiffs' contention that the Student's present levels were not discussed, as the SRO properly found.

### 3.  The IEP states appropriate annual goals and short-term objectives

Plaintiffs allege that the annual goals and objectives on the Student's IEP were not sufficiently specific or measurable. They also state that "not all of the Goals and Objectives were appropriate for the Student," although they fail to articulate any basis for this assertion. (Pls.' Mem. 7.)  These claims were addressed by the SRO, who found that both the annual goals and the short-term objectives on the Student's IEP were appropriate and relevant to the Student's needs. (See Compl. Ex. B at 14.)  While the SRO noted that the annual goals "were vague and not measurable," he concluded that the short-term objectives clarified the goals and provided the requisite specificity, and that accordingly, any lack of specificity "did not, in this instance, result in a loss of educational opportunity for the child nor did it deprive the child of educational benefits under the IEP." (Id.)

An examination of the IEP supports the SRO's conclusions. For example, under the annual goal, "[The Student] will demonstrate an understanding of numbers from 1-10 and their values, on a kindergarten level, in ten class sessions with at least an 80% level of accuracy," short-term objectives include: "[The Student] will manipulate objects to match his teacher's verbal request for a particular number from one to ten, in five class sessions with at least an 80% level of accuracy," and "[The Student] will match pictured numbers to the corresponding number (from 1-10), in at least 8 class sessions, with at least an 80% level of accuracy." (Pls.' Ex. C at 9.)  As one court reviewing similar goals and objectives observed, it is "difficult . . . to imagine how much more specific the District could be concerning its goals and objectives for the student's continued educational progress." W.S., 454 F. Supp. 2d at 147.  In short, the goals and

objectives as stated on the IEP were appropriate, and insofar as any lack of specificity could be found, it did not cause a deprivation of educational benefits, significantly impede plaintiffs' opportunity to participate in the decision-making process, or impede the Student's right to a FAPE. See 20 U.S.C. § 1415(f)(3)(E)(ii).

### 4. Plaintiffs had a meaningful opportunity to participate in the development of the IEP

Plaintiffs claim, in effect, that they were impermissibly excluded from the development of the Student's IEP.  Under the IDEA, parents of a disabled child shall have "an opportunity . . . to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(1). The record provides ample evidence that plaintiffs had this opportunity.

First, plaintiffs contend that they were "kept out" of the process of creating the goals and objectives in the IEP. (See Pls.' Mem. 7-8.) They first allege that the goals and objectives were not reviewed or discussed at the meeting, but both the IHO and the SRO credited testimony to the contrary. (See Compl. Ex. A at 10, Ex. B at 15.)  In addition and as noted, plaintiffs were provided a copy of the proposed IEP, which stated the goals and objectives, and there is nothing in the record suggesting that they were precluded from raising concerns or questions that they may have had about those goals and objectives. (See, e.g., Tr. 568.) Plaintiffs also question whether the proposed IEP being discussed was in draft status and claim that they were not informed that it was.[2]  This was not an argument raised before the SRO (see Verified Pet.; Petr.'s Mem. of Law; Compl. Ex. B at 15) and is thus not properly before this Court. Nonetheless, even

---

[2] School districts may bring draft IEPs to IEP meetings as long as "drafted content and the child's needs and the services to be provided to meet those needs" are fully discussed with the parents before the IEP is finalized. Cerra, 427 F.3d at 193.

a brief examination of the handwritten notes on the IEP indicates that it was a draft that was updated and finalized during the meeting (see, e.g., Pls.' Ex. C at 1-3, 18; see also, e.g., Tr. 556), and there is nothing in the record suggesting the contrary.

