UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

M.D. and T.D., on behalf of C.D.,

                              Plaintiffs,

             -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, Region 9 (District 2),

                              Defendant.

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

07 Civ. 7967 (RMB)

------------------------------------------------------------ x

       Pursuant to Rule 56.1 of the Local Rules of this Court, and in support of its cross-motion for summary judgment, defendant New York City Department of Education ("DOE") submits that the following facts are undisputed:

       1.      Plaintiffs M.D. and T.D. are the parents of C.D. ("the Student"). <u>See, e.g.</u>, Def.'s Ex. 1; Pls.' Ex. C at 1.[1]

       2.      Plaintiffs presently appeal from the decision of the State Review Officer of the New York State Education Department dated June 14, 2007, affirming the impartial hearing officer's finding that the DOE offered the Student a free appropriate public education ("FAPE") as set forth in the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(9), for the 2006-2007 school year and denying plaintiffs' request for reimbursement for tuition and transportation-related costs stemming from their unilateral placement of the Student at the ELIJA School for the 2006-2007 school year. <u>See</u> Compl. Exs. A, B.

       3.      The Student was born on November 10, 1998. In September 2006, he was seven

---

[1] Unless otherwise indicated, citations to "Def.'s" and "Pls.'" exhibits refer to the exhibits submitted by the parties in the state administrative proceedings and made part of the hearing record provided to this Court on December 6, 2007.

years and ten months old. He is classified as having autism. See, e.g., Pls.' Ex. C at 1.

4.      Prior to the 2006-2007 school year, the Student attended the McCarton School ("McCarton"), a private school selected by his parents, where he received 1:1 (one student to one teacher) instruction. See, e.g., Tr. of Impartial Hrg. before Veronica C. Odom in Case No. 106508 at 273 [hereinafter "Tr."]; Pls.' Ex. B at 3. The Student began attending the McCarton School in March 2003. See Def.'s Ex. 19 at 4.

5.      On December 6, 2005, the DOE's school psychologist, Dr. Dewey Aleem, conducted a functional behavioral assessment ("FBA") and psychological evaluation of the Student at McCarton. See Def.'s Ex. 6; Pls.' Ex. S.

6.      In conducting the FBA, Dr. Aleem used personal observation and recording of the Student's behavior, teacher interview(s), the psychological evaluation, and the Student's Committee on Special Education ("CSE") file, which included school reports and prior assessments of the Student. See Def.'s Ex. 6.

7.      In conducting the psychological evaluation, Dr. Aleem reviewed the CSE file; reviewed previous assessments and other data; observed the Student (including in the classroom); conducted clinical interviews with the Student's teachers; and conducted several assessments, including the "Wechsler Intelligence Scale for Children-IV," the "Draw-a-Person Intellectual Ability for Children, Adolescent, and Adults," the "Wechsler Individual Achievement Test II," and the "Adaptive Behavior Assessment System-II Teacher Form, Ages 5-21," some of which had to be modified or replaced with informal assessment when the Student experienced difficulty. Pls.' Ex. S at 2; see also Tr. 526-28. Dr. Aleem also noted that the Student had shown "striking improvement" in his test behavior compared with his behavior during a prior assessment conducted in December 2002. Pls.' Ex. S at 3; see id. at 1, 7.

8.      The psychological evaluation report and FBA completed by Dr. Aleem identified three main behaviors exhibited by the Student that interfered with his learning: self-injurious behavior (e.g., head-banging and throwing himself on the floor), vocal protest (i.e., high-pitched screaming), and biting objects. See Def.'s Ex. 6; Pls.' Ex. S at 1.  The Student did not exhibit these behaviors in a ninety-minute period during which Dr. Aleem observed him. See Def.'s Ex. 6 at 2-3.

9.      In the psychological evaluation report, Dr. Aleem described the Student's delays in language skills, abstract verbal reasoning, phonemic categorization and phonological awareness, and adaptive skills, as well as the Student's potential for "inappropriate expression of his frustration/anxiety and negative feelings, and the tendency to avoid social interactions." Pls.' Ex. S at 7; see id. at 2-6.  Notwithstanding these findings, Dr. Aleem also noted that the Student was able to read and follow a daily classroom schedule, properly use and put away class supplies and other items, and control his feelings and reactions in a variety of common, potentially frustrating classroom situations.  Id. at 6.  Dr. Aleem concluded that the Student "would benefit from a well structured, consistent, predictable educational environment with intensive remediation and the appropriate related services (i.e., occupational therapy and speech and language)." Id. at 7.