Second, plaintiffs contend that defendant did not consider their request for a 1:1 placement. (Pls.' Mem. 8-9.)  Plaintiffs voiced this request at the meeting (Def.'s 56.1 Statement ¶ 14), and the CSE team was familiar with plaintiffs' concerns and what the Student had been receiving at McCarton, and was also familiar with the Student's then-current needs and abilities (see, e.g., Tr. 532-34). Based on all of this information, the team recommended the 6:1:1 placement in a special class in a specialized school, plus a full-time individually assigned crisis management paraprofessional for the Student and 1:1 speech and language and occupational therapy services. (See Tr. 532-35, 537-38; Pls.' Ex. C at 16, 18; see also Def.'s 56.1 Statement ¶¶ 13, 14, 16.)  Although plaintiffs claim that they were told that a 1:1 placement could not be made or that it did not exist, the record contains evidence contradicting this claim. As the school psychologist testified, had a 1:1 staffing ratio been appropriate, the Student's case would have been referred to the Central Based Support Team ("CBST"), which finds placements for students in private schools. (See Tr. 544, 557-58, 577-78.)  See also Bettinger v. N.Y. City Bd. of Educ., 06 Civ. 6889, 2007 U.S. Dist. LEXIS 86116, at *6-8 (S.D.N.Y. Nov. 20, 2007) (discussing the process by which a student's CSE team referred that student's case to the CBST for private school placement).  While plaintiffs may disagree with the CSE team's recommendations, this fact does not lead to the conclusion that they were significantly impeded from participating in the meeting or formulating the Student's IEP, or that the IEP was predetermined. 20 U.S.C. § 1415(f)(3)(E)(ii); see W.S., 454 F. Supp. 2d at 148. The SRO's similar findings should be upheld. (See Compl. Ex. B at 16.)

11

Finally, plaintiffs contend that their rights were violated because a specific public school for the Fall was not designated at the IEP meeting. Plaintiffs misconstrue the reference to "specific class placement" in Walczak, 142 F.3d at 123, and the requirements of the IDEA and applicable regulations. Under the IDEA section delineating the information that must be included in an IEP, there is no provision requiring that a specific school be designated, and the same section also states: "Nothing in this section shall be construed to require that additional information be included in a child's IEP beyond what is explicitly required in this section." 20 U.S.C. § 1414(d)(1)(A)(ii)(I). The relevant New York regulation states simply: "The IEP shall indicate the recommended placement." 8 N.Y.C.R.R. § 200.4(d)(2)(xii). The Second Circuit has construed the term "placement" as used in the Act and regulations to refer "only to the general type of educational program in which the child is placed." Concerned Parents & Citizens v. N.Y. City Bd. of Educ., 629 F.2d 751, 753 (2d Cir. 1980); see id. at 754-56; see also Christopher P. v. Marcus, 915 F.2d 794, 796 n.1 (2d Cir. 1990). As the Student's IEP recommended a 6:1:1 program in a special class in a specialized school, a placement was identified as required. See Concerned Parents, 629 F.2d at 756.[3] Moreover, as defendant provided plaintiffs with the IEP in April 2006, and designated the specific school in the Final Notice of Recommendation that plaintiffs received prior to the beginning of the school year (see Def.'s 56.1 Statement ¶¶ 16, 25), it more than fulfilled its obligations under the IDEA and statutory regulations. See Cerra, 427 F.3d at 193-94. In short, none of these contentions amounts to a denial of a FAPE or a denial of plaintiffs' opportunity to develop the IEP. See, e.g., W.S., 454 F. Supp. 2d at 138.

---

[3] Plaintiffs also argue that defendant failed to provide written notice of their reasons for not recommending a 1:1 placement. This is another argument that plaintiffs did not raise before the SRO. (See Compl. Ex. B; Petr.'s Mem. of Law.) In any event, this argument would not support a finding of a loss of educational opportunity for the Student or a serious infringement on plaintiffs' participation in the development of the IEP. See W.S., 454 F. Supp. 2d at 138.

**5. The Student's Behavioral Intervention Plan was procedurally and substantively proper**

Plaintiffs assert that the Student's Behavioral Intervention Plan ("BIP")[4] was not reviewed at the CSE meeting or developed with input from all of the CSE team members, was vague, and lacked a corresponding Functional Behavioral Assessment ("FBA").[5] (See Pls.' Mem. 11-13.) As the SRO properly found, these assertions cannot support a finding of a procedural violation amounting to the denial of a FAPE.