10.     As of January 2007 (when the impartial hearing presently at issue was conducted), Dr. Aleem had been employed for approximately twenty-three years as a school psychologist for the DOE. Tr. 525. He had been conducting CSE reviews for approximately eight years. Id.  He is certified by the State of New York and the State of New Jersey as a school psychologist and has a national certification in school psychology. Id. at 524. He is also licensed by the DOE as a school psychologist. Id. He has both undergraduate and graduate degrees in

psychology, including a Master's degree in school psychology. Id. His training in working specifically with autistic students includes undergraduate and graduate work and ongoing and recent participation in workshops and seminars. Id. at 525-26. In addition, he has counseled autistic children and has trained and provided support to their parents and teachers, for example, by designing behavior modification plans or providing social skills training. Id. at 526.

11. On April 7, 2006, a CSE meeting was held for the Student's annual review and to develop an Individualized Education Program ("IEP"). See, e.g., Pls.' Ex. C; Tr. 528.

12. The CSE meeting was attended by plaintiffs, a social worker, a DOE special education teacher, a parent member, an assistant director from McCarton, and Dr. Aleem (attending as both a school psychologist and district representative). See Pls.' Ex. C at 2; Tr. 529-30.

13. The data about the Student that was reviewed and discussed at the CSE meeting and that informed his IEP included the psychological evaluation, the FBA, a social history, a Behavior Reduction Plan from McCarton, a speech and language progress report from McCarton, an occupational therapy progress report from McCarton, an updated classroom observation of the Student, and tables and charts tracking the Student's problem behaviors. See Def.'s Exs. 1, 3-6, 8-10; Tr. 526-31, 538-39.

14. At the CSE meeting, plaintiffs requested that the Student remain in a 1:1 instructional setting. See Tr. 280. Based on the Student's then-current academic levels and behavioral needs, the CSE team recommended a less restrictive staffing ratio. See Tr. 538, 544-45, 582.

15. Had a more restrictive staffing ratio been appropriate, the Student's case would have been referred to the Central Based Support Team, which finds placements for students in State-approved private schools. See Tr. 544, 557-58, 577-78.

16.     The IEP that was finalized at the April 7, 2006 CSE meeting indicated the Student's reading, spelling, and math levels; indicated his social/emotional performance and health and physical development; contained fourteen annual goals and approximately seventy short-term objectives; included a behavioral intervention plan ("BIP"); and recommended placement in a twelve-month 6:1:1 (six students to one teacher and one paraprofessional) special class in a specialized school, a full-time individual crisis management paraprofessional (assigned only to the Student), seven thirty-minute 1:1 occupational therapy sessions per week, and seven thirty-minute 1:1 speech/language therapy sessions per week. See Pls.' Ex. C.  Plaintiffs received a copy of this IEP during the meeting. Tr. 541; see Pls.' Ex. C at 2.

17.     On or around April 9, 2006, two days after the CSE meeting, plaintiffs completed and submitted an application for the Student's admission to the ELIJA School for the 2006-2007 school year. See Def.'s Ex. 19.

18.     The ELIJA School is a private school for children diagnosed with autistic spectrum disorders. Pls.' Ex. P at 1. It is located in Bethpage, New York, a forty-five minute drive from the Student's home. Pls.' Ex. D at 1; Tr. 211, 367. Its first year of operation was the 2006-2007 school year. See Def.'s Ex. 17; Tr. 31. The school provides full-time 1:1 instruction and had five students, who were between the ages of seven and ten, and seven teachers during the 2006-2007 school year. See Pls.' Ex. P at 1; Tr. 57, 250. It is based on and uses Applied Behavior Analysis ("ABA"), a method of educating children with autism. See Pls.' Ex. P at 8-9.

19.     Plaintiff M.D. believes that ABA is the only appropriate methodology for working with the Student and would not have accepted any program that was not ABA-based. Tr. 365.

20.     Plaintiff M.D. would not have considered any program for the Student that did not have a one-to-one staffing ratio. See Tr. 370.

21.     By letter dated April 17, 2006, plaintiff M.D. informed the DOE that plaintiffs disagreed with the 6:1:1 recommendation "and plan to place [the Student] in [] The Elija School . . . and will seek to hold The New York City Department of Education responsible for reimbursement of tuition." Def.'s Ex. 14.

22.     On June 2, 2006, plaintiffs paid the ELIJA School the full $90,000 tuition for the 2006-2007 school year. See Def.'s Ex. 18; Tr. 255-56.  As of that date, 50% of the tuition was non-refundable if the Student was withdrawn from the ELIJA School for any reason. If a student was withdrawn from the school on or after August 1, 2006, 100% of the tuition was non-refundable. See Def.'s Ex. 17 at 2; Tr. 256.

23.     Plaintiffs are listed as "Gold Door" sponsors of the ELIJA School based on their $10,000 contribution to the school, which they made in addition to their tuition payment. See Def.'s Ex. 16 at 2; Tr. 257, 312.  Other individuals also made donations to the ELIJA School on behalf of the Student. See Def.'s Ex. 16 at 4; Tr. 259-60.