First, the record indicates that the BIP was drafted during the CSE meeting and provided to the parents, who had an opportunity to respond to it. (See Tr. 565-67; see also Compl. Ex. B at 16; Pls.' Ex. C at 19.)  The record also indicates that the BIP reflects input from the various members at the meeting, as it indicates the problem behaviors identified by both plaintiffs and McCarton, in addition to strategies for reducing such behaviors. (See Pls.' Ex. C at 19; see also Pls.' Ex. S at 1; Def.'s Exs. 3, 6; Tr. 274-75, 564.)  Second, while the SRO noted that "aspects of the BIP were vague with regard to implementation" (Compl. Ex. B at 17), the SRO, relying on testimony from the school district's special education teacher and site coordinator, also determined that the evidence as a whole demonstrated that district staff would be able to appropriately interpret and implement the BIP (see id.). The SRO also noted that "at ELIJA, the child's behavior reduction plan was established on September 14, 2006, after school had started," and that "[i]t would be difficult for [the school district] to determine in April 2006 the specific

---

[4] A Behavioral Intervention Plan is "a plan that is based on the results of a functional behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior." 8 N.Y.C.R.R. § 200.1(mmm).

[5] A Functional Behavioral Assessment is "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." 8 N.Y.C.R.R. § 200.1(r).

strategies necessary to reduce or extinguish the identified behaviors prior to observing the child in his new 2006-07 program." (Id.) Finally, plaintiffs' contention that the BIP lacked a corresponding FBA or that the FBA was "stale" rings hollow. An FBA was conducted only four months prior to the CSE meeting at which the BIP was developed, and, as the SRO found, nothing in the record suggests that the Student's behaviors had changed in that interim. (See Def.'s 56.1 Statement ¶¶ 5, 11; Compl. Ex. B at 16.)  The record also makes clear that the FBA was developed based on observation and recording of the Student's behavior, interview(s) with the Student's teacher at McCarton, and the psychological evaluation, which was in turn based on prior and current assessments and data about the Student, observations of the Student, and interviews with the Student's teachers (see Def.'s 56.1 Statement ¶¶ 6, 7; see also Def.'s Ex. 6; Pls.' Ex. S), contradicting plaintiffs' claim about information that the FBA purportedly did not incorporate.[6] For all of these reasons, the SRO appropriately concluded that the BIP was proper.[7]

In sum, plaintiffs have not demonstrated that defendant did not comply with the IDEA's procedural requirements, and plaintiffs accordingly cannot prevail on this ground.

**B.    The Student's IEP Was Reasonably Calculated to Confer Educational Benefit**

A State or local educational agency has complied with the substantive provisions of the IDEA if it provides the disabled child with an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07.  More specifically, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater

---

[6] Notably, plaintiffs cite to no cases, statutes, or regulations requiring the information they claim was not incorporated in the FBA.

[7] In addition, the case plaintiffs rely on to challenge the Student's FBA is inapposite, as that case involved a school district's failure to conduct any FBA whatsoever. See A.C. v. Bd. of Educ., 06 Civ. 4238, 2007 U.S. Dist. LEXIS 31417, at *12 (S.D.N.Y. Apr. 27, 2007).

than mere 'trivial advancement.'" <u>Cerra</u>, 427 F.3d at 195 (<u>quoting</u> <u>Walczak</u>, 142 F.3d at 130). It is well-settled that the "primary responsibility" for formulating a student's educational program under the IDEA falls to "state and local educational agencies in cooperation with the parents or guardian of the child." <u>Rowley</u>, 458 U.S. at 208.  Moreover, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." <u>Cerra</u>, 427 F.3d at 195.

Plaintiffs argue that defendant did not offer the Student "substantively appropriate and sufficient educational programming, leading to a FAPE denial." (Pls.' Mem. 13.) As set forth below, their argument is unsupported by the record and cannot be sustained.

### 1. The IEP was likely to produce progress

When the IEP for the 2006-2007 school year was developed, the Student exhibited delays in various academic and adaptive skills, as well as certain maladaptive behaviors that interfered with his learning. (Def.'s 56.1 Statement ¶¶ 8, 9.)  The Student also exhibited behaviors demonstrating amenability to learning in a small-group classroom, including his ability to read and follow a daily classroom schedule, properly use and put away classroom items, and control his feelings and reactions in a variety of social situations (such as when another person breaks the rules in a game).  (<u>Id.</u> at ¶ 9; Pls.' Ex. S at 6.) Given the Student's academic and behavioral needs, the school psychologist recommended "a well structured, consistent, predictable educational environment with intensive remediation and the appropriate related services (i.e., occupational therapy and speech and language)." (Pls.' Ex. S at 7.)