24.     Ray Cepeda is the educational director of the ELIJA School. Tr. 31. Mr. Cepeda was formerly employed at McCarton, and worked privately with the Student outside of school during the 2005-2006 school year. See Tr. 33, 284, 364.  Plaintiff M.D. described Mr. Cepeda as "the one person we have been looking for" and "very, very capable and very able to work with [the Student]." Tr. 364.  Plaintiffs learned that Mr. Cepeda would be moving from the McCarton School to the ELIJA School in July 2006. Tr. 359-60.

25.     By letter dated July 19, 2006, the DOE informed plaintiffs of its Final Notice of Recommendation, which finalized the 6:1:1 placement and related services recommendation in the IEP and identified Public School 75Q at Public School 239 as the specific school recommended for the Student. See Pls.' Ex. J at 1.

26. By letter dated July 25, 2006, plaintiffs informed the DOE that it had not received the final recommendation. Plaintiffs also stated that they "remain willing to look at any placements recommended by the Department of Education. However, if no appropriate placement is offered we will be providing [the Student] with an appropriate educational program and looking to the Department of Education for reimbursement." Pls.' Ex. I.

27. Although it is general practice for the DOE to mail Final Notices of Recommendation on the date that they are generated, plaintiffs did not receive the notice until sometime after August 10, 2006. See Tr. 294-95, 547.

28. Plaintiff M.D. attempted to visit the public school placement offered by the DOE prior to the start of the 2006-2007 school year but was unable to do so. Tr. 295-96.

29. The Student began attending the ELIJA School in September 2006. See, e.g., Pls.' Ex. H. He was in a class with two other students, also classified as autistic. See Pls.' Ex. K.

30. Occupational therapy is not offered at the ELIJA School. Tr. 183. The school also does not provide parent training or home-based therapy or services. Tr. 191-92, 254.

31. Through their attorney, plaintiffs requested an impartial hearing by letter dated September 8, 2006, contending that the DOE failed to offer the Student a FAPE for the 2006-2007 school year and seeking tuition reimbursement and other relief. See Pls.' Ex. A at 1.

32. An impartial hearing was held before Impartial Hearing Officer Veronica C. Odom (the "IHO"). It consisted of four days of testimony, beginning on December 15, 2006 and concluding on January 31, 2007. Pls.' Compl. Ex. A; see also Tr.

33. At the impartial hearing, plaintiffs presented four witnesses and submitted nineteen exhibits. The DOE presented three witnesses and submitted nineteen exhibits. See Tr. 2-5, 376.

34. Among the DOE's witnesses at the hearing was Rochelle Kossover, the site coordinator of Public School 75Q at Public School 239. Tr. 411-12. Ms. Kossover has a Master's degree in special education, with a specialty in learning disabilities. Tr. 412. She is State-certified in special education and as of January 2007, had had twenty-two years of experience in the DOE, four of which had been in District 75. Tr. 414.

35. District 75 provides a highly specialized school environment for severely disabled students, including autistic students. Tr. 415-16. Public School 75Q at Public School 239 is part of District 75, and housed in Public School 239, a general education community school building. Id. The District 75 classes are operated in a self-contained wing of the second floor of the building. Id.

36. The District 75 program at Public School 239 has been open for four years. The program has five classes, three of which are for students with autism. Tr. 416. Students are grouped by age and by functional level. Tr. 422.

37. The teachers in the District 75 program maintain and review "data folios" on the students in order to monitor their individual progress and ensure that students are appropriately progressing. (Tr. 421, 448.) Related service providers working with the students maintain close contact with the District 75 teachers and regularly review the students' goals and progress. (Tr. 391, 419, 448.)

38. The District 75 program contains a gym, a speech and language room, a room for occupational therapy and physical therapy, and an "activities of daily living" classroom. The program also has its own nurse. Tr. 416.

39. The District 75 program offers parent training through community-based and DOE-led workshops, holds parent meetings, makes a parent coordinator available to parents, and

8

notifies parents of resources such as after-school activities and summer camps. The parent coordinator is available to assist parents with their specific concerns. Tr. 422-23, 452-53.

40.     John Gutman, the special education teacher in whose class the Student would have been placed at Public School 75Q at Public School 239, also testified. See, e.g., Pls.' Compl. Ex. A at 2; Tr. 435.

41.     Mr. Gutman has an undergraduate degree in elementary education, a Master's degree in special education, and is certified by both New York State and New York City in special education. Tr. 380. As of January 2007, he had been working in special education for the DOE for fourteen years, the last four of which had involved working with autistic children. Tr. 385. His experience includes implementing IEPs, conducting FBAs, and developing BIPs. Tr. 489-90.