The IEP developed for the Student recommended a twelve-month 6:1:1 special class in a specialized school, with a full-time individual crisis management paraprofessional, seven thirty-minute 1:1 occupational therapy sessions per week, and seven thirty-minute 1:1 speech/language therapy sessions per week. (Def.'s 56.1 Statement ¶ 16.)  In the DOE class in which the Student

would have been placed, the Student would have been with five other similarly aged autistic children, all of whom received additional special education services and whose behavioral needs and academic levels were similar to those of the Student. (Id. at ¶ 42.)  The Student would have been taught by an instructor certified in special education who has over fourteen years of experience teaching special education and at least four years of experience teaching autistic children. (Id. at ¶ 41.)[8]  The Student would have received the services of a paraprofessional assigned only to him, and this paraprofessional would have provided assistance with instruction, refocusing, and behavioral intervention. (Id. at ¶¶ 16, 46; Tr. 386, 425, 466, 491, 537-38, 563.) The Student would also have received at least one hour of one-to-one related services every day, in the form of occupational and speech/language therapy. (Def.'s 56.1 Statement ¶ 16; see also, e.g., Pls.' Ex. C at 18.)

The school in which the Student would have been placed was characterized as "highly specialized" and a "highly structured" setting. (Tr. 433.)  Expert coaches regularly visit the school and provide continuing training to teachers. (Tr. 433-34.)  Teachers maintain and review "data folios" on the students in order to monitor their individual progress and ensure that students are appropriately progressing. (Def.'s 56.1 Statement ¶ 37.)  Related service providers maintain close contact with teachers and regularly review the students' goals and progress. (Id.)

In the proposed class, the Student would have worked on academic skills such as math and reading, tailored to his academic needs and abilities. (Id. at ¶ 45.)  He would have also focused on improving skills that promote independence and self-sufficiency, such as simple meal

---

[8]  In their brief, plaintiffs inappropriately attack the special education instructor's qualifications by mischaracterizing the record and reaching conclusions unsupported by it. (See Pls.' Mem. 18-19.)  A fair reading of the record shows that the instructor was highly qualified and experienced in working with students with disabilities, including autism, and able to provide the Student with appropriate instruction and support. (See, e.g., Def.'s 56.1 Statement ¶ 41; Tr. 396-97.)

preparation, hygiene, and social skills related to daily living. (Id.)  The Student additionally would have had the opportunity to socially interact with peers and have activities in the community. (Id.)  The instructor in whose class the Student would have been placed testified that the Student's need for a "well structured, consistent, predictable educational environment with intensive remediation and the appropriate related services" was consistent with how his class is structured and what his class provides. (See, e.g., Tr. 396-97.)

Based on all of the evidence, both the IHO and the SRO concluded—after setting forth decisions that reviewed the record in detail and made frequent citation to it—that the IEP was reasonably calculated to enable the Student to receive educational benefits. (See Compl. Ex. A at 11, Ex. B at 21.)  Their thorough and well-reasoned decisions comport with the IDEA and the case law interpreting its substantive requirements, see, e.g., Rowley, 458 U.S. at 198-99, and should be given the "due weight" to which they are entitled under the IDEA. Walczak, 142 F.3d at 129 ("Deference is particularly appropriate when, as here, the state hearing officers' review has been thorough and careful."); see Cerra, 427 F.3d at 195; J.R., 345 F. Supp. 2d at 398 (giving "the requisite weight to the decisions of impartial state education officers who are far better versed in educational policy and practice than this Court" in holding that an IEP was reasonably calculated to confer educational benefit).

### 2.  The Student did not require full-time 1:1 instruction to receive a FAPE

Plaintiffs contend that a 6:1:1 placement was "wholly inappropriate" for the Student, arguing that only a full-time 1:1 placement, including home-based 1:1 instruction, would have been proper. (Pls.' Mem. 14-15.)  As discussed, both the IHO and the SRO considered this argument and reviewed the relevant evidence, and both determined that the Student would have received the requisite educational benefits through the 6:1:1 placement and related services offered by defendant. Plaintiffs thus ask this Court to engage in exactly the type of substitution

of judgment that is barred by <u>Rowley</u> and its progeny. <u>See, e.g.</u>, <u>Cerra</u>, 427 F.3d at 195 ("In violation of <u>Rowley</u>, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of the state administrative officers who had heard the same evidence.") (citation omitted); <u>W.S.</u>, 454 F. Supp. 2d at 145 ("The problem with plaintiffs' argument is that this sort of weighing of conflicting evidence is exactly the sort of area in which I am required to defer to the SRO—the education professional—rather than pretend to transform myself into some sort of educational specialist."). In any event, there is ample evidence supporting the IHO's and SRO's conclusions that the offered placement would have provided the Student with the support and services he needed.