42.     Mr. Gutman's 2006-2007 class consisted of five students, ages eight to eleven, all of whom were classified as autistic. Tr. 380-81. The Student's math, reading, and writing levels were pre-K to kindergarten; the levels of the other students in Mr. Gutman's class in the same subjects were pre-K to emerging first grade. Tr. 381, 396. The students in Mr. Gutman's class also all received related services, such as speech/language therapy, occupational therapy, and physical therapy. See Tr. 390-92.

43.     Mr. Gutman uses both ABA and TEACCH[2] methodologies in the class. Tr. 393-94. If a student in his class has already been working within the ABA framework prior to entering his class, Mr. Gutman continues to use ABA with the student. Tr. 394.

44.     Mr. Gutman testified that all of the students in his class receive one-to-one instruction for at least part of the day, and that the instruction in his classroom is individualized.

9

Tr. 387, 395, 480.

45.    In Mr. Gutman's class, the Student would have worked on math, reading, and writing skills based on his academic needs and abilities, as well as "daily living" activities such as simple meal preparation, hygiene, and social skills and manners. (See, e.g., Tr. 386-88, 402-07, 417-18.)  The Student additionally would have had opportunities to interact with his classmates and have activities in the community. (Tr. 407-08.)

46.    In addition to Mr. Gutman, two paraprofessionals were in the classroom proposed for the Student, one of whom was assigned to a particular student. Tr. 381, 476. The types of activities the classroom paraprofessional assisted students with included the use of manipulatives during lessons, focusing, and hand-over-hand writing. See Tr. 491-92. The paraprofessional assigned to the particular student assisted that student with various activities, including focusing, writing, hand-over-hand coloring, and exercising his motor skills. Tr. 491.

47.    Mr. Gutman communicates with his students' parents at least one to three times per week in addition to communicating with them during IEP conferences, parent-teacher conferences, and conferences regarding student report cards. Tr. 389. He provides tools and materials to parents for use at home with their children, and is available to assist parents when their children display problem behaviors at home. Tr. 390.

48.    The IHO issued her Findings of Fact and Decision on February 28, 2007. Compl. Ex. A.

49.    In her Findings of Fact and Decision, the IHO credited Dr. Aleem's testimony that plaintiffs were given an opportunity to be full participants in the development of the Student's IEP. Compl. Ex. A at 10.

---

[2] TEACCH stands for "Treatment and Education of Autistic and related Communication-

50.     The IHO also found that the IEP as written was likely to provide the Student with educational benefits.  Compl. Ex. A at 11.

51.     Based on these and other findings, the IHO found that the DOE had offered the Student a FAPE and that the IEP formulated for the Student was procedurally proper.  Compl. Ex. A at 9-11.  Accordingly, the IHO denied plaintiffs' request for reimbursement for tuition and transportation costs related to their unilateral enrollment of the Student at the ELIJA School. Id. at 2, 11.

52.     Plaintiffs appealed the IHO decision to the State Review Officer ("SRO") by due process demand dated September 8, 2006.  Pls.' Ex. A.  The DOE submitted a verified answer and memorandum of law in response on May 15, 2007.  See Letter from Daniel J. Schneider, Esq. to Cynthia DiVirgilio (May 15, 2007).

53.     The SRO issued a twenty-one-page, single-spaced decision on June 14, 2007. Compl. Ex. B.

54.     The SRO concurred with the IHO's finding that the DOE offered the Student an appropriate program for the 2006-2007 school year and that the IEP was "reasonably calculated to enable the child to receive educational benefit."  Compl. Ex. B at 21.

55.     The SRO also found that the procedural errors asserted by plaintiffs "were either not supported by the record, or did not rise to the level of a denial of a FAPE." Compl. Ex. B at 20.

56.     Accordingly, the SRO found that the DOE had offered the Student a FAPE for the 2006-2007 school year, and denied plaintiffs' request for reimbursement for tuition and transportation expenses. Compl. Ex. B at 1, 21.

---

handicapped CHildren" and is a method used in the education of autistic children.

57.     The SRO sustained one aspect of plaintiffs' appeal, namely, that pursuant to the parties' agreement, the DOE was to reimburse plaintiffs the cost of twelve hours per week of home-based services for the Student during the pendency of the proceedings, upon plaintiffs' submission of proof of payment for such expenses. Compl. Ex. B at 21; see also id. at 10; Tr. 6-10.

58.     Plaintiffs appealed the SRO's decision (except as to the pendency determination) to this Court by complaint dated September 11, 2007.

Dated:     January 22, 2008
           New York, New York

                                        MICHAEL A. CARDOZO
                                        Corporation Counsel of the City of New York
                                        Attorney for Defendants
                                        100 Church Street, Room 2-301
                                        New York, N.Y. 10007
                                        (212) 788-0908
                                        Fax: (212) 788-0940
                                        tgantz@law.nyc.gov

                                        By:_____s/_____
                                            Toni Gantz (TG1198)
                                            Assistant Corporation Counsel