The record demonstrates that the Student would have received an appropriate amount of 1:1 support and instruction throughout the day in the proposed class. As previously discussed, he would have been assigned a full-time individual paraprofessional to assist with focusing, behavior, and instruction through the entire school day.[9] He would have received 1:1 occupational therapy and speech/language therapy every day. He also would have received some 1:1 instruction from the special education teacher every day. (Tr. 395, 480.) In addition, the proposed placement included a classroom paraprofessional to assist students (Def.'s 56.1 Statement ¶ 46), and the special education teacher discussed ways in which he and the paraprofessional worked with those students in the class who required a higher amount of assistance (<u>see, e.g.</u>, Tr. 481). Finally, the SRO, conducting an independent review of the record, concluded that "it does not contain evaluative data to support [plaintiffs'] contention that the

---

[9] Although plaintiff M.D. testified that she understood this paraprofessional's role to be only to ensure that the Student did not "escape" from the school (<u>see</u> Pls.' Mem. 15), the weight of the evidence indicated that the paraprofessional's role was far more supportive and involved, as the SRO discussed and concluded (<u>see</u> Pls.' Ex. B at 18).

child requires home-based 1:1 instruction in order to receive a FAPE." (Pls.' Compl. Ex. B at 20.)[10]

Plaintiffs also argue that the students in the proposed class did not "present[] with similar educational needs" to those of their child. (Pls.' Mem. 18.)  This argument is dubious at best. The relevant New York regulation requires that disabled students be grouped by similarity of academic levels, social and physical development, and management needs. See 8 N.Y.C.R.R. § 200.6(a)(3).  As noted, the five students in the proposed class were autistic and similar in age to the Student. (Def.'s 56.1 Statement ¶ 42.) They received similar related services as those recommended for the Student and performed at academic levels that were comparable to the Student's. (Id.) Some of the students exhibited behaviors similar to those of the Student, and one also was assigned a full-time paraprofessional. (Id. at ¶¶ 42, 46; see also Tr. 482-83, 490-91; Pls.' Ex. S at 1.) The record thus indicates, as the SRO concluded (see Compl. Ex. B at 20), that the Student would have been appropriately grouped in the proposed class.

While plaintiffs plainly desire full-time 1:1 instruction for the Student, the record makes clear that this is not required in order for him to receive a FAPE. See, e.g., Walczak, 142 F.3d at 129 ("What the statute guarantees is an 'appropriate' education, 'not one that provides everything that might be thought desirable by loving parents.'"); J.R., 345 F. Supp. 2d at 399 ("[N]either our sympathy, nor more importantly the IDEA, entitles S.R. to the 'best education that money can buy' at the expenditure of the District's finite financial resources."). In short, and as the IHO and SRO found, plaintiffs have not demonstrated that either a full-time 1:1 placement was required or that the student could not make progress in the 6:1:1 placement with related services recommended by defendant. Accordingly, they have not shown that the Student

_____

[10] Indeed, the ELIJA School does not provide home-based services or instruction. (See Tr. 191, 253-54.)

was denied a FAPE and are therefore not entitled to reimbursement of tuition or transportation costs. 20 U.S.C. § 1412(a)(10)(C)(i); see, e.g., Cerra, 427 F.3d at 195.

### 3. Defendant offered plaintiffs appropriate parent counseling and training

Plaintiffs claim that defendant failed to offer parent counseling and training (see Pls.' Mem. 13-14), which is defined in the state regulations as "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program," 8 N.Y.C.R.R. § 200.1(kk); see also id. at § 200.13(d).   As the SRO found, the record makes clear that appropriate parent counseling and training was available to plaintiffs through the school proposed by defendant, even if it was not referred to on the IEP. (See Compl. Ex. B at 13.)  The record contains undisputed testimony that the school makes a parent coordinator available to parents to assist with specific concerns, offers parent training through community-based and DOE-led workshops, and holds regular parent meetings. (Def.'s 56.1 Statement ¶ 39.) The special education teacher in the Student's proposed class also stated that he provides tools and materials to parents for use at home with their children, is available to assist parents when their children display problem behaviors at home, and communicates with his students' parents at least one to three times per week in addition to communicating with them during IEP conferences, parent-teacher conferences, and conferences regarding student report cards. (Id. at ¶ 47.)  The lack of a provision on the IEP for parent counseling and training did not deprive the Student of a FAPE, as the SRO properly concluded. (Compl. Ex. B at 13.)[11]

---

[11] It is worth noting that plaintiffs' witness Ray Cepeda, educational director of the ELIJA School, testified that parent training "is not required for the Student to thrive in his educational environment" and that parent training was not offered at ELIJA during the 2006-2007 school year. (Tr. 31, 192.)

Based on the foregoing, it is clear that the IEP prepared for the Student was adequate and offered the Student a FAPE for the 2006-2007 school year. Accordingly, defendant is entitled to judgment as a matter of law and its cross-motion should be granted.[12]

## POINT II

### PLAINTIFFS' UNILATERAL PRIVATE PLACEMENT WAS INAPPROPRIATE FOR THE STUDENT

Because the IEP was adequate and defendant offered the Student a FAPE for the 2006-2007 school year, defendant "has satisfied its obligations under the IDEA and the necessary inquiry is at an end." M.C., 226 F.3d at 66.  Nonetheless, even assuming *arguendo* that the IEP was not adequate to afford the Student with an appropriate education, reimbursement for tuition and transportation costs is still not warranted because plaintiffs cannot demonstrate that their unilateral placement is appropriate to the Student's needs. See, e.g., Walczak, 142 F.3d at 129.

**A.    The ELIJA School Is Not the Least Restrictive Environment for the Student**

As previously stated, in determining the appropriateness of plaintiffs' unilateral placement, most of "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered." Frank G., 459 F.3d at 364. While the "test for the parents' private placement is that it is appropriate, and not that it is perfect," M.S. v. Yonkers Bd. of Educ., 231 F. 3d 96, 105 (2d Cir. 2000) (citation omitted), the IDEA's preference for educating disabled students in the least restrictive environment to the

---

[12] Plaintiffs also disparage both the school psychologist and the SRO as they argue against the adequacy of the IEP. (See Pls.' Mem. 20 nn.19, 20.)  As is clear from the record, the school psychologist is highly experienced and qualified (see Def.'s 56.1 Statement ¶ 10), and there is ample evidence supporting the SRO's careful, well-reasoned decision. Plaintiffs' rather unseemly attempt to cast doubt on these individuals does not change the proper conclusion, based on the record and also reached by both the SRO and the IHO, that defendant offered the Student a FAPE for the 2006-2007 school year.

maximum extent appropriate "remains a consideration that bears upon a parent's choice of an alternative placement," id; see generally 20 U.S.C. § 1412(a)(5)(A). In addition, the preference for educating disabled students in the "least restrictive environment" applies even when education with nondisabled peers is not possible; as the Second Circuit has noted, many factors are relevant in determining restrictiveness, and efforts should be made to place all disabled students in the least restrictive placement appropriate for meeting their needs. See Walczak, 142 F.3d at 132.

In New York, educating students in the "least restrictive environment" requires that "placement of students with disabilities in special classes, separate schools or other removal from the regular educational environment occurs only when the nature or severity of the disability is such that even with the use of supplementary aids and services, education cannot be satisfactorily achieved." 8 N.Y.C.R.R. § 200.1(cc). The regulation further provides that:

> The placement of an individual student with a disability in the least restrictive environment shall:
> (1) provide the special education needed by the student;
> (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and
> (3) be as close as possible to the student's home.

Id.

It is undisputed that in plaintiffs' unilaterally chosen private placement, the ELIJA School, the Student has no exposure to nondisabled peers or the community. During the 2006-2007 school year, the school had a total of five students, all of whom were autistic. (Def.'s 56.1 Statement ¶ 18.) All students receive full-time 1:1 instruction. (Id.) Students do not leave the school for supervised activities in the community. (Tr. 206.) The Student does not even have the opportunity to interact with the other students in his school; as ELIJA's educational director testified, "As far as contact with other children goes, there are some very specific prerequisite

skills that [the Student] would, that he really should master prior to having meaningful interaction with other kids." (Tr. 169-70.) In addition, the school is forty-five minutes from the Student's home by car. (Def.'s 56.1 Statement ¶ 18.)

Given this evidence, particularly in combination with evidence indicating that the Student is a social child (Tr. 37, 119) and enjoys interacting with other children (Def.'s Ex. 19 at 7; see also Tr. 276), plaintiffs' unilaterally chosen placement does not allow the Student to be educated in the least restrictive environment. Given the IDEA's "strong preference" for educating students as much as possible in such an environment, plaintiffs' placement is inappropriate under the IDEA. Gagliardo, 489 F.3d at 108; see Walczak, 142 F.3d at 132; Pinn v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (denying plaintiffs' request for tuition reimbursement because, among other things, the unilaterally chosen placement was not the least restrictive placement for the student).

**B.    The ELIJA School Cannot Provide Required Occupational Therapy Services**

It is undisputed that the Student received occupational therapy at the McCarton School prior to the 2006-2007 school year (see Def.'s 56.1 Statement ¶ 4), and that occupational therapy was recommended for the 2006-2007 school year (see, e.g., Tr. 185, Pls.' Ex. C at 18). The record also contains testimony that a program without occupational therapy would be "inappropriate" for the Student. (Tr. 536-37.)  The Student did not receive occupational therapy during the 2006-2007 school year, however, because the ELIJA School does not offer it (Tr. 183, 366). Moreover, despite testimony suggesting that the types of "problematic behavior" that the Student addressed at McCarton through occupational therapy were also being addressed at ELIJA, the Student's progress report from ELIJA offers no evidence of such. (See Pls.' Ex. D.) Because the ELIJA School does not provide the Student with all of the services he needs, it is not an appropriate placement under the IDEA. See, e.g., Gagliardo, 489 F.3d at 114-15.

23

In sum, because plaintiffs cannot show that their unilaterally chosen placement was appropriate for the Student, their claim for reimbursement for the costs incurred at the ELIJA School must be denied. See, e.g., M.S., 231 F. 3d at 105.

## POINT III

### THE EQUITIES FAVOR DEFENDANT

While the Court need not consider the equities in this case because plaintiffs cannot show that defendant failed to offer the Student a FAPE, or that their unilateral placement was appropriate, a consideration of the equitable factors also requires a finding in favor of defendant.

Under the IDEA, a request for tuition reimbursement for a unilaterally chosen private school may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III). In addition, courts have recognized that when parents fail to cooperate with school officials in working together to find an appropriate placement for a child, tuition reimbursement is inappropriate. See, e.g., Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989) (recognizing the "danger" that plaintiffs "might have sought to exploit the [Act] by selecting Eagle Hill without first fulfilling their obligation to work together with school officials to find a placement that was 'appropriate' within the meaning of the [Act]"); Carmel, 373 F. Supp. 2d at 417-18 (denying plaintiffs tuition reimbursement based on their failure to cooperate with the school district in devising an appropriate public school placement). Here, the evidence plainly indicates that plaintiffs never intended to consider the public school placement offered by defendant, and intended instead only to unilaterally place the Student in the private school of their choosing and retroactively seek tuition reimbursement. This action is not what the IDEA contemplates, and should preclude any grant of relief. See, e.g., Antkowiak v. Ambach, 838 F.2d 635, 642 (2d Cir. 1988).

24

Plaintiffs received the IEP recommending a 6:1:1 placement for the Student at the CSE meeting held on April 7, 2006. (Def.'s 56.1 Statement ¶ 16.)  Two days later, they completed and submitted an application for the Student's admission to the ELIJA School for the 2006-2007 school year. (Id. at ¶ 17.)  Approximately a week later, on April 17, 2006, plaintiff M.D. informed defendant that plaintiffs disagreed with the 6:1:1 recommendation "and plan to place [the Student] in [] The Elija School . . . and will seek to hold The New York City Department of Education responsible for reimbursement of tuition." (Id. at ¶ 21.)  As plaintiff M.D. testified, she never intended to look at any program that was not solely 1:1 instruction, or that was not based primarily in "Applied Behavior Analysis" ("ABA"), a particular method of educating autistic children. (Id. at ¶¶ 18-20.)  It is undisputed that the ELIJA School provides full-time 1:1, ABA-based instruction. (Id. at ¶ 18.)

By June 2, 2006, plaintiffs had paid in full the $90,000 tuition for the 2006-2007 school year at ELIJA. (Id. at ¶ 22.)  They had not yet received the CSE's Final Notice of Recommendation for the Student, which would indicate the specific school the CSE recommended for the Student for September 2006, based on his IEP.  (Id. at ¶ 25.)  As of June 2, 2006, 50% of the tuition was non-refundable if the Student was withdrawn from the ELIJA School for any reason, which plaintiffs knew. (Id. at ¶ 22; Tr. 256.)[13]

Plaintiffs contend that defendant "effectively made it impossible" for plaintiffs to accept the CSE's recommended placement, "leaving them without a spot for [the Student] come September 2006." (Pls.' Mem. 27.)  This contention is unsupported by the record. It is

---

[13] Although the record suggests that plaintiffs *may* have been able to seek a partial refund of the tuition from the ELIJA School, it is undisputed that they entered a contract under which a significant portion of the tuition was not refundable, and under which an increasingly smaller percentage of the tuition was refundable as the school year approached. (See Def.'s Ex. 17 at 2; Tr. 256.)

undisputed that plaintiffs received a Final Notice of Recommendation, which identified a specific school for the Student, around August 10, 2006, approximately one month prior to the beginning of the school year. (Def.'s 56.1 Statement ¶¶ 25, 27.) Moreover, while plaintiffs suggest that defendant somehow delayed in identifying a placement, it is undisputed that a program recommendation had been made in April 2006 (through the IEP of which parents had a copy), and a specific school had been identified by August 2006, if not earlier. (Id. at ¶¶ 16, 25, 27.)  As school districts "must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy [of the IEP]," there was nothing improper about the timing of the program recommendation or school designation. Cerra, 427 F.3d at 193-94.  Moreover, while plaintiffs may have been unsuccessful in the one attempt they made to visit the designated public school prior to the school year (see Tr. 295-96), this does not mean that they had no alternative but to unilaterally enroll the Student in ELIJA.

In addition, although plaintiffs explain that parents investigating private school options often do so months in advance of the school year, and argue that "[t]here is nothing wrong with parents exploring alternative options" (Pls.' Mem. 28), it is undisputed that plaintiffs looked at and applied *only* to the ELIJA School (see Tr. 310).  Furthermore, plaintiffs were clearly very committed to and enthusiastic about the ELIJA School: the record indicates that they, as well as other individuals, made substantial contributions to the school on behalf of the Student prior to the 2006-2007 school year (Def.'s 56.1 Statement ¶ 23), and that plaintiffs knew as early as July 2006 that Ray Cepeda, who had worked individually with the Student while he was at the McCarton School and who plaintiff M.D. described as "the one person we have been looking for," would be moving from McCarton to the ELIJA School (id. at ¶ 24). Most significantly,

plaintiffs unequivocally told defendant as early as April 2006 that they intended to enroll the Student at the ELIJA School and seek tuition reimbursement. (Def.'s Ex. 14.)

In sum, the evidence as a whole plainly shows that plaintiffs desired exclusively for the Student to attend the ELIJA School—and for defendant to reimburse them for it—and never intended to consider any public school placement offered by defendant. Indeed, plaintiffs informed defendant of this exact intention. This alone should preclude an award of any relief. See, e.g., Tucker, 873 F.2d at 567.

## CONCLUSION

Based on the foregoing, defendant New York City Department of Education respectfully requests that plaintiffs' motion for "modified *de novo* review" be denied and that the Complaint be dismissed in its entirety, that defendant's cross-motion for summary judgment be granted, and that the Court grant defendant such other and further relief as the Court deems just and proper.

Dated:       January 22, 2008
             New York, New York

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the City of New York
                              Attorney for Defendants
                              100 Church Street, Room 2-301
                              New York, N.Y. 10007
                              (212) 788-0908
                              Fax: (212) 788-0940
                              tgantz@law.nyc.gov

                              By:_____s/_____
                                 Toni Gantz (TG1198)
                                 Assistant Corporation Counsel

27